Nicholas J. Henderson, OSB No. 074027
nhenderson@portlaw.com
Motschenbacher & Blattner, LLP
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: (503) 417-0500
Facsimile: (503) 417-0501

Proposed Attorneys for Debtor
Earth Class Mail Corporation

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>Earth Class Mail Corporation,<br><br>        Debtor. | Case No.<br><br>DECLARATION OF STACEY LEE IN SUPPORT OF DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS |

I, Stacey Lee, declare as follows:

1. I am the secretary and chief financial officer of Earth Class Mail Corporation ("ECM"), which commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on February 27, 2015 (the "Petition Date").

2. In my capacity as secretary and chief financial officer, I am familiar with ECM's operations, businesses, and financial affairs. Except as otherwise indicated, all facts set forth in this declaration are based on my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, or my opinion based on experience, knowledge, and information concerning ECM's operations. If called upon to testify, I would testify competently to the facts set forth herein. Financial information contained herein is unaudited.

PAGE 1- DECLARATION OF STACEY LEE

3. ECM is a corporation organized under the laws of the State of Oregon. ECM was formed in October 2004 under the name Remote Control Mail Corporation. The corporation changed its name to Document Command, Inc. in July of 2005, and finally to Earth Class Mail Corporation in April of 2007.

4. I have worked at ECM since November of 2007. Prior to that, I worked from 2006 to 2007 as a chief financial officer at Galois, Inc. Prior to that, I worked from 2002 to 2006 as vice president of operations at Covansys Corp.

### Business Operations

5. ECM is a national leader in online postal management. ECM offers a variety of affordable, reliable, and secure methods for customers to manage postal mail and parcels through online delivery systems. ECM's offerings include the following:

a. <u>Nationwide address network</u>. ECM maintains street and PO Box addresses at twenty different cities throughout the country. Customers may designate one or more of these addresses at which they may receive mail. When a customer receives mail at one of ECM's addresses, ECM then images the envelope or package and delivers the image electronically to the customer, who then provides further delivery instructions.

b. <u>Account management</u>. Each customer may designate multiple recipients and transfer received items among recipients as necessary.

c. <u>Electronic delivery</u>. Upon receipt of an envelope or package image, customers may instruct ECM to open the item, scan the contents, and transmit an electronic copy to the customer.

d. <u>Payment systems</u>. When customers receive payments through the mail, ECM will facilitate electronic deposit into the customer's bank account. In addition, ECM offers integration with Bill.com, pursuant to which ECM will route invoices and payments to the customer's Bill.com account.

PAGE 2- DECLARATION OF STACEY LEE

MOTSCHENBACHER & BLATTNER, LLP
117 SW Taylor, Suite 200
Portland, OR 97204
Phone: (503) 417-0500
Fax: (503) 417-0501

    e.     <u>Forwarding and delivery</u>. ECM provides mail forwarding service to most locations in the world at discounted rates. Customers can also pick up items at storefront locations.

    f.     <u>Storage and disposal</u>. ECM will store customers' letters and parcels, and offers free unlimited digital storage of envelope images and content scans. ECM also offers secure shredding and recycling of unwanted items.

    g.     <u>Registered agent</u>. ECM will serve as a customer's registered agent for service of process in certain designated states.

6.     ECM is headquartered in Beaverton, Oregon, where it currently employs 16 people. ECM also employs an additional 10 people across the country, with 5 employees in New York City, New York, 2 employees in Los Angeles, California, 2 employees in San Francisco, and 2 employees in Seattle, Washington.

## Financial Condition

7.     ECM is a C corporation; with 27,299,139 shares of stock outstanding, consisting of 13,078,295 shares of Common Stock, and 14,220,844 shares of Preferred Stock. ECM's outstanding stock is held by 134 shareholders. ECM has debts totaling approximately $8,450,000, secured by substantially all of ECM's assets. Additionally, ECM has other unsecured debts totaling approximately $9,800,000.

8.     ECM has been in financial distress since the economic downturn in 2008. In 2008, ECM's operating costs greatly exceeded its revenue, and the company's cash was depleting at a rapid rate. ECM had fully drawn on its $3,000,000 line of credit with Comerica Bank, and was in default on the agreement. As a result, ECM was at risk for foreclosure by Comerica Bank, which held a security interest in all of ECM's assets. Additionally, ECM's board of directors determined that the company's cash reserves would be depleted unless

PAGE 3- DECLARATION OF STACEY LEE

MOTSCHENBACHER & BLATTNER, LLP
117 SW Taylor, Suite 200
Portland, OR 97204
Phone: (503) 417-0500
Fax: (503) 417-0501

significant changes were made to the company's operations. Key management changes were made as a result, and ECM also laid off a significant amount of its employees.

9. ECM's management and workforce changes extended the amount of time the company could operate on its cash reserves, but only to approximately 6 months. To keep ECM afloat, one of its shareholders, Ignition Ventures Management, LLC ("Ignition") provided ECM with a short term loan, to allow ECM to prepare and implement a more formal turnaround plan.

10. By the end of 2009, Ignition had loaned ECM approximately $675,000 to keep ECM's operations going, and to prevent foreclosure action by Comerica Bank. ECM implemented a series of operational changes, and doubled its pricing to increase revenue.

11. In March of 2010, Ignition and other shareholders entered into a $3,000,000 secured credit facility agreement, and through May of 2013 loaned $2,774,915 to ECM, through promissory notes secured by all of ECM's assets (together, the "Secured Subordinated Notes"). The holders of the Secured Subordinated Notes entered into an agreement with Comerica Bank, agreeing not to exercise any collection remedies against ECM until the loan to Comerica Bank was fully satisfied. The Board of Directors believed that the loan from the Secured Subordinated Note holders was in the best interest of the company, as ECM had no other options for financing to support continued operations.

12. Since obtaining the loan from Ignition and other shareholders in 2010, ECM has continued to service the Comerica debt, and has regained a positive cash flow position. The Secured Subordinated Notes matured on March 1, 2012, and have been accruing interest at the default rate of 28% since that date. Together, as of February 27, 2015, the balance of the Secured Subordinated Notes is $8,276,902.80.

13. The Secured Subordinated Note holders have not been able to enforce their notes or exercise collection remedies against ECM because of their agreement with Comerica Bank. However, the balance of the Comerica Bank debt is $181,326 as of today, and the debt will be

MOTSCHENBACHER & BLATTNER, LLP
117 SW Taylor, Suite 200
Portland, OR 97204
Phone: (503) 417-0500
Fax: (503) 417-0501

paid off in approximately 6 months. Once the Comerica Bank debt is repaid, the Secured Subordinated Note holders will be able to exercise their remedies, and foreclose on ECM's assets. Even if the Secured Subordinated Note holders were to refrain from foreclosing on ECM's assets, ECM's cash flow is not sufficient to repay the Secured Subordinated Notes due to the interest that accumulates on the debt.

14. In 2014, ECM received an unsolicited offer from one of its customers, Xenon Ventures, LLC ("Xenon"), offering to purchase ECM's assets for approximately $5,000,000. Xenon's offer was conditioned on ECM obtaining a court order approving the sale under § 363 of the Bankruptcy Code.

15. After conducting some initial due diligence, ECM's board of directors determined that the offer appeared reasonable. To continue its due diligence in evaluating Xenon's offer, ECM hired Cascadia Capital LLC ("Cascadia") to appraise and value the company, and to solicit other potential buyers that may offer a higher purchase price for ECM's assets. Cascadia examined ECM's books and records, and determined that the Xenon offer was a healthy offer, within the value range estimated by Cascadia.

16. Cascadia also reported that it had marketed ECM to ten companies that were perceived as potential buyers for ECM's assets. Two parties expressed interest in a potential purchase, but neither party made an offer after ECM's financial data was provided to them.

### First-Day Motions

### Cash Management and Bank Accounts Motion

17. ECM has filed a motion seeking authority for continued use of its existing bank accounts and cash management system, including business forms.

PAGE  5-   DECLARATION OF STACEY LEE

MOTSCHENBACHER & BLATTNER, LLP
117 SW Taylor, Suite 200
Portland, OR 97204
Phone: (503) 417-0500
Fax: (503) 417-0501

18. Before the Petition Date, ECM maintained, in the ordinary course of its business and as part of an integrated cash management system, 4 bank accounts (collectively the "Bank Accounts"). A list of the Bank Accounts is attached hereto as **Exhibit A**[1].

19. ECM uses the Bank Accounts to, among other things, manage cash receipts and disbursements for all of its day-to-day business operations. ECM routinely deposits, withdraws, and otherwise transfers funds to, from, and among the Bank Accounts by various methods including electronic fund transfers. In addition, ECM draws numerous checks on the Bank Accounts every month to pay employees, vendors, customers, and creditors.

20. In light of ECM's reliance on credit card processing as the exclusive method of receiving revenue, an abrupt and wholesale change to its forms and checks would be harmful to ECM and its operations. ECM believes that all parties-in-interest, including ECM's employees, vendors, customers, and creditors, will be best served by preserving ECM's business continuity and avoiding the significant disruption and delay to ECM's cash disbursement activities that would necessarily result from closing the Bank Accounts and opening new accounts.

21. Similarly, the cost and delay inherent in identifying, collecting, discarding, redesigning, and replacing all existing forms, checks, and stationary would seriously disrupt ECM's day-to-day business operations and create unnecessary cost and expense. Such a project imposed across ECM's business and numerous operating locations would divert limited employee and management time from the reorganization effort, distract from normal business operations, and generate substantial costs with little or no corresponding benefit. Such obligations would also seriously disrupt the normal flow of internal and external communications on which all businesses rely.

22. The smooth transition from prepetition operations into post-petition operations will depend greatly upon the steadiness of ECM's daily banking, accounting, and business

---

[1] Account numbers are abbreviated for security purposes

PAGE 6- DECLARATION OF STACEY LEE

MOTSCHENBACHER & BLATTNER, LLP
117 SW Taylor, Suite 200
Portland, OR 97204
Phone: (503) 417-0500
Fax: (503) 417-0501

practices. Authorization to continue using a limited number of existing accounts and existing forms, stationary, and checks is an essential component of this stability.

23.  Most of ECM's customers pay by credit or debit card. In such instances, ECM does not collect funds directly from customers, but rather from card issuers or banks and institutions that process payment-card transactions (collectively, the "Card Processors"). When a customer transacts business with ECM using a payment card, ECM creates a receivable. Under their agreements with ECM, the Card Processors remit payment to ECM in the amount of the receivable, less the processor's fee. In this relationship, ECM functions as a merchant while the Card Processors are themselves responsible for collecting payments from each customer.

24.  Subject to the terms of their individual agreements, the Card Processors transmit net payments on payment-card receivables to ECM's bank account. ECM incurs periodic service charges and other fees in favor of the payment-card networks and the Card Processors, including charges associated with lost or damaged goods, chargebacks, or similar refunds (collectively, the "Service Charges").

25.  As of the Petition Date, it is likely that certain Service Charges will have accrued but will not yet be paid. It is also likely that Card Processors will hold, on the Petition Date, amounts owing to ECM attributable to sales that occurred prepetition.

**Utilities Motion**

26.  In connection with the operation of its business, Debtor obtains telephone, electric, gas, water, internet, server hosting and other utility services (collectively, "Utility Services") from approximately 16 utility companies ("Utility Companies").

27.  If Utility Companies are permitted to refuse or discontinue service for even a brief period, the impact on Debtor's operations could be devastating. Such an interruption would damage customer relationships, revenue, and profits, and would ultimately adversely affect Debtor's efforts to reorganize. Moreover, such an interruption would result in a diminution in

PAGE  7-   DECLARATION OF STACEY LEE

Motschenbacher & Blattner, LLP
117 SW Taylor, Suite 200
Portland, OR 97204
Phone: (503) 417-0500
Fax: (503) 417-0501

value of Debtor's assets and cause irreparable harm to the bankruptcy estate. For example, if a provider of electricity was to terminate or disrupt service to Debtor, the Debtor would be unable to render services that makeup its only source of revenue. As a result of the foregoing, customer confidence in Debtor's services would likely be lost which, in turn, would affect Debtor's ability to generate revenue. Accordingly, maintaining uninterrupted Utility Services is essential to Debtor's ability to maintain its business operations and to preserve the value of its assets.

28. Debtor has proposed to make adequate assurance payments to the Utility Companies consisting of a cash deposit upon request equal to one month of average service for each utility.

## Cash Collateral

29. ECM has 7 major secured creditors: Comerica Bank and the Secured Subordinated Note holders, all of which hold valid, properly perfected security interests in substantially all of the Debtor's assets.

30. ECM needs authority to use cash collateral to enable it to continue the operation of its business in an orderly manner, and preserve and maintain the going concern value of its business for the benefit of all of its creditors and its estate. ECM's payroll and benefits, paid on a semi-monthly basis, exceeds $86,000. ECM's operational, shipping and administrative expenses vary between $40,000 and $60,000 per week. In addition to the normal operating expenses, Debtor projects it will be required to make up to $16,000 of utility deposits. In March and April, the Debtor will also be required to renew its various post office boxes, which are a critical tool in its business operations. The Debtor expects the cost of renewing its post office boxes to be approximately $28,000, as indicated on the cash collateral budget.

31. It is essential that Debtor maintain its operations to preserve customer confidence in ECM's operations going forward, and to preserve ECM's value as a going concern.

PAGE 8- DECLARATION OF STACEY LEE

MOTSCHENBACHER & BLATTNER, LLP
117 SW Taylor, Suite 200
Portland, OR 97204
Phone: (503) 417-0500
Fax: (503) 417-0501

32.  Because ECM's cash is subject to the security interests of Comerica Bank and the Secured Subordinated Note holders, ECM must receive authorization to use this cash in order to continue business operations and maximize the value of its assets.

### Employment Motions

**A. Motschenbacher & Blattner, LLP ("M&B") as General Bankruptcy Counsel.**

33.  It is my understanding that M&B's billing rates are at market rate.

34.  M&B has agreed to maintain detailed, contemporaneous time records of expenses incurred. Expenses shall be reasonable pursuant to LBR 2016(b)(2).

35.  Compensation and reimbursement of expenses shall be paid as administrative expenses in such amounts as may be allowed by this Court after notice and hearing pursuant to Section 330 of the Bankruptcy code or as otherwise provided by Court order.

**B. Perkins Coie, LLP as Special Counsel (to be filed).**

36.  It is my understanding that Perkins Coie LLP's billing rates are at market rate.

37.  Perkins Coie LLP has agreed to maintain detailed, contemporaneous time records of expenses incurred. Expenses shall be reasonable pursuant to LBR 2016(b)(2).

38.  Compensation and reimbursement of expenses shall be paid as administrative expenses in such amounts as may be allowed by this Court after notice and hearing pursuant to Section 330 of the Bankruptcy code or as otherwise provided by Court order.

Pursuant to 26 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: February 27, 2015, at Beaverton, Oregon

_/s/ Stacey Lee_
Stacey Lee

PAGE 9- DECLARATION OF STACEY LEE

MOTSCHENBACHER & BLATTNER, LLP
117 SW Taylor, Suite 200
Portland, OR 97204
Phone: (503) 417-0500
Fax: (503) 417-0501

1

2  **EXHIBIT A**

3  **LIST OF BANK ACCOUNTS**

4

5  **US Bank Checking Account – account number XXXXXXXX4685**
   **US Bank Savings Account – account number XXXXXXXX4164**
6  **Comerica Checking Account – account number XXXXXX3385**
   **Comerica Savings Account – account number XXXXXX3393**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

PAGE   1-   EXHIBIT A

MOTSCHENBACHER & BLATTNER, LLP
117 SW Taylor, Suite 200
Portland, OR  97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501