Nicholas J. Henderson
nhenderson@portlaw.com
MOTSCHENBACHER & BLATTNER, LLP
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone:  (503) 417-0500
Facsimile:  (503) 417-0501

Proposed Attorneys for Debtor
Earth Class Mail Corporation

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF OREGON

In re

Earth Class Mail Corporation,

        Debtor.

Case No.    15-30982-tmb11

DEBTOR'S MOTION FOR ORDERS (1) AUTHORIZING AND SCHEDULING AN AUCTION FOR THE SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS AND OTHER INTERESTS, (2) APPROVING SALE PROCEDURES, (3)  APPROVING PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (4) DIRECTING APPOINTMENT OF CONSUMER PRIVACY OMBUDSMAN, (5) APPROVING PURCHASE AGREEMENT OR SUBSEQUENT OVERBID, (6) SCHEDULING A HEARING TO CONSIDER APPROVAL OF THE SALE, (7) ESTABLISHING THE FORM AND MANNER OF NOTICES RELATED THERETO, (8) AUTHORIZING INTERIM DISTRIBUTION FROM SALE PROCEEDS AND (9) REQUESTING WAIVER OF THE STAY UNDER BANKRUPTCY RULE 6004(F) AND 6006(D)

EXPEDITED HEARING REQUESTED

PAGE  1-    DEBTOR'S MOTION FOR ORDER AUTHORIZING
          AN AUCTION AND RELATED RELIEF

Earth Class Mail Corporation (the "Debtor"), as debtor in possession, hereby moves this Court for the entry of orders: (a) authorizing and scheduling an auction (the "Auction") to sell substantially all assets of the Debtor (the "Purchased Assets") free and clear of liens and other interests (the "Sale"); (b) establishing reasonable and necessary bidding procedures in connection with the Sale and the Auction (the "Sale Procedures"); (c) approving procedures for the assumption and assignment of executory contracts and unexpired leases (the "Assumption and Assignment Procedures"); (d) approving the Sale pursuant to (i) that certain Asset Purchase Agreement dated February 13, 2015, by and between the Debtor and Delivered.io, Inc. (the "Purchaser"), a copy of which, exclusive of the disclosure schedules, is attached hereto as Exhibit A (the "Agreement") or (ii) a higher and better offer received at the Auction; (e) scheduling a final hearing to consider approval of the Sale (the "Sale Hearing"); (f) authorizing an interim distribution from the Sale proceeds; (g) waiving the stay under Bankruptcy Rule 6004(f) and 6006(d); and (h) establishing the form and manner of notices related thereto.  In support of this motion, the Debtor represents:

**Background**

1.      On February 27, 2015 (the "Petition Date"), the Debtor filed herein a voluntary petition under Chapter 11 of the Bankruptcy Code.  As of the date hereof, no trustee or examiner has been requested or appointed and no official committee of creditors has been appointed.

2.      The Debtor is a Oregon corporation headquartered in Beaverton, Oregon that is engaged in the business of providing online postal mail management services.

3.      On or about February 13, 2015, following significant efforts to locate a potential purchaser for the Debtor's business, the Debtor negotiated the terms for the sale of substantially all of the Debtor's assets and executed the Agreement with Purchaser.  As more fully explained below, prior to the Petition Date, the Debtor's investment banker had approached a number of potential purchasers of the Debtor's business and its assets.  While a few potential purchasers

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

1

2

3

4

expressed some interest, the only person or entity that ultimately decided to provide a formal proposal to purchase the Debtor's assets was the Purchaser.  The Debtor has also been unable to obtain additional investment in the Debtor due to the Debtor's significant insolvency and secured debt load.

5

6

7

8

9

10

**Jurisdiction**

4.     This Court has jurisdiction over this matter pursuant to 28 USC §§ 157 and 1334 and LR 2100.1.  Consideration of this motion constitutes a core proceeding within the meaning of 28 USC § 157(b)(2).  The statutory predicates for the relief sought by this motion are sections 105, 363 and 365 of the Bankruptcy Code.  This motion is also governed by Bankruptcy Rules 2002, 6004, 6006 and 9007 and LBR 2002-1 and LBF 363.  Venue is proper under 28 USC § 1408.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Relief Requested**

5.     By this motion, the Debtor seeks entry of: (i) an order in the form attached hereto as Exhibit B (the "Sale Procedures Order") that will, among other things, establish rules by which prospective bidders can qualify to participate at the Auction, schedule the date and time of the Auction, establish rules to govern the Auction, schedule the Sale Hearing, approve the Purchaser's right to receive a break-up fee of 3% of the purchase price (the "Break-up Fee") from the successful bidder with three days of the entry of the Sale Order in the event there is a successful overbid and Purchaser is not the successful Purchaser at the Auction, authorize and approve procedures (the "Assumption and Assignment Procedures") for the assumption and assignment of executory contracts and unexpired leases designated by the successful bidder at the Auction, and approve notice procedures relating to the Sale; and (ii) an order in the form attached hereto as Exhibit C (the "Sale Order") approving the Sale to the Purchaser or, if an Auction is conducted, to the successful bidder at the Auction.  The Debtor requests that the Court hold an expedited hearing on this motion for the purposes of considering and acting on this motion to the extent it seeks entry of the Sale Procedures Order.

26

PAGE  3-     DEBTOR'S MOTION FOR ORDER AUTHORIZING
AN AUCTION AND RELATED RELIEF

*Motschenbacher & Blattner, LLP*
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

1  **Summary and Highlighting of Material Terms of Agreement[1]**

2        6.      The following is a summary of the terms of the sale transaction contemplated by the

3  Agreement, including provisions required to be highlighted in accordance with local rules and

4  guidelines:

5  Purchase Price            As more particularly described in Section 2.1 of the
   Agreement, the Purchase Price is $5,000,000, plus or minus
6        the amount by which Debtor's Closing Working Capital
   exceeds or is less than $500,000, plus the amount of the
7        Reimbursement for Costs described in Section 11.1 of the
   Agreement, and as explained below.  The specific formulae
8        for adjustment to the Purchase Price as set forth in section 2.2
   of the Agreement.

9

10       The Purchase Price will be payable as follows: (i) $150,000
   as a deposit against the Purchase Price (or to be returned to
11       the Purchaser if it is not the successful purchaser) (the
   "Deposit") to be paid into escrow as a deposit; (ii) $350,000,
12       subject to adjustment, in cash at Closing to be held in escrow
   along with the $150,000 deposit, to satisfy any claims for
13       Damages (as defined in section 12.3 of the Agreement) to
   Purchaser ("Escrow Deposit"); (iii) $4,500,000, subject to
14       adjustment, in cash at Closing ("Closing Cash
   Consideration"); and (iv) the an amount to cover certain costs
15       and expenses incurred by Debtor and Ignition Ventures
   Management, LLC ("Ignition") in connection with the
16       Agreement as provided in Section 11.1 of the Agreement
   ("Reimbursement for Costs).

17       The Purchaser is also assuming (i) certain Assumed
   Liabilities as set forth in Section 1.4 of the Agreement, and
18       (ii) certain Assumed Leases and Assumed Contracts (the
   "Material Agreements") as set forth in Section 1.5 of the
19       Agreement, provided that the Debtor shall pay all costs
   required to cure the Material Agreements (the "Cure Costs").

20
   Assets to be Acquired       The Purchased Assets as defined in 1.2 of the Agreement,
21       which is substantially all of the Debtor's assets.

22 Excluded Assets       The "Excluded Assets" as defined in Section 1.3 of the
   Agreement, including the Debtor's corporate records,
23       insurance policies, rights under the Agreement, and Excluded
   Contracts

24 _____

25 [1] The description of the Agreement contained in this motion is a summary only and should not be construed as
   modifying or limiting the terms of the Purchase Agreement.  In the event of a conflict between the description in this
   motion and the Purchase Agreement, the provisions of the Purchase Agreement shall govern. Capitalized terms used
26 but not defined herein have the meaning ascribed to them in the Purchase Agreement.

PAGE  4-    DEBTOR'S MOTION FOR ORDER AUTHORIZING
AN AUCTION AND RELATED RELIEF

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

| | | |
|---|---|---|
| 1 | | |
| 2 | Assumed Liabilities | Only those Assumed Liabilities expressly listed in Section 1.4 of the Agreement. |
| 3 | Excluded Liabilities: | All liabilities other than those expressly identified as Assumed Liabilities in the Agreement. |
| 4 | | |
| 5 | Assumption and Assignment of Executory Contracts | Purchaser will assume the Material Agreements described in Section 1.5 of the Agreement.  However, Debtor will pay all Cure Costs, as defined in section 8.6 of the Agreement, with respect to the Material Agreements. |
| 6 | | |
| 7 | Closing Conditions | The parties' conditions for closing are set forth in Articles 9 and 10 of the Agreement.  Such conditions include the entry of the Sale Order, the accuracy of representations and warranties, the absence of any occurrence or circumstance that has or is reasonably likely to have a Material Adverse Effect, as defined in the Agreement.  There is no financing contingency for the Purchaser's obligation to close the Sale. |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | Expense Reimbursement | Each party shall pay and be solely responsible for the costs and expenses of its respective counsel and the other costs and fees incurred by such party in connection with negotiating and closing the transactions contemplated by this Agreement; provided, however, that upon Closing (if and only if the Closing occurs), as stated in Section 11.1 of the Agreement, Purchaser shall pay to Debtor the lesser of (a) $150,000 or (b) one-half of the aggregate expenses incurred by Debtor and Ignition in connection with the Agreement and the transactions contemplated thereby.  In the interest of full disclosure, Ignition is not only the collateral agent for the holders of certain secured debts against the Debtor; Ignition is also a preferred stock holder. |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | Sale to Insider: | Purchaser is not an insider as defined in Bankruptcy Code § 101(31). |
| 19 | | |
| 20 | Sale Free and Clear: | The sale will be free and clear of Liens and Liabilities, each as defined in the Agreement. The parties with such Liens and Liabilities and the nature of those interests are set forth below. |
| 21 | | |
| 22 | Liens: | There are seven secured creditors, as follows: (1) Comerica Bank; (2) Ignition Venture Partners III, LP; (3) Ignition Managing Directors Fund III, LLC; (4) Washington Park Ventures, LLC; (5) Evergone Investments; (6) Robert R. McIntryre 2003 Trust; and (7) Lauren D. Rachlin (collectively, the "Secured Creditors").  The estimated total of amounts owed on the liens is $8,458,228.80.  The sale is permitted pursuant to § 363(f)(2), as the Secured Creditors consent to the sale. |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |

Motschenbacher & Blattner, LLP
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

| | | |
|---|---|---|
| 1 | | |
| 2 | Agreements with Management; Releases and Insider Benefits: | Purchaser is released from any potential liability in connection with the purchase of the Purchased Assets, other than the Permitted Liens and Assumed Liabilities as defined in Section 1.4 of the Agreement. |
| 3 | | |
| 4 | | |
| 5 | | Purchaser has agreed to assume Debtor's employment agreements with James Wilson, president and chief operations officer, dated 9/24/2014, and Stacey Lee, secretary and chief financial officer, dated 9/24/2014. |
| 6 | | |
| 7 | | Additionally, pursuant to Section 8.4 of the Agreement, Purchaser shall offer employment to all of Debtor's employees, on terms no less favorable in any material respect to the terms currently in effect with respect to such employees.  This includes the Debtor's current officers. |
| 8 | | |
| 9 | | |
| 10 | | Finally, the Debtor has entered into a Management Carve-Out Plan with certain officers and key employees, which will result in the payment of bonuses to these individuals upon the closing of the proposed Sale.  Debtor's Board adopted the bonus plan to provide an incentive to certain officers, directors, employees and consultants to contribute to the performance of the Debtor's business prior to any sale of the business.  Debtor believes this bonus plan was necessary to retain key individuals and maximize the going concern value of the Debtor.  As discussed below, the seeks an order of the Court regarding distribution of the Sale proceeds, including payment of the bonus plan to management and key employees.  The Management Carve-Out Plans are attached hereto as <u>Exhibit D</u>. |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | Closing Deadlines and Contingencies: | As set forth in Section 13.1(b) of the Agreement, the Sale must close within 90 days of the Petition Date, or **May 28, 2015**.  The obligations of Debtor and Purchaser under the Agreement are conditioned on approval of the Sale by this Court, and various other conditions set forth in Articles 7 through 10 of the Agreement, including approval of the Sale Order attached hereto as <u>Exhibit C</u>.  There are no financing contingencies for Purchaser's obligation to close. |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | Good Faith Deposit: | Purchaser has paid a refundable deposit of $150,000 as a good faith deposit.  As set forth in the Sale Procedures attached as Exhibit 1 to the Sale Procedures Order, all competing bidders will be required to pay a similar good faith deposit. |
| 23 | | |
| 24 | | |
| 25 | Interim Agreement With Proposed Buyer: | None. |
| 26 | | |

PAGE  6-    DEBTOR'S MOTION FOR ORDER AUTHORIZING AN AUCTION AND RELATED RELIEF

***Motschenbacher & Blattner, LLP***
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

| | | |
|---|---|---|
| 1 | Use of Proceeds: | As set forth in the proposed Sale Order, Debtor requests an interim distribution to the Secured Creditors and the Debtor's executives and employees under the Management Carve-Out Plans with such individuals.  Debtor will seek a separate final distribution order authorizing the disbursement of proceeds from the Sale to unsecured creditors. |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | Record Retention: | After the sale, Debtor will have reasonable access to the books and records as necessary to administer the Chapter 11 case and file final returns, as appropriate. |
| 6 | | |
| 7 | Sale of Avoidance Actions: | The sale does not include the sale of any avoidance claims under Chapter 5 of the Bankruptcy Code. |
| 8 | Requested Findings as to Successor Liability: | Purchaser will not be deemed, as a result of any action taken in connection with the Agreement, to (i) be the successor of Debtor, (ii) have, de facto or otherwise, merged with or into Debtor, (iii) be a consolidation, mere continuation or substantial continuation of Debtor or the enterprise of Debtor, (iv) be a continuation of the Debtor or the estate's business or (v) be responsible for any liability of Debtor or for payment of any benefit accruing to Debtor. |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | Credit Bidding: | The motion does not seek to limit credit bidding under § 363. |
| 14 | Standard for Approval: | The motion seeks approval of the proposed sale pursuant to the business judgment standard and best interests of the estate standard. |
| 15 | | |
| 16 | Relief from Bankruptcy Rule 6004(h): | This motion requests relief from Bankruptcy Rule 6004(h) to protect the value of the Purchased Assets, and to ensure that the estate will not continue to be depleted by ongoing operations. |
| 17 | | |
| 18 | Solicitation Process: | Notice of the proposed sale will be given to all parties and creditors in interest, and other parties as set forth in the certificate of service. |
| 19 | | |

**Highlighting of the Proposed Sale Procedures**

21    7.    The proposed Sale Procedures are intended to permit a fair and efficient

22  competitive sale consistent with the time line of this Chapter 11 case and promptly identify any

23  alternative bid that is higher or otherwise better than the bid set forth in the Agreement. Because

24  the Sale Procedures (the "Sale Procedures" or "Sale Proc.") are attached as **Exhibit 1** to proposed

25  Sale Procedures Order, they are not restated herein. Generally speaking, however, the Sale

26  Procedures establish the following, among other things:

*Motschenbacher & Blattner, LLP*
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

Case 15-30982-tmb11    Doc 37    Filed 03/20/15

- The deadlines and requirements for becoming an Acceptable Bidder, submitting competing bids and the method and criteria by which such competing bids are to become entitled to be Qualified Bids sufficient to trigger an Auction, including the minimum consideration that must be provided and the terms and conditions that must be satisfied by any Bidder (other than Purchaser) to be entitled to be an Acceptable Bidder and a Qualified Bidder (See Sale Proc. at ¶¶ B, D).

- • The manner in which Qualified Bids will be evaluated by Debtor to determine the Starting Bid for the Auction (Sale Proc. at ¶ E).

- • The procedures for conducting the Auction, if any (See Sale Proc. at ¶ G).

- • The criteria by which the "Successful Bidder" will be selected by Debtor, in consultation with its advisors (See Sale Proc. at ¶ H).

- • Various other matters relating to the sale process generally, including the Sale Hearing, designation of a Back-Up Bidder, and certain reservations of rights (See Sale Proc. at ¶¶ I-K).

8.    The Sale Procedures recognize Debtor's fiduciary obligations to maximize sale value, and, as such, do not impair Debtor's ability to consider all qualified bid proposals, and preserve Debtor's right to modify the Sale Procedures as necessary or appropriate to maximize value for Debtor's estate in consultation with key parties set forth therein.

9.    The Sale Procedures contain the following provisions that are required to be highlighted pursuant to local rules and guidelines:

(a) Provisions Governing Qualifications of Bidders.  The provisions governing an entity's right to become an Acceptable Bidder are set forth in paragraphs B and D of the Sale Procedures.  These include the requirement that Acceptable Bidders must deposit $150,000 in cash, which will be returned to each party that is not the Successful Bidder.

(b) Provisions Governing Qualified Bids.  The provisions governing Qualified Bids are set forth in paragraphs D and E of the Sale Procedures.  Such provisions include, among other things, the deadlines for submitting a bid, the requirements for submitting a bid, the assets to be included in the bid and the period the bid must remain open. Qualified Bids are required to include a marked-up version of the Agreement, to show amendments or modifications to the Agreement.  Purchaser is deemed to have satisfied all of the bidding conditions.

PAGE 8-    DEBTOR'S MOTION FOR ORDER AUTHORIZING
AN AUCTION AND RELATED RELIEF

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

(c) <u>Bid Protections to Purchaser as Stalking Horse Bidder</u>.  The Agreement does not include any limitations on Debtor's ability to solicit higher or better bids. Paragraph D(3) of the Sale Procedures sets forth minimum bidding increments of $50,000, and also sets the Minimum Initial Overbid Amount.  The Minimum Initial Overbid Amount is set at $5,200,000, which is equal to the $5,000,000 Purchase Price, plus the Break-Up Fee, plus the $50,000 bidding increment. The Agreement provides that if Purchaser is not, for any reason, the Successful Bidder, Purchaser will be entitled to a cash payment from the Successful Bidder in an amount equal to the Break-up Fee, which shall be in addition to the amount of the purchase price to be paid by the Successful Bidder.  Purchaser shall also be entitled to a return of the Deposit. The Successful Bidder shall pay the Break-Up Fee within three days after entry of the Sale Order, and the Debtor shall promptly file a motion requesting an order directing the Purchaser's counsel to return the Deposit to Purchaser.  The provisions governing the Break-Up Fee to Purchaser are set forth in Exhibit 1 to the Sale Procedures Order.  The basis for the Break-Up Fee is discussed below.

(d) <u>Due Diligence Period</u>.  Interested parties shall have until _____, 2015 (the "Bid Deadline") to conduct due diligence. Paragraphs B and C of the Sale Procedures sets forth the requirements for obtaining due diligence access.

(e) <u>Modification of Bidding and Auction Procedures</u>.  Paragraph K of the Sale Procedures describes the Debtor's reservation of the right to modify the Sale Procedures without further order of the Court.

(f) <u>Closing with Alternative Backup Bidders</u>.  Paragraph J of the Sale Procedures addresses the ability of Debtor to sell the Purchased Assets to the Back-Up Bidder.

(g) <u>Provisions Governing the Auction</u>.  Paragraph G of the Sale Procedures sets forth the provisions governing the auction, and this Motion specifies the date, time and place at which the Auction will be conducted and the method for providing notice to parties of any changes thereto. Further, Paragraph D(1) of the Sale Procedures requires each bidder to identify whether it is bidding for itself or others and if for others, the identities of such parties and whether the bidder is party to any agreement limiting the bidders at the auction.

**Proposed Assumption and Assignment Procedures**

10.    The following is a summary of the proposed Assumption and Assignment Procedures:

(a)    Debtor is also seeking approval of certain procedures to facilitate the fair and orderly assumption and assignment of the Material Agreements pursuant to the procedures set

PAGE  9-    DEBTOR'S MOTION FOR ORDER AUTHORIZING
AN AUCTION AND RELATED RELIEF

Motschenbacher & Blattner, LLP
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

forth in section 1.5 of the Agreement.  Among other things, Debtor will first pay all Cure Costs and

timely provide Purchaser with the information required in section 1.5(c) and elsewhere in the

Agreement.

(b)       The effective date on which the Purchaser seeks to have the assumption and

assignment of the Material Agreements become effective will be the Closing Date pursuant to the

terms of the Agreement (the "Proposed Assumption Effective Date").

(c)       By the date to be fixed by the Court in the Sale Procedures Order, the

Debtor will provide notice (the "Assumption and Assignment Notice") to each non-debtor

counterparty to a Material Agreement that Purchaser designates for assumption and assignment,

substantially in the form attached to the Sale Procedures Order as Exhibit 3, that (i) identifies the

proposed amount to be paid to such counterparty to cure all defaults under such agreement that are

required to be cured pursuant to section 365 of the Bankruptcy Code as a prerequisite to

assumption (together with the timing of such payments, if any), and (ii) describes the procedures

for objecting to the proposed assumption and assignment of the agreement.

(d)       Purchaser's promise to perform from and after the Closing Date with

respect to the Material Agreements shall be the only adequate assurance of future performance

provided to satisfy the requirements of section 365 of the Bankruptcy Code.

(e)       Objections, if any, to the proposed assumption and assignment of any

Material Agreements to Purchaser must be made in writing and filed with the Court no later than a

date to be fixed by the Court in the Sale Procedures Order (the "Objection Deadline").

(f)       Any counterparty to a Material Agreement proposed to be assumed and

assigned that does not timely file and serve an objection to assignment (a "Contract Objection")

before the Objection Deadline will be deemed to have consented to the assumption and assignment

of its Material Agreement to Purchaser and the cure of existing defaults and shall be forever barred

from objecting to the cure and from asserting any additional cure or other amounts against the

PAGE  10-  DEBTOR'S MOTION FOR ORDER AUTHORIZING
AN AUCTION AND RELATED RELIEF

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

Debtor or Purchaser.  In that event, the Debtor and Purchaser may provide in the Sale Order for the assumption and assignment of the applicable Material Agreement to Purchaser (or other Successful Bidder) and for payment of the cure amount, if any, specified in the Assumption and Assignment Notice, all without further notice to that counterparty.

(g)     If Qualified Alternative Bids are received by the Debtor, and Purchaser is not the Successful Bidder at the Auction, the Debtor will provide an amended Assumption and Assignment Notice to each non-Debtor counterparty to an Assumed Contract or Assumed Lease designated by the Successful Bidder for assumption and assignment, identifying the Successful Bidder, and providing information to the non-debtor counterparties regarding the ability of the Successful Bidder to provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code.  Objections, if any, to the proposed assumption and assignment of any Assumed Contract or Assumed Lease to a Successful Bidder (other than Purchaser) must be made in writing and filed with the Court on a date to be fixed by the Court at the Sale Hearing.

(h)     If a timely Contract Objection is filed by the Objection Deadline and such objection cannot otherwise be resolved by the parties, the Bankruptcy Court may hear such objection at the Sale Hearing, or any adjourned date thereof.

(i)     Each Material Agreement will be assumed and assigned to Purchaser or the Successful Bidder (as applicable) on the date (the "Assumption Effective Date") that is the later of (i) the Proposed Assumption Effective Date, and (ii) the Assumption Resolution Date (as defined below).  The "Assumption Resolution Date" shall be, (i) if no Contract Objection has been filed on or prior to the Contract Objection Deadline, the business day after the Contract Objection Deadline, or (ii) if a Contract Objection has been filed on or prior to the Contract Objection Deadline, the date of the Assumption Resolution Stipulation or the date of a Court order authorizing the assumption and assignment to Purchaser or the Successful Bidder (as applicable)

***Motschenbacher & Blattner, LLP***
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

of the Assumed Contract or Assumed Lease.  If Purchaser is the Successful Bidder, the Assumption Effective Date shall not be later than the Closing Date.

**Points and Authorities**

A.    <u>Sale of Substantially All Assets Under Section 363</u>

11.    Section 363 of the Bankruptcy Code provides authority for a debtor in possession "after notice and a hearing, [to] use, sell or lease, other than in the ordinary course of business, property of the estate." 11 USC § 363(b)(1).  This provision generally allows a debtor in possession (subject to court approval) to sell property of the estate outside the ordinary course of business where the proposed sale is a sound exercise of the debtor's business judgment and when the sale is proposed in good faith and for fair value.  *See Committee of Equity Security Holders v. Lionel Corporation (In re Lionel Corp.),* 722 F2d 1063, 1070 (2d Cir 1983); *In re Ernst Home Ctr., Inc.*, 209 BR 974, 980 (Bankr WD Wash 1997).  When a trustee or debtor articulates a reasonable basis for its business decisions, the "court will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 BR 612, 616 (Bankr SDNY 1986).

12.    The authority to sell assets conferred upon a debtor in possession by section 363(b) "include[s] a sale of substantially all the assets of an estate." *Otto Preminger Films, Ltd. v. Qintex Entm 't, Inc. (In re Qintex Entm't, Inc.)*, 950 F2d 1492, 1495 (9th Cir 1991).  Further, section 105(a) allows the court to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title."

13.    A bankruptcy court's power to authorize a sale under section 363(b) is to be exercised at the court's discretion. *In re WPRV-TV*, 983 F2d 336, 340 (1st Cir 1993); *New Haven Radio, Inc. v  Meister (In re Martin-Trigona)*, 760 F2d 1334, 1346 (2d Cir 1985); *Lionel*, 722 F2d at 1069; *Stephens Indus., Inc. v McClung*, 789 F2d 386, 390-91 (6th Cir 1986).

PAGE  12-  DEBTOR'S MOTION FOR ORDER AUTHORIZING
AN AUCTION AND RELATED RELIEF

***Motschenbacher & Blattner, LLP***
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

14.     Courts within the Ninth Circuit have authorized a sale of all or substantially all of a debtor's assets pursuant to section 363 when there is a good business reason for so doing. *See, e.g., In re Am. Dev. Corp.*, 95 BR 735, 739 (Bankr CD Cal 1989) (among the factors that determines whether a good business reason exists is whether the sale is in the best interests of the estate's creditors); *In re Photocopy & Supply, Inc.*, 1994 WL 553065 at 1 (Bankr. D. Idaho 1994) (a sale of substantially all of the debtor's assets was authorized, in the absence of a reorganization plan, when justified by a good business reason); *see also In re Martin*, 91 F3d 395 (3d Cir 1996); *Lionel*, 722 F2d at 1071; *In re Titusville Country Club*, 128 BR 396 (Bankr WD Pa 1991).

15.     Courts have also required that the debtor provide reasonable and adequate notice of the sale, that the sale price be fair and reasonable, and that the sale be the result of good faith negotiations with the Purchaser. *See, e.g., In re Ewell*, 958 F2d 276 (9th Cir 1992) (declining to set aside or modify a sale pursuant to 11 USC § 363 because the price was fair and reasonable and the Purchaser was a good faith purchaser pursuant to 11 USC § 363(m)); *In re King-Wilson*, 1998 US Dist LEXIS 16595 at *11-12 (ND Cal Oct. 13, 1998); *In re Canyon P'ship*, 55 BR 520 (Bankr SD Cal 1985); *see also In re Abbotts Dairies of Pa.*, 788 F2d 143, 147-50 (3d Cir 1986): *In re Tempo Tech. Corp.*, 202 BR 363, 367 (D Del 1996*), aff'd sub nom. Diamond Abrasives Corp. v. Temtechco, Inc. (In re Temtechco, Inc.)*, 141 F3d 1155 (3d Cir 1998).

16.     In *Lionel*, the Second Circuit Court of Appeals held that the standard for the proper exercise of the debtor's discretion is a good business reason. *Id*. at 1071. The court adopted, in part, the following criteria for evaluating whether a good business reason exists for authorizing a sale of substantially all of the assets of a debtor:

(1)     The proportionate value of the asset to the estate as a whole;

(2)     The amount of elapsed time since the filing of the petition;

(3)     The likelihood that a plan will be proposed and confirmed in the near future;

(4)     The effect of the proposed disposition on future plans of reorganization; and

PAGE  13-  DEBTOR'S MOTION FOR ORDER AUTHORIZING AN AUCTION AND RELATED RELIEF

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone: (503) 417-0500
Fax: (503) 417-0501

1

2

       (5)     Most importantly, whether the assets to be sold are decreasing or increasing in value.

3

4

    17.    The Debtor respectfully submits that the proposed sale of substantially all of the Debtor's assets as set forth herein is entirely consistent with the guidelines set forth in *Lionel* and

5

6

applicable law.  A prompt sale will maximize the amount that the Debtor, its estate and its creditors may realize for the value of the assets.  The terms and conditions of the Auction and the Sale

7

8

Procedures are fair and reasonable and in the best interest of the Debtor, its creditors, and the estate.  The proposed sale should, therefore, be approved.

9

10

    18.    Moreover, the Agreement is the product of substantial good faith, arms'- length negotiations between the Debtor and Purchaser.  The price and the form and structure of the

11

12

proposed sale will be tested in the marketplace.  The Sale Procedures provide certain protections to Purchaser while maximizing the opportunity for competing bids.  Thus, the Debtor is confident

13

14

that the winning bid that emerges from this process will be the highest and best bid obtainable for the Purchased Assets in the circumstances.

15

16

    19.    One of the more important factors to be considered in a sale of substantially all of the assets of a debtor under section 363(b) is whether the value of the debtor's assets will decline. *In re*

17

18

*Lionel Corp*., 722 F2d 1063, 1071.  Such consideration is often dispositive.  *In re Boogaart of Florida, Inc*., 17 BR 480, 483-84 (Bankr SD Fla 1981) ("Where . . . the value of the assets is rapidly

19

20

decreasing and the estates are suffering continuing losses, liquidation of  assets prior to the proposal and confirmation of plans of reorganization may be desirable because it will ultimately increase the

21

22

amounts distributed to creditors after plans are confirmed.").

23

    20.    In this case, the Debtor's assets would rapidly become a "melting ice cube" but for the patience of the Secured Creditors and certain unsecured creditors.  Debtor's existing cash flow

24

does not satisfy its debt service requirements.  Debtor's cash flow has been consistent for years,

25

and Debtor's business has been ongoing only because certain secured noteholders have refrained

26

PAGE  14-   DEBTOR'S MOTION FOR ORDER AUTHORIZING
             AN AUCTION AND RELATED RELIEF

from exercising their rights caused by Debtor's default of its obligations to such creditors.  The Debtor's cash flow will not increase without substantial additional capital investment, and Debtor has found that it is impossible to raise additional capital with its current equity and debt structure.

21.     Delaying a sale could seriously jeopardize the value of the Debtor's business assets. The existing value of the Debtor's business assets is directly related to the continued used of Debtor's services by its customers, none of which have any long-term contracts.  Debtor provides online mail management services, and customers relying on these services to receive their mail are acutely aware of service disruptions and delays.  In order to preserve its customer base and the value of its business assets, the Debtor must continue to operate its business in an orderly manner throughout the sale process to ensure that employee and customer impacts are kept to a minimum, something that will increase in difficulty if the business is subject to a protracted sale process and bankruptcy proceeding. Service disruptions caused by a manner of liquidation or sale that results in increased customer impacts than would be achieved through the sale of substantially all of the assets of the business will result in a substantial loss to the customer base and value of the Debtor's estate.

22.     A prompt sale, as opposed to a sale pursuant to a plan of liquidation or reorganization, will provide the greatest value to creditors.

B.      Sale Free and Clear of Liens and Other Interests

23.     The Debtor requests authorization to sell the Purchased Assets free and clear of all liens and other interests.  Section 363(f) of the Bankruptcy Code authorizes a debtor in possession to sell property "free and clear of any interest in such property of an entity other than the estate" if one or more of the following conditions is satisfied:

(1)     applicable nonbankruptcy law permits the sale of such property free and clear of such interest;

(2)     such entity consents;

*Motschenbacher & Blattner, LLP*
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

(3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)    such interest is bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 USC § 363(f).  Consistent with the use of the term elsewhere in the Bankruptcy Code, courts construe the term "interest" broadly to include all legal and equitable interests in the property and arising from the property.  *See In re Trans World Airlines, Inc*., 322 F.3d 283, 289 (3d Cir. 2003) ("interests" is read expansively to include obligations that may flow from ownership of the property).

24.    Applicable case law provides that a sale of a debtor's assets free and clear of liens, interests and encumbrances, with such liens, interests and encumbrances attaching to the net proceeds of the sale, is permissible under section 363(f).  *See, e.g., In re Goffena*, 175 BR 386, 387 (Bankr D Mont 1994); *In re Granite Lumber Co*., 63 BR 466, 471 (Bankr D Mont 1986); *see also Folger Adam Sec., Inc. v. DeMatteis/MacGregor, JV*, 209 F3d 252, 259 (3d Cir 2000) ("[T]he holdings of the courts suggest that any interest in property that can be reduced to a money satisfaction constitutes a claim for purposes of § 363(f) and, therefore, attaches to the proceeds of the sale."); *In re Elliot*, 94 BR 343, 345 (ED Pa 1988).

25.    One or more of the conditions set forth in section 363(f) are satisfied here with regard to each of the security interests of the Debtor's prepetition creditors.  *See In re Jolan, Inc*., 403 B.R. 866, 869-70 (Bankr. W.D. Wash.  2009); *see also* Memorandum Regarding Sale, *In re Wrangell Seafoods, Inc.*, No. 09-00012 (Bankr. D. Alaska Mar. 9, 2009).  In addition, the absence of an objection by holders of interests in the assets to be sold can constitute consent to the sale free and clear of such claims and interests, satisfying section 363(f)(2).  *See Futuresource LLC v. Reuters Ltd.*, 312 F.3d 281, 285-86 (7th Cir. 2002) (in a sale conducted pursuant to section 363 of

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

1   the Bankruptcy Code, "lack of objection (provided of course there is notice) counts as consent.");

2   *In re Tabone, Inc.*, 175 BR 855, 858 (Bankr D.N.J. 1994); *Veltman v. Whetzal*, 93 F3d 517 (8th Cir

3   1996).  The Secured Creditors affirmatively consent to the proposed Sale.

4   C.      <u>Sale in Good Faith</u>

5        26.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) and (c) of this section of a sale or lease of property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were stayed
> pending appeal.

11 USC § 363(m).

        27.    While the Bankruptcy Code does not define "good faith," the Ninth Circuit has held

that:

> For purposes of § 363(m), a "good faith purchaser" is one who buys
> "in good faith" and "for value."  This court has said that lack of good
> faith is shown by "fraud, collusion between the purchaser and the
> trustee, or an attempt to take grossly unfair advantage of other
> bidders."

*In re Serzow*, 1994 US App LEXIS 16392, at *4-6 (9th Cir June 28, 1994) (citations omitted); *In re

Ewell*, 958 F2d 276, 281 (9th Cir 1992).

        28.    The Debtor submits, and if necessary will present additional evidence at the Sale

Hearing showing, that the negotiation of the Agreement was conducted in a fair manner, and that

due to the open and competitive nature of the Auction, the Agreement or any purchase agreement

finalized by another Successful Bidder will, by definition, be the result of arms'-length

negotiations in good faith, and the Successful Bidder is entitled to all the benefits of section

363(m).

***Motschenbacher & Blattner, LLP***
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

D.    The Expense Reimbursement

29.    The Agreement provides that, in the event Purchaser is not the Successful Bidder, the Successful Bidder shall pay to the Purchaser, within three days following the entry of the Sale Order, the Break-up Fee, if the Successful Bidder is not the Purchaser. "Stalking horse" purchasers in asset sales often seek break-up fees or other forms of protection in the event they are not the successful purchasers, and courts have often approved such incentives, deferring to debtors' business judgment that such incentives are necessary in order to induce the initial bidder to step forward. *See, e.g., In re 995 Fifth Ave. Assocs., L.P.*, 96 BR 24, 28 (Bankr SDNY 1989) (holding that bidding incentives may be necessary to "convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted). Even courts that have rejected the "business judgment" test for evaluating break-up fees as a bidding incentive have indicated that bidding incentives would be appropriate where they provide a benefit to the debtor's estate. *See, e.g., In re O'Brien Envtl. Energy, Inc*., 181 F3d 527, 533 (3d Cir 1999) (stating that bidding incentives benefit the estate where they (i) promote "more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited," or (ii) induce a bidder to submit a bid that serves as a "floor bid" on which other bidders can rely).

30.    The Debtor submits that the Break-up Fee is reasonable and appropriate in the circumstances of this case. Given its modest amount and the material benefits which will inure to the estate and creditors as the result of a going concern sale (as opposed to a liquidation) – including the establishment of a floor price for the assets to be sold – the Debtor submits that the expense reimbursement should be approved.

E.    Assumption and Assignment of Executory Contracts and Unexpired Leases

31.    As set forth above, the Agreement provides for Purchaser or other Successful Bidder to request that the Debtor assume and assign certain contracts and leases. The Bankruptcy

PAGE  18-  DEBTOR'S MOTION FOR ORDER AUTHORIZING
AN AUCTION AND RELATED RELIEF

Code authorizes a debtor in possession to assume or reject an executory contract or unexpired lease, subject to bankruptcy court approval, providing that:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee
>> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
>> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>> (C)  provides adequate assurance of future performance under such contract or lease.

11 USC § 365(a), (b)(1).

32.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical pragmatic construction."  *See*, e.*g.,* *In re Great Nw. Recreation Ctr., Inc*., 74 BR 846 (Bankr D Mont 1987); *see also Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc*.), 103 BR 524, 538 (Bankr D NJ 1988); *In re Bon Ton Rest. & Pastry Shop, Inc*., 53 BR 789, 803 (Bankr ND Ill 1985) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").  Purchaser's promise to perform from and after the Closing Date with respect to Assumed Contracts and Assumed Leases constitutes adequate assurance of future performance in satisfaction of the requirements of section 365 of the Bankruptcy Code.

33.    The standard that is applied in the Ninth Circuit for determining whether an executory contract or unexpired lease should be assumed is the debtor's "business judgment" that the assumption is in its economic best interests.  *See In re GI Indus., Inc*., 204 F3d 1276, 1282 (9th Cir 2000) ("a bankruptcy court applies the business judgment rule to evaluate a trustee's rejection decision"); *see also Sharon Steel Corp. v. National Fuel Gas Distrib. Corp*.  (*In re Sharon Steel Corp*.), 872 F2d 36, 40 (3d Cir 1989); *In re III Enters., Inc. V*, 163 BR 453, 469 (Bankr ED Pa 1994) ("Generally, a court will give great deference to a debtor's decision to assume or reject a contract. A debtor need only show that its decision to assume or reject the contract is an exercise of sound

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

business judgment- a standard which we have concluded many times is not difficult to meet.")
(citations omitted). *Cf Agarwal v. Pomona Valley Med. Group, Inc.* (*In re Pomona Valley Med. Group, Inc.*), 476 F3d 665 (9th Cir 2007) (DIP's rejection of contract was permitted unless based on bad faith, whim or caprice, or on unreasonable strategy).

34.    Under the Agreement, the Debtor will be responsible for any and all cure costs that are required to be paid under section 365 as a condition of the assumption and assignment of the contacts and leases designated by Purchaser.

F.    Appointment of a Consumer Privacy Ombudsman

35.    It may be the case that the Debtor has disclosed to its customers a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the Debtor and that such a policy was in effect on the Petition Date. Accordingly, in accordance with Bankruptcy Rule 6004(g)(1), the Debtor is requesting herein that the Court enter an order directing the United States trustee to appoint a consumer privacy ombudsman under section 322 so that the Court will be able to make the findings required by section 363(b)(l)(A) or (B) at the Sale Hearing.

G.    Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate

36.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Bankruptcy Rule 6006(d) similarly provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under§ 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Debtor requests that any order authorizing it to sell the Purchased Assets and to assign the Material Agreements be effective immediately by providing that the 14-day stay of Bankruptcy Rules 6004(h) and 6006(d) will not apply.

PAGE  20-  DEBTOR'S MOTION FOR ORDER AUTHORIZING
AN AUCTION AND RELATED RELIEF

37.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Committee Notes to Bankruptcy Rules 6004(h).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay, a leading bankruptcy treatise suggests that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."  10 COLLIER ON BANKRUPTCY.  ¶ 6004.10 (15th ed. rev. 2006).  That treatise further suggests that if an objection is overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to seek a stay, unless the court determines that the need to proceed sooner outweighs the interests of the objecting party.  *Id.*

38.     The Debtor requests that the Court rule that the 14-day stay period under Bankruptcy Rules 6004(h) and 6006(d) be waived so that the sale to the Purchaser can close immediately after the entry of the Sale Order.  This is necessary to protect the value of the Purchased Assets, and to ensure that the estate will not continue to be depleted by on going operations for which it has insufficient capital. Debtor is in default of its obligations to its secured debtholders, which have not enforced their rights as an accommodation to Debtor.  Debtor's business is not generating and cannot generate sufficient income to service Debtor's outstanding secured debt.  Every day Debtor's obligations increase, and the business operations would immediately fail if the Debtor's secured noteholders exercised their remedies for Debtor's default.

### Notice

39.     Notice of this motion has been given to, among other parties, (i) the Purchaser; (ii) the Creditors' Committee, if any; (iii) the Secured Creditors; (iv) all shareholders (v) all other persons or entities holding or claiming to have liens or interests in any of the Purchased Assets; (vi) the Office of the United States Trustee; (vii) all creditors of the Debtor; (viii) the Internal

PAGE  21-  DEBTOR'S MOTION FOR ORDER AUTHORIZING
AN AUCTION AND RELATED RELIEF

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

Revenue Service, the Oregon Department of Revenue, and any other entity to whom any tax or other charge may be due, or owing; (ix) all individuals or entities, if any, which have contacted the Debtor to express interest in purchasing the Purchased Assets; (x) all individuals or entities, if any, whom the Debtor believes might have an interest in purchasing the Purchased Assets; (xi) all parties requesting special notice in this Chapter 11 case; and (xii) all other persons or entities required to be served pursuant to orders of this Court, or known counsel for any of the foregoing.

40.     The Debtor submits that the foregoing constitutes good and sufficient notice and that no other or further notice need be given in the circumstances.

WHEREFORE, the Debtor requests entry of an order granting the relief requested herein and such other and further relief as is appropriate.

DATED:  March 20, 2015

MOTSCHENBACHER & BLATTNER, LLP

By: /s/ Nicholas J. Henderson
Nicholas J. Henderson, OSB No. 074027
nhenderson@portlaw.com
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone:  (503) 417-0500
Facsimile:  (503) 417-0501

Proposed Attorneys for Debtor
Earth Class Mail Corporation

PAGE  22-  DEBTOR'S MOTION FOR ORDER AUTHORIZING
AN AUCTION AND RELATED RELIEF

*Motschenbacher & Blattner, LLP*
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

1

EXHIBIT A
AGREEMENT

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

**ASSET PURCHASE AGREEMENT**

between

**DELIVERED.IO, INC.,**
a Delaware corporation
("Buyer")

and

**EARTH CLASS MAIL CORPORATION,**
an Oregon corporation,
in anticipation of it becoming a
Debtor in the United States Bankruptcy Court for the District of Oregon
("Seller")

**February 13, 2015**

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (the "Agreement") is made and entered into, effective as of February 13, 2015 (the "Effective Date"), by and between **DELIVERED.IO, INC.,** a Delaware corporation (the "Buyer"), and **EARTH CLASS MAIL CORPORATION**, an Oregon corporation, in anticipation of it becoming a Debtor in the United States Bankruptcy Court for the District of Oregon ("Seller"), with reference to the following facts:

## RECITALS:

**A.** Seller owns and has operated a business providing online mail management services (the "Business").

**B.** Seller has committed that, within 5 business days after execution of this agreement (the date Seller actually files being hereinafter called the "Petition Date"), it will file a voluntary petition commencing a Chapter 11 Bankruptcy Case styled *in re Earth Class Mail Corporation,* Case No. _____ [to be assigned] (hereinafter, the "Bankruptcy Case") pursuant to Chapter 11 of Title 11 of the United States Code, Section 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Oregon (the "Bankruptcy Court").

**C.** Seller desires to sell all of the assets of the Business to Buyer and Buyer desires to purchase such assets from Seller (such transaction, and the related transactions described below, the "Transactions").

**D.** The parties intend to effectuate the Transactions pursuant to Section 363 of the Bankruptcy Code.

**E.** The execution and delivery of this Agreement and Seller's ability to consummate the Transactions set forth in this Agreement are subject, among other things, to the entry of the Sale Order (as defined in Section 7.2).

**F.** Those terms not otherwise defined herein shall have the meaning ascribed thereto in Section 14.16.

## AGREEMENTS:

**NOW, THEREFORE**, the parties hereto, intending to be legally bound, do hereby agree as follows:

## ARTICLE 1
## PURCHASE AND SALE OF ASSETS

**1.1     AGREEMENT TO SELL.** Upon the terms and subject to all of the conditions contained herein, Seller hereby agrees to sell, assign, transfer and deliver to Buyer at Closing (as defined in Article 3), and Buyer hereby agrees to purchase from Seller at Closing, the Purchased Assets (as defined in Section 1.2), free and clear of all Liens and Liabilities other than Permitted Liens and Assumed Liabilities (as defined in Section 1.4).

**1.2    PURCHASED ASSETS.**  For purposes of this Agreement and subject to the terms and conditions set forth herein, the term "Purchased Assets" shall mean all of the assets constituting property (wherever located, whether tangible or intangible), owned, leased, or otherwise held by Seller in connection with the Business as of the Closing Date (as defined in Section 3.1), including but not limited to the following assets:

        **(a)    ACCOUNTS RECEIVABLE.**  All of Seller's accounts receivable (the "Accounts Receivable"), which shall be reflected in a memorandum that Seller shall deliver to Buyer at the Closing, listing the name of each customer, the amount due from such customer, and the aging thereof.

        **(b)    FURNITURE, FIXTURES, AND EQUIPMENT**.  All of Seller's tangible personal property (including all furniture, fixtures, computers, and other equipment), a list of which as of the date hereof is attached hereto at **EXHIBIT A**.

        **(c)    INVENTORY AND SUPPLIES**.  All of Seller's inventory relating exclusively to the Business (the "Inventory"), and all of Seller's supplies relating exclusively to the Business (the "Supplies").

        **(d)    BOOKS AND RECORDS**.  All of Seller's books, records and files pertaining directly and exclusively to the Business (excluding unissued checks drawn on any Seller checking account), including, without limitation, databases, files and lists of customers, supplier lists, catalogues, pricing, sales and promotional literature, trade show booths and display assets, manuals, and copies of equipment records.

        **(e)    CONTRACTS**.  All of Seller's existing contracts with third parties pertaining exclusively to the Business, including all agreements with vendors and with other suppliers used in the Business, all executory contracts related to the Seller Intellectual Property, including all computer software licenses and services contracts, and any leases (each, an "Assumed Lease"), a list of which is attached hereto at **EXHIBIT B** (all such contracts described in this Section 1.2(e), other than the Assumed Leases, are referred to herein as the "Assumed Contracts"), provided, however, with respect to any Assumed Lease or executory contract, Seller shall have paid all Cure Costs required under Section 8.6.

        **(f)    PREPAID EXPENSES.**  All prepaid expenses and deposits exclusively associated with the Business and the Assumed Contracts and Assumed Leases.

        **(g)    INTELLECTUAL PROPERTY.**  All intellectual property of Seller, to the extent owned by Seller or which Seller has a right to use and to the extent that such intellectual property may be assigned by Seller, including without limitation (A) all rights to all trade names and trademarks (whether registered or unregistered), including but not limited to "**Earth Class Mail**" and any derivative used exclusively in the Business, (B) all copyrights and other right, title, and interest in and to the product names, trade brochures and marketing materials, and drawings for the products sold in the Business, and (C) all trade secrets, business plans, marketing plans, and other intangible assets used exclusively in the Business, (D) all patents, provisional patents, and patent applications, (E) all domain names, including "earthclassmail.com", and (F) all software used in the business (the "Software") including but not limited to the following with respect to the Software owned by Seller:

        **(i)**        All source code for the Software;

        **(ii)**        All binaries with respect to the Software;

   **(iii)** All libraries with respect to the Software;

   **(iv)** All XML, HTML, and executables with respect to the Software;

   **(v)** All applications constructed with the source code for the Software;

   **(vi)** All documentation describing all or any portion of the Software or the source code therefor; and

   **(vii)** All of Seller's rights in and to all copyrights with respect to the Software.

   A list of Seller's Intellectual Property that is material to the Business is set forth in **Schedule 4.5(b)(i)**.

   **(h)** **GOODWILL**.  All goodwill associated exclusively with the Business, including (i) the name "**Earth Class Mail**" and any derivative thereof, (ii) all phone and fax numbers used in the Business, and (iii) all goodwill associated with the existing contracts of Seller.

   **(i)** **CLAIMS.**  The right to tender claims asserted exclusively against Buyer to Seller's insurance companies under Seller's casualty insurance policies (to the extent such right is assignable under the terms of Seller's policies of insurance) relating to the Purchased Assets.

  **1.3** **EXCLUDED ASSETS.**  Notwithstanding the foregoing, the Purchased Assets shall not include the following assets (collectively, the "Excluded Assets"):

   **(a)** **CORPORATE RECORDS.**  The corporate seals, organizational documents, minute books, stock books, Tax returns, books of account or other records having to do with the corporate organization of Seller.

   **(b)** **INSURANCE**.  All insurance policies of Seller and all rights to applicable claims and proceeds thereunder, except to the extent set forth in Section 1.2(i).

   **(c)** **RIGHTS UNDER AGREEMENT**.  The rights which accrue or will accrue to Seller under this Agreement and all agreements related hereto.

   **(d)** **EXCLUDED CONTRACTS**.  All contracts and leases listed on **EXHIBIT C**, as it may be updated from time to time pursuant to Section 6.3 ("Excluded Contracts").

  **1.4** **ASSUMED LIABILITIES.**  Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge only the following Liabilities of Seller as of the Closing Date (collectively, the "Assumed Liabilities"), and no other Liabilities:

   **(a)** **ACCOUNTS PAYABLE.**  All trade accounts payable of Seller to third parties in connection with the Business that remain unpaid and are not delinquent on or after the Closing Date and that arose in the ordinary course of business consistent with past practice.  A list of all such trade accounts payable existing as of the Effective Date is set forth in **Schedule 1.4(a)**.

3

(b)    **ASSUMED CONTRACTS**.  All Liabilities in respect of the Assumed Contracts and Assumed Leases but only to the extent that, in each case, such Liabilities thereunder are required to be performed on or after the Closing Date, were incurred in the ordinary course of business and do not relate to any failure to perform, improper performance, warranty or other breach, default or violation by Seller prior to the Closing.

(c)    **ACCRUED VACATION.**  All Liabilities of Seller in respect of any accrued and unpaid vacation and paid time-off benefits with respect to the Employees (such Liabilities, "Accrued Vacation").

(d)    **COBRA.**  All Liabilities and obligations related to the provision of COBRA continuation coverage after Closing to individuals who are "M & A qualified beneficiaries," as defined in Treasury Regulation Section 54.4980B-9, Q&A-4(a), with respect to the transactions contemplated in or by this Agreement.

(e)    **NO OTHER ASSUMED LIABILITIES**.  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, EXCEPT AS SET FORTH IN THIS SECTION 1.4, AT THE CLOSING BUYER SHALL NOT ASSUME ANY LIABILITY WHATSOEVER WITH RESPECT TO ANY OF SELLER'S DEBTS, LIABILITIES, OR OTHER OBLIGATIONS, WHETHER OR NOT ARISING OUT OF OR RELATING TO THE PURCHASED ASSETS OR THE BUSINESS OR ANY OTHER BUSINESS OF SELLER.  ALL LIABILITIES AND OBLIGATIONS OF SELLER SHALL BE AND REMAIN SOLELY THE LIABILITIES AND OBLIGATIONS OF SELLER.

**1.5**    **ASSUMED CONTRACTS AND ASSUMED LEASES**.

(a)    Seller will provide notice to each counterparty to the contracts and leases listed on **Schedule 1.5(a)** (the "Material Agreements") that the contract or lease will be assumed pursuant to the provisions hereof, and provide each counterparty due notice of the opportunity to object to the terms of the assumption, or the terms of the assignment, of any such contract or lease prior to entry of the Sale Order.

(b)    With respect to each Assumed Contract and Assumed Lease, on the Closing Date Seller shall (i) assume such Assumed Contract or Assumed Lease in the Bankruptcy Case and (ii) subject to Seller paying any amounts designated in **Schedule 1.5(b)** as Cure Costs and providing adequate assurance of performance to the counterparty thereto to the extent required by the Bankruptcy Court, assign such Assumed Contract or Assumed Lease to Buyer pursuant to an Order of the Bankruptcy Court (which may be the Sale Order). Buyer is to have no liability for any Cure Costs except any that Buyer elects to pay. Effective on the Closing Date, Seller shall assign to Buyer each such Assumed Contract or Assumed Lease.

(c)    The Sale Order shall provide that, as of the Closing, Seller shall assign to Buyer each Assumed Contract and Assumed Lease. At least 7 business days prior to the filing of the Sale Order, Seller shall identify any leases, contracts and other rights, property and commitments included in the Purchased Assets that cannot be transferred or assigned effectively without the consent of any third party or Order of the Bankruptcy Court. Buyer shall be permitted to request that Seller obtain a signed certification (an "Estoppel Certificate") from any counterparty to the effect that as of the date of assignment to Buyer, there are no uncured defaults or events which, with the giving of required notice or otherwise, might constitute an event of default, and if so requested by Buyer, Seller shall use commercially reasonable efforts to obtain such signed certification.

4

**ARTICLE 2**
**CONSIDERATION FOR ASSETS**

     **2.1**    **PURCHASE PRICE.** The purchase price for the Purchased Assets identified in Section 1.2, above, shall be $5,000,000, subject to adjustment pursuant to Section 2.2 (the "Purchase Price"), payable as follows:

     **(a) DEPOSIT.** Upon execution of this Agreement, and within 1 business day following the Petition Date, Buyer shall deposit with U.S. Bank National Association (the "Escrow Agent"), to be held in trust until disbursed pursuant to Section 13.3, a good faith deposit of $150,000 (the "Deposit"), which shall be applied toward Buyer's payment of the Purchase Price if Buyer is the successful purchaser, or otherwise released to Buyer or Seller, as the case may be, in accordance with Section 13.3.

     **(b) ESCROW.** At the Closing, Buyer shall wire $350,000, or such other amount as is necessary for the total amount deposited in escrow by the Buyer to equal $500,000 (the "Escrow Amount"), to the Escrow Agent, to be held by the Escrow Agent for a 1 year period to satisfy any claims for Damages (as defined in Section 12.3) pursuant to Article 12. Such amount shall be paid to Seller, if at all, after the expiration of the Survival Period (as defined in Section 12.1), provided, however, that if a claim for Damages has not yet been resolved, the Escrow Agent may retain a portion of the Escrow Amount equal to the unresolved claim amount until that claim has been finally resolved in accordance with the Escrow Agreement.

     **(c) CLOSING PAYMENT.** At the Closing, Buyer shall pay the Purchase Price, less the Escrow Amount and Deposit (the "Closing Payment"), to Seller by wire transfer to the account(s) designated by Seller or as otherwise provided in the Sale Order that has become a Final Order.

     **(d) REIMBURSEMENT COSTS.** At the Closing, Buyer shall also be required to pay the Reimbursement Costs, in cash, to the extent required by Section 11.1, which Reimbursement Costs shall be in addition to the Purchase Price.

     **2.2**    **PURCHASE PRICE ADJUSTMENT.**

     **(a) CLOSING ADJUSTMENT.**

     **(i)**    At least 3 business days before the Closing, Seller shall prepare and deliver to Buyer a statement setting forth its good faith estimate of Closing Working Capital (the "Estimated Closing Working Capital") in a form similar to that set forth in **Schedule 2.2(a)(ii)**, which statement shall contain an estimated balance sheet of the Seller as of the Closing Date (without giving effect to the transactions contemplated herein), a calculation of Estimated Closing Working Capital (the "Estimated Closing Working Capital Statement") and a certificate of the Chief Financial Officer of Seller that the Estimated Closing Working Capital Statement was prepared in accordance with GAAP applied in a manner consistent with the Seller's past practice.

     **(ii)**    The "Closing Adjustment" shall be an amount equal to the Estimated Closing Working Capital minus $500,000 (the "Target Working Capital"). If the Closing Adjustment is a positive number, the Purchase Price shall be increased by the amount of the Closing Adjustment. If the Closing Adjustment is a negative number, the Purchase Price shall be reduced by the amount of the Closing Adjustment.

5

**(b) POST-CLOSING ADJUSTMENT.**

(i)     Within 90 days after the Closing Date, Buyer shall prepare and deliver to Seller a statement setting forth its calculation of Closing Working Capital, which statement shall contain a balance sheet of the Seller as of the Closing Date (without giving effect to the transactions contemplated herein), a calculation of Closing Working Capital (the "Closing Working Capital Statement") and a certificate of the Chief Financial Officer of Buyer that the Closing Working Capital Statement was prepared in accordance with GAAP applied in a manner consistent with the Seller's past practice.

(ii)    The post-closing adjustment shall be an amount equal to the Closing Working Capital minus the Estimated Closing Working Capital (the "Post-Closing Adjustment"). If the Post-Closing Adjustment is a positive number greater than $5,000, Buyer shall pay to Seller an amount equal to the Post-Closing Adjustment. If the Post-Closing Adjustment is a negative number, the absolute value of which is greater than $5,000, Seller shall pay to Buyer an amount equal to the Post-Closing Adjustment.

**(c) EXAMINATION AND REVIEW.**

(i)     After receipt of the Closing Working Capital Statement, Seller shall have 30 days (the "Review Period") to review the Closing Working Capital Statement. During the Review Period, Seller and its accountants and financial advisors shall have full access to the books and records of the Buyer, the personnel of, and work papers prepared by, Buyer and/or Buyer's accountants and financial advisors to the extent that they relate to the Closing Working Capital Statement and to such historical financial information (to the extent in Buyer's possession) relating to the Closing Working Capital Statement as Seller may reasonably request for the purpose of reviewing the Closing Working Capital Statement and to prepare a Statement of Objections (defined below), provided, that such access shall be in a manner that does not interfere with the normal business operations of Buyer.

(ii)    On or prior to the last day of the Review Period, Seller may object to the Closing Working Capital Statement by delivering to Buyer a written statement setting forth Seller's objections in reasonable detail, indicating each disputed item or amount and the basis for Seller's disagreement therewith (the "Statement of Objections"). If Seller fails to deliver the Statement of Objections before the expiration of the Review Period, the Closing Working Capital Statement and the Post-Closing Adjustment, as the case may be, reflected in the Closing Working Capital Statement shall be deemed to have been accepted by Seller. If Seller delivers the Statement of Objections before the expiration of the Review Period, Buyer and Seller shall negotiate in good faith to resolve such objections within 30 days after the delivery of the Statement of Objections (the "Resolution Period"), and, if the same are so resolved within the Resolution Period, the Post-Closing Adjustment and the Closing Working Capital Statement with such changes as may have been previously agreed in writing by Buyer and Seller, shall be final and binding.

(iii)   If Seller and Buyer fail to reach an agreement with respect to all of the matters set forth in the Statement of Objections before expiration of the Resolution Period, then any amounts remaining in dispute ("Disputed Amounts") shall be submitted for resolution to the office of Moss Adams LLP or, if Moss Adams LLP is unable to serve, Buyer and Seller shall appoint by mutual agreement the office of an impartial nationally or regionally recognized firm of independent certified public accountants other than the accountants of Seller or Buyer (the "Independent Accountants") who, acting as experts and not arbitrators, shall resolve the Disputed Amounts only and make any adjustments

6

to the Post-Closing Adjustment, as the case may be, and the Closing Working Capital Statement. The Independent Accountants shall only decide the specific items under dispute by the parties and their decision for each Disputed Amount must be within the range of values assigned to each such item in the Closing Working Capital Statement and the Statement of Objections, respectively.

**(iv)**    The fees and expenses of the Independent Accountant shall be paid by Seller, on the one hand, and by Buyer, on the other hand, based upon the percentage that the amount actually contested but not awarded to Seller or Buyer, respectively, bears to the aggregate amount actually contested by Seller and Buyer.

**(v)**    The Independent Accountants shall make a determination as soon as practicable within 30 days (or such other time as the parties hereto shall agree in writing) after their engagement, and their resolution of the Disputed Amounts and their adjustments to the Closing Working Capital Statement and/or the Post-Closing Adjustment shall be conclusive and binding upon the parties hereto.

**(vi)**    Except as otherwise provided herein, any payment of the Post-Closing Adjustment by the Buyer or Seller shall (A) be due within 10 business days of final determination of the Post-Closing Adjustment in accordance with this Section 2.2(c); and (B) be paid by wire transfer to the account(s) designated by the Seller or Buyer, as the case may be.

**(d)  ADJUSTMENT FOR TAX PURPOSES.**  Any payments made pursuant to Section 2.2 shall be treated as an adjustment to the Purchase Price by the parties for Tax purposes, unless otherwise required by applicable law.

**2.3    NO ASSUMPTION OF LIABILITIES**.  Buyer shall not assume, and Seller shall retain, all of Seller's Liabilities that exist as of the Closing Date other than the Assumed Liabilities.

## ARTICLE 3
## CLOSING

**3.1    CLOSING.**  Upon the terms and conditions set forth in this Agreement, the closing of the sale of the Purchased Assets (the "Closing") shall occur as promptly as practicable and no later than the 5th business day following the date on which the Sale Order has become a Final Order.  The date and time at which the Closing actually occurs is referred to as the "Closing Date".

**3.2    DOCUMENTS AND CONSIDERATION DELIVERED BY SELLER AT CLOSING.**  At the Closing, Seller shall deliver to Buyer the executed copies of the following documents in a form reasonably satisfactory to Buyer:

**(a)**    The Escrow Agreement, duly executed by Seller in a form reasonably satisfactory to Buyer;

**(b)**    A bill of sale and assignment and assumption agreement in form reasonably acceptable to Buyer, covering all of the Purchased Assets;

**(c)**    Instruments of assignment of the Seller Intellectual Property included in the Purchased Assets sufficient to vest Seller's rights to the Seller Intellectual Property in Buyer;

7

(d)      All files, documents, and electronically stored information in the possession of or controlled by Seller relating to the Seller Intellectual Property;

(e)      All agreements of any sort between Seller and Employees or Former Employees relating to the Seller Intellectual Property, whether relating to ownership, assignment, production, development, non-disclosure, non-competition or otherwise;

(f)      To the extent approved by the Sale Order, instruments of assumption and assignment of the Assumed Leases and Assumed Contracts;

(g)      To the extent in Seller's possession: (i) all files for the Assumed Leases and Assumed Contracts, and (ii) all keys and the combination of any equipment, machineries, safes, and access codes for any electronic security included in the Purchased Assets; and

(h)      Each other document reasonably requested by Buyer to transfer the Purchased Assets in accordance with the terms of this Agreement.

**3.3**      **DOCUMENTS AND CONSIDERATION DELIVERED BY BUYER AT CLOSING.**  At the Closing, Buyer shall deliver the following to Seller:

(a)      The Escrow Agreement, duly executed by Buyer in a form reasonably satisfactory to Seller;

(b)      An assignment and assumption agreement covering all of the Purchased Assets and Assumed Liabilities, duly executed by Buyer;

(c)      To the extent approved by the Sale Order, instruments of assumption and assignment of the Assumed Leases and Assumed Contracts, duly executed by Buyer;

(d)      The Closing Payment; and

(e)      The Reimbursement Costs.

**ARTICLE 4**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

Except as set forth on the Disclosure Schedules attached to this Agreement, which exceptions shall be deemed to be part of the representations and warranties made hereunder, Seller hereby represents and warrants to Buyer that:

**4.1**      **ORGANIZATION OF SELLER.**  Seller is an entity duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization, the state of Oregon, and qualified to do business in the jurisdictions set forth in **Schedule 4.1**.

**4.2**      **AUTHORITY AND CONSENTS.**  Seller has full power and authority to enter into this Agreement, and following the entry of the Sale Order, Seller will have full power and authority to carry out the transactions contemplated by this Agreement.  This Agreement and its execution and delivery to Buyer have been duly authorized by Seller.  This Agreement, subject to the entry of the Sale Order,

8

constitutes the valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except to the effect, if any, of general principles of equity, including rules of law governing specific performance, injunctive relief, and other equitable remedies.

**4.3  NO VIOLATION.**  Except as set forth in **Schedule 4.3**, neither the execution and delivery of this Agreement, nor the consummation of the transactions provided for herein by Seller, will conflict with, or (with or without notice or lapse of time, or both) result in a termination, breach, impairment or violation of, (a) in any material respect, any contract or any other agreement, instrument or commitment pertaining to the Business to which Seller is a party or by which it is bound, or (b) any federal, state, local or foreign law, judgment, writ, decree, order, statute, rule or regulation applicable to Seller or by which any of its properties or assets is bound or affected, except where the conflict, termination, breach, impairment or violation would have a Material Adverse Effect.  The consummation of this Agreement and Buyer's acquisition of the Purchased Assets and exercise of the rights hereunder in and of themselves will not (x) result in the creation of any Lien upon the Purchased Assets, or (y) require the consent of any third party except for the Sale Order and any consents which would not have a Material Adverse Effect if not obtained.  Except as set forth in **Schedule 4.3**, Seller is not a party to, or otherwise subject to any provision contained in, any instrument or agreement which restricts or otherwise limits the Seller's right to transfer the Purchased Assets under the terms contemplated by this Agreement.

**4.4  TITLE TO ASSETS.**  Seller has, and upon delivery to Buyer on the Closing Date of instruments of transfer contemplated herein, as authorized by the terms of the Sale Order, Seller will thereby transfer to Buyer good and marketable title to, or in the case of property leased or licensed by Seller, a valid and subsisting leasehold interest in or a legal, valid and enforceable licensed interest in or right to use, all of the Purchased Assets free and clear of Liens other than Permitted Liens.

**4.5  INTELLECTUAL PROPERTY.**

    **(a)  *Definitions*.**

        **(i)**    "Inbound License" means any contract pursuant to or under which any Intellectual Property Rights or Public Software are licensed to the Seller.

        **(ii)**    "Intellectual Property Right(s)" means any or all of the following and all rights in, arising out of, or associated therewith, which in each case may exist or be created under the laws of any jurisdiction in the world: (1) all patents, utility models and rights in inventions, discoveries, methods, apparatuses and processes (whether or not capable of being patented) (collectively, "Patents"); (2) all trade secrets, know-how, methods, processes, developments, discoveries, ideas, designs, algorithms, models, strategies, techniques and confidential or proprietary information ("Trade Secrets"); (3) all rights associated with software (including both source code and executable code and associated application programming interfaces) and works of authorship, including copyrights, moral rights, or rights of publicity associated therewith ("Copyrights"); (4) all mask works, mask work registrations and applications therefore ("Mask Works"); (5) all industrial designs and any registrations and applications therefore throughout the world; (6) all rights in domain names and applications and registrations therefor ("Domain Names"); (7) all trade names, trade dress, logos or other corporate designations, slogans, brand names, trademarks and service marks, and in each case all goodwill associated therewith ("Trademarks"); (8) all rights in databases and data compilations; (9) any and all registrations and applications (including provisional applications) for items (1)-(8), and all reissues, divisionals, re-examinations, corrections, renewals, extensions, continuations and continuations-in-part thereof; and (10) any similar, corresponding or equivalent rights to any of the foregoing.

9

(iii)    "Public Software" means any software that contains, includes, incorporates, or has instantiated therein, or is derived in any manner (in whole or in part) from, any software that is distributed as free software, open source software (e.g., Linux) or similar licensing or distribution models, including software licensed or distributed under any of the following licenses or distribution models, or licenses or distribution models similar to any of the following: (1) GNU's General Public License (GPL) or Lesser/Library GPL (LGPL); (2) the Artistic License (e.g., PERL); (3) the Mozilla Public License; (4) the Netscape Public License; (5) the Sun Community Source License (SCSL); (6) the Sun Industry Standards License (SISL); (7) the BSD License; and (8) the Apache License.

(iv)    "Registered Intellectual Property Right(s)" means any and all Intellectual Property Rights that are registered, filed, recorded, or issued under the authority of any state, government or other public or private legal authority at any time, including without limitation (1) Patents; (2) registered Trademarks; (3) registered Copyrights; (4) registered Mask Works; (5) Domain Names; and (6) any applications for any of the foregoing.

(v)    "Seller Intellectual Property" means any and all Intellectual Property Rights owned (in whole or in part) by, purported to be owned by, or exclusively licensed to, the Seller. For clarification, "Seller Intellectual Property" does not include any non-exclusive Intellectual Property Rights granted to Seller in any license agreement, covenant not to sue, or other contract.

(vi)    "Seller IP Contract" means any contract to which the Seller is a party or by which the Seller is bound that contains any assignment or license of, or covenant not to assert or enforce, any Intellectual Property Right or that otherwise relates to any Seller Intellectual Property or any Intellectual Property Rights developed by, with, or for the Seller.

(vii)    "Seller Product" means any product or service presently being (or that in the past 12 months has been) designed, developed, manufactured, marketed, distributed, provided, licensed, or sold by the Seller.

(viii)    "Seller Registered Intellectual Property Rights" means all Registered Intellectual Property Rights owned (in whole or in part) by, purported to be owned by, filed in the name of or applied for by, or exclusively licensed to the Seller.

(b)  *Fundamental Intellectual Property Representations*.

(i)    *Disclosures*. **Schedule 4.5(b)(i)** is a complete and accurate list of all of the following:

(A) all Intellectual Property Rights material to the Business that are both (1) licensed to the Seller or in which the Seller has received or acquired any right or interest and (2) embedded or incorporated into any Seller Product, constitute a software development tool or are used directly in the distribution or support of any Seller Product (other than (A) Public Software, which is separately contemplated by Section 4.5(b)(i)(B), (B) Intellectual Property Rights purchased by the Seller in the acquisitions contemplated by Section 4.5(c)(iv), and (C) widely-available commercial software products that are licensed pursuant to a non-exclusive, internal-use license and are generally available on standard terms for less than $5,000, for each such software product, in annual license and maintenance fees for the license type and quantity used by the Seller), and the corresponding Contracts pursuant to or

10

under which such Intellectual Property Rights are licensed to the Seller or such right or interest is received or acquired by the Seller;

(B) all Public Software programs, libraries and/or materials that are embedded or incorporated into any Seller Product, which list shall contain (A) the name of the Public Software, (B) the license name and version pursuant to which the Seller has received a license to such Public Software, (C) a short statement regarding how the Public Software is being used by the Seller, (D) whether or not the Seller has made any modifications to such Public Software and (E) whether or not such Public Software is distributed;

(C) all other Intellectual Property Rights that are both (1) licensed to the Seller or in which the Seller has received or acquired any right or interest and (2) material to the business of the Seller as it currently is conducted (other than widely-available commercial software products that are licensed pursuant to a non-exclusive, internal-use license and are generally available on standard terms for less than $5,000, for each such software product, in annual license and maintenance fees for the license type and quantity used by the Seller) and the corresponding contracts pursuant to or under which such Intellectual Property Rights are licensed to Seller;

(D) each contract pursuant to or under which any Person has been granted any license to or under, or otherwise has received or acquired any right or interest in (whether or not currently exercisable or vested), any Seller Intellectual Property (other than non-exclusive, internal-use licenses granted to end user customers in the ordinary course of business on materially the same terms as are in the Seller's form customer contract for the applicable Seller Product located on the Seller's website), including, but not limited to, contracts that contain any grant or assignment of any license or other rights in or to any Seller Intellectual Property upon the occurrence of some future event or circumstance;

(E) each contract pursuant to or under which (A) the source code for any Seller Product or any other confidential information or Trade Secret of the Seller has been provided to an escrow agent or to any other Person or (B) the Seller is obligated (whether a present, future or contingent obligation) to provide the source code for any Seller Software or any other confidential information or Trade Secret of the Seller to an escrow agent or to any other Person; and

(F) the name of each Person who is or was, at any time since June 1, 2007, an employee or contractor of the Seller and who is or was involved in the contribution, creation or development of any Seller Intellectual Property and the corresponding contracts with such Persons.

(ii)    *Specific Representations*.

(A) Seller has provided complete and accurate copies of all contracts identified in **Schedule 4.5(b)(i)**, each of which, to the Knowledge of the Seller, is valid and enforceable.

(B) To the Knowledge of Seller, no Public Software has been used in any way that (A) would or could require, when the object code is distributed, the distribution or provision of access to the source code of any Seller Product or portion thereof that is combined with or linked to such Public Software or based upon such Public Software, (B) would or could require the distribution for free or at some reduced price of any Seller Software or portion thereof that is combined with or linked to such Public Software or based upon such Public Software or (C) would or could otherwise impose any

11

limitation, restriction or condition on the right or ability to use or distribute any Seller Software or portion thereof that is combined with or linked to such Public Software or based upon such Public Software.

**(C)** No source code or other material confidential information or material Trade Secret of the Seller has been disclosed to any Person other than under Contracts identified pursuant to **Schedule 4.5(b)(i)(E)** or under a confidentiality or non-disclosure agreement, except to the extent that such disclosure would not adversely affect the Seller Intellectual Property being transferred to Buyer.

**(D)** No event has occurred, and no circumstance or condition exists, that (with or without notice or lapse of time) will, or could reasonably be expected to, result in the delivery, license, or disclosure to any other Person of the source code for any Seller Software or any other material confidential information or material Trade Secret of the Seller.

**(E)** The Seller is not in material breach of nor has the Seller failed to perform in any material respect under any Inbound License.

**(F)** To the Knowledge of the Seller, the Seller Products and the business of the Seller as it currently is conducted do not infringe, misappropriate or violate any Copyright, Trade Secret or other Intellectual Property Right of any Person. No infringement, misappropriation, or similar claim or proceeding is pending or, to the Knowledge of the Seller, has been threatened against the Seller or against any other Person who may be entitled to be indemnified, defended, held harmless, or reimbursed by the Seller with respect to such claim or proceeding. The Seller has never received any written notice or other communication relating to any actual, alleged, or suspected infringement, misappropriation, or violation of any Intellectual Property Rights of another Person (including any claim that the seller must license or refrain from using any Intellectual Property Rights of any third party, and including any so-called "invitation to license").

**(G)** The Seller exclusively owns all right, title and interest to and in the Seller Intellectual Property owned by Seller free and clear of any Liens other than Permitted Liens, and no other party is a joint owner of any Seller Intellectual Property owned by Seller; provided, however, that nothing in this Section 4.5(b)(ii)(G) will be deemed to be or constitute any representation or warranty of non-infringement, which is dealt with exclusively in Section 4.5(b)(ii)(F).

**(c)** *Additional Intellectual Property Disclosures and Representations*.

**(i)** *No Source Code Documentation*. The source code for the Seller Products contains over 700,000 lines of custom code without any annotations or programmer's comments, nor has the code otherwise been documented in a manner, that: (A) is consistent with customary code annotation conventions and good practices in the software industry; or (B) is sufficient to independently enable a programmer of reasonable skill and competence to understand analyze and interpret program logic, correct errors and improve, modify and support the Seller Software.

**(ii)** *Copyrights, Trademarks and Patents*. **Schedule 4.5(c)(ii)** is a complete and accurate list of all Registered Intellectual Property Rights and unregistered Copyrights and Trademarks that are material to the Seller or its business and are included in the Seller Intellectual Property. To the Knowledge of the Seller, no trademark or trade name owned, used, or applied for by the

12

Seller conflicts or interferes with any trademark or trade name owned, used, or applied for by any other Person. The Seller has not taken any action that would set a United States patent bar date within 120 days of the Closing Date for any patent application being contemplated or prepared by the Seller as of the Closing Date.

(iii) *Trade Secrets*. The Seller has taken reasonable steps required to protect the Seller's rights in (A) confidential information and Trade Secrets of the Seller and (B) confidential information and Trade Secrets provided by any third Person to the Seller, and to protect such information and Trade secrets against loss, theft and unauthorized access, use or disclosure.

(iv) *Intellectual Property Acquisition, Dispositions and Joint Ownership*. **Schedule 4.5(c)(iv)** is a complete and accurate list of all Intellectual Property Rights material to the business that were acquired, assigned or transferred by the Seller (other than from Employees) at any time since June 1, 2007, whether by contract or operation of law.

(v) *Employees and Contractors*. To the Knowledge of Seller, no employee of the Seller is (A) bound by or otherwise subject to any contract restricting him or her from performing his or her duties for the Seller; or (B) in breach of any contract with any former employer or other Person concerning Intellectual Property Rights or confidentiality due to his or her activities as an employee of the Seller.

(vi) *Government Rights*. No funding, facilities, or personnel of any Governmental Authority or any college, university, or other educational institution were used, directly or indirectly, to develop or create, in whole or in part, any Seller Intellectual Property.

(vii) *Compliance with Contracts*. (A) The Seller is not in material breach of nor has the Seller failed to perform in any material respect under any Seller IP Contract; (B) to the Knowledge of the Seller, no other party to any such Contract is in breach thereof; and (C) to the Knowledge of the Seller there is no dispute regarding the scope of any such Contract, or performance under any such contract, including with respect to any payments to be made or received by the Seller thereunder.

(viii) *Third Party Infringement of Seller Intellectual Property*. To the Knowledge of the Seller, no Person has infringed, misappropriated or otherwise violated any Seller Intellectual Property and no Person is currently infringing, misappropriating or otherwise violating any Seller Intellectual Property.

(ix) *Software defects*. To the Knowledge of the Seller, none of the software that comprises or that enables or is embedded within any Seller Product (A) contains any material bug, defect or error that materially and adversely affects the use, functionality, performance or value thereof or (B) fails in a material respect to comply with any applicable warranty or other contractual commitment relating to the use, functionality or performance of any Seller Product.

(x) *Harmful Code*. To the Knowledge of the Seller, no software that comprises or that enables or is embedded within any Seller Product contains any "back door," "drop dead device," "time bomb," "Trojan horse," "virus," or "worm" (as such terms are commonly understood in the software industry) or any other code designed or intended to have any of the following functions: (A) disrupting, disabling, harming, or otherwise impeding in any manner the operation of, or providing

13

unauthorized access to, a computer system or network or other device on which such code is stored or installed; or (B) damaging or destroying any data or file without the user's consent.

        **(xi)**    *Royalties*. The Seller is not and following the Closing Date will not be obligated to pay any royalties or other fees or consideration with respect to Intellectual Property Rights of any third party embedded or otherwise used in conjunction with any Seller Product; provided, however, that nothing in this Section 4.5(c)(xi) will be deemed to be or constitute any representation or warranty of non-infringement, which is dealt with exclusively in Section 4.5(b)(ii)(F).

        **(xii)**    *Sufficiency*. To the Knowledge of the Seller, the Seller Intellectual Property and the Intellectual Property Rights licensed to the Seller pursuant to the Inbound Licenses constitute, and after the Closing the Buyer will have, all Intellectual Property Rights needed to conduct the business of the Seller in all material respects as currently conducted; provided, however, that nothing in this Section 4.5(c)(xi) will be deemed to be or constitute any representation or warranty of non-infringement, which is dealt with exclusively in Section 4.5(b)(ii)(F).

        **(xiii)**    *Transferable.* All Seller Intellectual Property owned by Seller is fully transferable, alienable and licensable by the Seller, without payment of any kind to any Person.

        **(xiv)**    *Effects of This Transaction*. Neither this Agreement nor the transactions contemplated by this Agreement, including the assignment to the Buyer, by operation of law or otherwise, of any contracts or agreements to which the Seller is a party, will result in (A) Buyer, or any affiliate of Buyer, being obligated to pay with respect to any Intellectual Property Right any amount or other consideration other than ongoing fees, royalties or payments that the Seller would otherwise be required to pay pursuant to the terms of any agreement to which the Seller is a party or by which it is bound had the transactions contemplated by this Agreement not occurred; (B) a loss of, or Lien on, any Seller Intellectual Property; or (C) a breach of any Seller IP Contract or Inbound License.

    **4.6**    **PRIVACY; DATA PROTECTION**.

        **(a)** Except as disclosed in **Schedule 4.6(a)**, to the Seller's Knowledge all personal and behavioral information that has been collected by or on behalf of the Seller whether (i) from the Seller's customers, (ii) from users of the Seller's website, or (iii) by or through the Seller's products or services, or otherwise, has been collected, stored, maintained and used in accordance with all Legal Requirements related to privacy. The Seller has not received a notice of noncompliance with or audit, investigation or proceeding with respect to any data protection laws, rules, regulations, guidelines or industry standards nor of any contract (including privacy policies and terms of use on any website) governing any information or data used by the Seller. The Seller has provided Buyer with true and correct copies of all current and past privacy policies and terms of use for the last 5 years that apply to the personal and behavioral information used by the Seller. Except as disclosed in **Schedule 4.6(a)**, the Seller's practices are in compliance with (x) its current privacy policy posted on the Seller's website, and (y) to the Knowledge of the Seller, its customers' privacy policies, when required to do so by contract. To the Knowledge of Seller, there has been no unauthorized access to or use of personal or behavioral information in the possession of the Seller or, to the Knowledge of the Seller, any third party to which Seller has provided such information. To the Knowledge of the Seller, the Seller is not subject to any obligation that would prevent the Buyer from using the personal and behavioral information collected by the Seller either (1) from the Seller's customers, (2) from users of the Seller's website, or (3) by the Seller's products or services in a manner consistent with any law or industry standard regarding the collection, retention, use, or disclosure of such personal and behavioral information.

14

(b)  Except as disclosed in **Schedule 4.6(b)**, the Seller has not received a written complaint regarding the Seller's collection, use or disclosure of personal and behavioral information. To the Knowledge of the Seller, each of the execution, delivery and performance of this Agreement complies with all Legal Requirements relating to privacy and does not violate Seller's privacy policies. True and correct copies of all such privacy policies are attached to **Schedule 4.6(b)** of the Seller Disclosure Schedule, and the Seller has at all times made all privacy policy disclosures to such users or customers on the Seller's websites and otherwise as required by any Legal Requirement. To the Knowledge of the Seller, none of such disclosures made or contained in any such privacy policy has been inaccurate, misleading or deceptive or in violation of any Legal Requirement in any material respect.

(c)  The Seller has implemented and maintains a plan, or plans, which (i) identifies internal and external risks to the security of data and confidential information, including personally identifiable information; (ii) implements and monitors adequate and effective administrative, electronic and physical safeguards to control those risks; (iii) maintains notification procedures in compliance with all Legal Requirements and privacy or other policies in the case of any breach of security compromising data, including unencrypted data containing personally identifiable information; and (iv) adequately provides for the prevention of data loss. To its Knowledge, Seller has not experienced any data loss, breach of security or otherwise unauthorized access by third parties to confidential information, including personally identifiable information, in the Seller's possession, custody or control.  Seller, and to the Knowledge of the Seller, its applicable vendors are currently compliant with all information and data security requirements of the Payment Card Industry Data Security Standard ("PCI DSS") and during the last 18 months has timely conducted all self-assessments and independent third-party audits, as required by the PCI DSS.

**4.7  COMPLIANCE WITH LAW; PERMITS**.

(a)  Except as set forth in **Schedule 4.7(a)**, to its Knowledge, the Seller is and has been in compliance in all material respects with all Legal Requirements applicable to it in connection with the conduct or operation of the Business and the ownership or use of the Purchased Assets.  Neither Seller nor any of its executive officers has received, nor to the Knowledge of Seller is there any basis for, any notice, order, complaint or other communication from any Governmental Authority or any other Person that such Seller is not in compliance in all material respects with any such Legal Requirements.

(b)  **Schedule 4.7(b)** sets forth a true and complete list of all permits necessary for Seller to own, lease and operate the Purchased Assets and to carry on the Business in all material respects as currently conducted (the "Permits").  Seller is and has been in compliance in all material respects with all such Permits.  As of the date hereof, no suspension, cancellation, modification, revocation or nonrenewal of any Permit is pending or, to the Knowledge of Seller, threatened.

**4.8    CONSENTS AND APPROVALS**.  Subject to the Sale Order becoming a Final Order, no consent, approval or authorization of, or declaration, filing or registration with, any government, regulatory authority or third party is required in connection with the execution, delivery and performance of this Agreement by Seller and the consummation of the transactions contemplated thereby.

15

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller that:

**5.1     AUTHORIZATION; ETC.**  Buyer has full power and authority to enter into this Agreement and to carry out the transactions contemplated hereby.   The Buyer has taken all action required by law to authorize the execution and delivery of this Agreement and the transactions contemplated hereby, and this Agreement is a valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, except as to the effect, if any, of (a) applicable bankruptcy, insolvency and other similar laws affecting the rights of creditors generally and (b) the effect of general principles of equity, including rules of law governing specific performance, injunctive relief and other equitable remedies.

**5.2     NO VIOLATION.**  The execution and performance of this Agreement will not result in a violation of Buyer's existing certificate of organization or limited liability company operating agreement or other organizational or governing documents.  Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will be in conflict with, or constitute a default under or cause the acceleration of the maturity of any debt or obligation pursuant to, any agreement or commitment to which Buyer is a party or by which Buyer is bound, or violate any statute or law or any judgment, decree, order, regulation, or rule of any court or governmental authority.  The consummation of this Agreement and Buyer's acquisition of the Assets and exercise of the rights hereunder in and of themselves will not (x) result in the creation of any Lien upon the assets of Buyer, or (y) require the consent of any third party (other than parties to contracts or other agreements or arrangements with Seller). Buyer is not a party to, or otherwise subject to any provision contained in, any instrument or agreement which restricts or otherwise limits either Buyer's right to acquire the Assets or will restrict Buyer's use thereof after transfer to Buyer.

**5.3     CONSENTS AND APPROVALS OF GOVERNMENT AUTHORITIES**.  No consent, approval or authorization of, or declaration, filing or registration with, any governmental or regulatory authority is required in connection with the execution, delivery and performance of this Agreement by Buyer and the consummation of the transactions contemplated hereby.

**5.4     NO BROKERS**.  No broker, finder or investment banker is entitled to brokerage commissions, finders' fees or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement made by or on behalf of Buyer.  Buyer shall indemnify, defend, and hold Seller free and harmless from any liability, loss or expense (including attorney's fees) arising in connection with any such claim.

**5.5     SUFFICIENCY OF FUNDS**.  Buyer has, and at the Closing will have, sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Purchase Price and the Reimbursement Costs and consummate the transactions contemplated by this Agreement.

## ARTICLE 6
## SELLER'S PRE-CLOSING COVENANTS

During the period from the date of this Agreement until the Closing, Seller covenants and agrees as follows:

16

**6.1   ADVICE OF CHANGES.**  Seller shall promptly advise Buyer in writing of any event occurring subsequent to the date of this Agreement that (a) would render any representation or warranty of Seller contained in this Agreement, if made on or as of the date of such event or the Closing Date, untrue or inaccurate in any material respect or (b) would constitute a Material Adverse Effect on the Business or Purchased Assets, individually or in the aggregate.

**6.2   MAINTENANCE OF BUSINESS.**  Seller shall use commercially reasonable efforts to carry on and preserve the Business and its relationships with customers, suppliers, employees and others in all material respects in substantially the same manner as it has prior to the date hereof.  If Seller becomes aware of a material deterioration in the relationship with any customer, supplier or key employee of Seller, it will promptly bring such information to the attention of Buyer in writing and, if requested by Buyer, will exert its commercially reasonable efforts to restore the relationship.  Seller shall also maintain the current levels of, and policies regarding, the insurance on the Business and Purchased Assets that exist as of the date of this Agreement.

**6.3   CONDUCT OF BUSINESS OF SELLER**.  Except as contemplated by this Agreement or consented to in writing by the Buyer (which consent shall not be unreasonably withheld), during the period from the date hereof to the Closing Date, Seller shall conduct the Business in the ordinary course of business consistent with past practice and, to the extent consistent therewith, with no less diligence and effort than would be applied in the absence of this Agreement, use its commercially reasonable efforts to preserve intact its current business operations, keep available the service of its current officers and employees and preserve its relationships with customers, suppliers, distributors, lessors, creditors, employees, contractors and others having business dealings with it, with the intention that its goodwill and ongoing businesses shall be unimpaired at the Closing Date except to the extent such impairment is caused by the Bankruptcy Case.  Seller shall provide written notice to Buyer of the entry into any material contract, in which case Buyer shall have 5 days after the receipt of such written notice to add such contract to **Exhibit C** as an Excluded Contract.

**6.4   REGULATORY APPROVALS.**  Seller shall execute and file, or join in the execution and filing, of any application or other document that may be necessary in order to obtain the authorization, approval or consent of any Governmental Authority which may be reasonably required, or which Buyer may reasonably request, in connection with the consummation of the transactions contemplated by this Agreement.  Seller shall use commercially reasonable efforts to obtain all such authorizations, approvals and consents.

**6.5   LITIGATION.**  Seller shall notify Buyer in writing promptly after learning of any material actions, suits, proceedings or investigations by or before any court, board or governmental agency, initiated by or against it, or known by it to be threatened against it.

**6.6   ACCESS TO INFORMATION; PRE-CLOSING INVENTORY.**  Until the Closing or termination of this Agreement pursuant to the terms of Article 12, below, Seller shall permit Buyer and its agents full access to all books and records of Seller pertaining to its Business (including, without limitation, any and all information relating to Seller's taxes, commitments, contracts, leases, licenses, and real, personal and intangible property and financial condition), and full access to all employees, customers and suppliers thereof, in order to make a reasonable and detailed investigation of Seller's Business; provided all such access shall be at reasonable times and on reasonable prior notice to Seller, and shall be coordinated through the Chief Executive Officer of Seller.  Seller will participate and cooperate with Buyer in completing such due diligence.  Seller will make available to Buyer and its

17

representatives all information reasonably necessary to facilitate such investigation and will instruct those persons with information concerning the subject matter of such investigation to disclose it to and cooperate with Buyer.

**6.7    CONTACT WITH CUSTOMERS, VENDORS AND EMPLOYEES**.  Seller shall use commercially reasonable efforts to facilitate Buyer's contact and communication with Employees and customers, suppliers, vendors and distributors of the Business.

**6.8    SATISFACTION OF CONDITIONS PRECEDENT.**  Seller shall use commercially reasonable efforts to satisfy or cause to be satisfied all the agreements and conditions precedent which are set forth in Article 8 and Article 10, and Seller will use commercially reasonable efforts to cause the transactions contemplated by this Agreement to be consummated, and, without limiting the generality of the foregoing, to obtain all consents and authorizations of third parties and to make all filings with, and give all notices to, third parties that may be necessary or reasonably required on its part in order to effect the transactions contemplated hereby.

## ARTICLE 7
## BANKRUPTCY MATTERS

**7.1**    Seller and Buyer acknowledge that this Agreement and the sale of the Purchased Assets are subject to Bankruptcy Court approval. Seller and Buyer acknowledge that (a) to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest or otherwise best offer possible for the Purchased Assets, including, but not limited to, giving notice of the transactions contemplated by this Agreement to creditors and certain other interested parties as ordered by the Bankruptcy Court, and (b) Seller must pay the Cure Costs and cure all defaults and provide adequate assurance of future performance under the Assumed Contracts and Assumed Leases. Seller and Buyer acknowledge that in connection with Seller's efforts to obtain the highest or otherwise best offer possible for the Purchased Assets, Seller has engaged a financial advisor, and with the assistance of this financial advisor has prepared an executive summary of the Business and actively marketed the sale of the Business from approximately November 20, 2014 to December 20, 2014. Further, the Seller and Buyer acknowledge that the Bankruptcy Court may, but is not required to, order an auction process for the sale of the Purchased Assets.

**7.2**    Seller has filed or will within 5 business days file with the Bankruptcy Court a motion (the "Sale Motion"), notices and proposed orders, in form and content reasonably satisfactory to Buyer seeking the Bankruptcy Court's issuance of the sale order (the "Sale Order"). The Sale Motion shall include a request that the Sale Order include, among other things:

**(a)**  that this Agreement was negotiated at arms-length, and the Buyer has acted in good faith and without collusion or fraud of any kind;

**(b)**  the Buyer is not an "insider" or "affiliate" of the Seller as those terms are defined in the Bankruptcy Code;

**(c)**  neither the Seller nor the Buyer has engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application of Section 363(n) of the Bankruptcy Code with respect to the consummation of the purchase transaction;

18

**(d)** Buyer is purchasing the Purchased Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code and is entitled to the protections afforded by Section 363(m) of the Bankruptcy Code;

**(e)** notice of the sale (and any required sale procedures), as sent to all creditors and interested parties, is sufficient to comply with notice requirements of the Bankruptcy Code;

**(f)** all objections to the sale free and clear of liens, claims, interests and encumbrances have been withdrawn or overruled, and the Buyer therefore purchases the Purchased Assets free and clear of all liens, claims, interests and encumbrances, including free and clear of the Liens and Liabilities, other than Permitted Liens and Assumed Liabilities; and

**(g)** Buyer is released from any potential liability in connection with the purchase of the Purchased Assets, other than Permitted Liens and Assumed Liabilities.

**7.3** Seller shall serve a copy of the Sale Motion on:

**(a)** all entities that claim any interest in or Lien (other than Permitted Liens) upon the Purchased Assets;

**(b)** all parties to Assumed Contracts and Assumed Leases;

**(c)** all governmental taxing authorities that have or as a result of the sale of the Purchased Assets may have claims, contingent or otherwise, against the Seller;

**(d)** all parties that filed requests for notices under Bankruptcy Rule 901(b) or were entitled to notice under Bankruptcy Rule 2002;

**(e)** all creditors or holders of claims (as defined in Section 101(5) of the Bankruptcy Code, whether or not liquidated, contingent, disputed, or unmatured) of the Seller;

**(f)** all interested governmental, pension, environmental and other regulatory entities;

**(g)** the Attorney General of the State of Oregon;

**(h)** the Office of the United States Trustee;

**(i)** the Internal Revenue Service and any governmental taxing authority that has filed a claim against the Seller; and

**(j)** all entities that expressed to the Seller an interest in purchasing the Purchased Assets.

**7.4** Seller shall provide Buyer with copies of all motions, applications and supporting papers prepared by or on behalf of the Seller (including forms of orders) directly relating to the Purchased Assets or this Agreement prior to the filing thereof in the Bankruptcy Case so as to allow Buyer to provide reasonable comments for incorporation into same.

19

**7.5**    The Seller has filed or will within 5 business days file with the Bankruptcy Court a motion seeking approval of a bidding process. The Bankruptcy Court order approving such bidding process shall include the following, without limitation:

    **(a)**  If Buyer is not, for any reason, the successful purchaser, Buyer will be entitled to a cash payment in an amount equal to 3% of the total purchase price paid by the successful purchaser (the "Break-Up Fee") and a return of the Deposit;

    **(b)**  Competing bidders will be required to pay the Break-Up Fee and overbid in $10,000.00 increments above the bid submitted by the Buyer; Buyer shall have the right but not the obligation to overbid competing bids in $10,000.00 increments;

    **(c)**  Competing bidders must demonstrate when bidding the ability to pay the purchase price in cash at the Closing;

    **(d)**  Competing bidders (other than the Buyer) will be required to deposit $150,000.00 cash, and deliver to Seller a signed copy of this Agreement, marked to show such bidder's proposed changes, in order to confirm a commitment to proceed with the purchase; and

    **(e)**  If the Buyer is the successful purchaser, then the Sale Order shall contain, among other things, the provisions set forth above in Section 7.2.

## ARTICLE 8
## ADDITIONAL AGREEMENTS

**8.1**    **FURTHER ASSURANCES**.  Subject to the terms and conditions herein provided, the parties hereto shall take or cause to be taken all action and do or cause to be done all things reasonably necessary, proper or advisable under applicable Legal Requirements to consummate and make effective, as soon as reasonably practicable, the transactions contemplated hereby.

**8.2**    **COOPERATION ON TAX MATTERS**.  The parties shall cooperate, and shall cause their respective representatives to cooperate, in preparing and filing all Tax returns (including amended Tax returns and claims for refund), in handling audits, examinations, investigations, and administrative, court or other Proceedings relating to Taxes, in resolving all disputes, audits and refund claims with respect to such Tax returns and Taxes, and any earlier Tax returns and Taxes of Seller, and in all other appropriate Tax matters.

**8.3**    **NO SUCCESSOR LIABILITY TO EMPLOYEES**.  Under no circumstances shall Buyer assume or be obligated to pay, and the Purchased Assets, shall not be or become liable for or subject to, any liabilities to the Seller's Employees arising prior to the Closing Date, including any Liabilities related to Benefit Plans, employment practices, COBRA (except as provided in Section 8.4(f) below), equal employment opportunity, nondiscrimination, harassment, wrongful termination, breach of contract, immigration, wage and hour laws, any other state, federal or local labor and employment laws" Liability under the WARN Act, salaries, vacations, sick pay, incentives, severance pay, bonus, overtime, meal period, pension profit sharing retirement and/or deferred compensation and any other compensation or benefits, other than Assumed Liabilities (the "Employee Claims"), which Employee Claims shall be discharged by Seller pursuant to the Sale Order.

20

**8.4**    **EMPLOYMENT**.

(a)  On the Closing Date, Seller shall (x) terminate the employment of all Employees directly employed by Seller and (y) terminate Seller's arrangement with the Agencies (as defined in Section 14.16) to provide such Employees to Seller.  Buyer shall offer employment to all Employees (or enter into an arrangement with the Agencies or a similar service provider to provide the services of such Employees) on terms no less favorable in any material respect than the terms currently in effect with respect to such Employees (and which terms shall not be modified so as to be less favorable in any material respect for a period of 12 months following the Closing Date) to commence immediately following the Closing, each such offer contingent upon (i) the Sale Order becoming a Final Order, (ii) the Closing and (iii) the completion of a customary background check, the results of which shall be reasonably satisfactory to Buyer.  Except as set forth on Schedule 8.4, Buyer's employment of any individuals previously employed by Seller shall be on an "at will" basis. Employees who accept Buyer's offer of employment and who commence employment with Buyer (either directly or through a third party such as the Agencies) from and after the Closing Date shall be referred to herein as the "Hired Employees."

(b)  On the Closing Date, and for a period of at least 12 months thereafter, Buyer shall provide or cause its Affiliates to provide Hired Employees with compensation and employee benefits that are not less favorable in any material respect than the compensation and employee benefits provided to such employees by the Seller immediately prior to the Closing.  Each Hired Employee will receive credit for purposes of eligibility to participate, vesting, benefit level and accrual, and all other purposes under each employee benefit plan sponsored by Buyer or its Affiliates (or through the Agencies for the Employees provided by the Agencies) in which such Hired Employee (or the spouse, domestic partner or dependent of such Hired Employee) participates or is eligible to participate on or after the Closing Date (each, a "Buyer Plan") for years of service with the Seller (or any predecessors) prior to the Closing Date, but only to the extent such service was taken into account for such purposes under the analogous Benefit Plan.  Buyer will cause each Buyer Plan that is a group health plan (i) to waive any and all pre-existing condition limitations, eligibility waiting periods, actively at work requirements and evidence of insurability requirements with respect to Hired Employees (and their spouses, domestic partners and dependents) to the extent waived, satisfied or not included under the analogous Benefit Plan, and (ii) to recognize for each Hired Employee (and the spouse, domestic partner and dependents of such Hired Employee) for purposes of applying annual deductible, co-payment and out-of-pocket maximums under such Buyer Plan any deductible, co-payment and out-of-pocket expenses paid by such Hired Employee and his or her spouse, domestic partner or dependents under the analogous Benefit Plan during the plan year of such Benefit Plan in which occurs the Closing Date.

(c)  With respect to each Hired Employee, Seller hereby waives and releases each such individual from any and all contractual, common law or other restrictions enforceable by Seller on the employment, activities or other conduct of such individuals after their termination of employment with Seller; provided, however, that Seller shall assign to Buyer Seller's rights to all obligations of each Hired Employee not to disclose confidential information relating to the Business and all obligations not to compete with the Business owed to Seller by such Hired Employee.

(d)  Nothing herein, express or implied, shall confer upon any Employee any rights or remedies (including any right to employment or continued employment for any specific period) of any nature or kind whatsoever, under or by reason of this Agreement.  Under no circumstance shall any individual employed or formerly employed by Seller (or provided to Seller by the Agencies) become an

21

employee of Buyer unless such individual becomes a Hired Employee.  Buyer and Seller agree that the provisions contained herein are not intended to be for the benefit of or otherwise be enforceable by, any third party, including any Employee.

(e)  Seller shall retain all Liabilities that are not Assumed Liabilities arising out of the termination of any Employees who are not Hired Employees, including: (i) compliance with the requirements of the WARN Act or under any similar or analogous Legal Requirement having applicability to Seller or the Business; (ii) administration and payment of severance benefits, and if provided, out placement assistance; (iii) accrued salary, vacation and benefits or other payments (other than the Assumed Liabilities); whether or not payable under Contract; and (iv) any other related Liabilities.

(f)  Buyer shall be responsible for providing continuation coverage to the extent required by COBRA to those individuals who are "M & A qualified beneficiaries," as defined in Treasury Regulation Section 54.4980B-9, Q&A-4(a), with respect to the transactions contemplated in or by this Agreement.

(g)  Within 10 business days of the date hereof, Seller shall deliver to Buyer: (i) a loss history for Seller's health insurance for the 24 months prior to the date hereof; and (ii) a detailed report of any individual health insurance claim by an Employee or former employee of Seller which exceeded $15,000.00 for the 12 month period prior to the date hereof.  Notwithstanding anything contained in this Agreement to the contrary, Seller shall not be required to provide any information which would violate HIPAA or any other Legal Requirements.

(h)  Except as provided in Section 8.4(a) or to the extent consented to by Seller in writing, Buyer agrees that from the date hereof until the date 12 months after this Agreement is terminated pursuant to Article 13, neither Buyer nor any of its Affiliates shall directly or indirectly solicit for employment or otherwise induce, influence or encourage to terminate employment with Seller, or employ or engage as an independent contractor, any Employee.

8.5  **ADEQUATE ASSURANCES REGARDING ASSUMED CONTRACTS AND ASSUMED LEASES**.  With respect to each Assumed Contract and each Assumed Lease, Seller and Buyer will use commercially reasonable efforts to provide adequate assurance as required under the Bankruptcy Code of the future performance by Buyer of each such Assumed Contract and Assumed Lease. Buyer and Seller agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that all defaults have been cured and that there has been an adequate demonstration of adequate assurance of future performance under the Assumed Contracts and the Assumed Leases, such as furnishing affidavits, non-confidential financial information or other documents or information for filing with the Bankruptcy Court and making Buyer's and Seller's employees and representatives available to testify before the Bankruptcy Court.

8.6  **CURE AMOUNTS**. Set forth on **Schedule 1.5(b)** is a list of the costs: (a) that pursuant to Bankruptcy Code Section 365(b) will be required to cure any default on the part of the Seller under the Assumed Contracts and Assumed Leases, which costs must be delivered to the nondebtor under the Assumed Contracts and Assumed Leases, or with respect to which adequate assurance of prompt delivery by Seller must be provided as a prerequisite to the assumption of such Assumed Contracts and Assumed Leases under Bankruptcy Code Section 365(a); (b) that will be necessary to keep the Seller current on any payments due under any Assumed Contract or Assumed Lease as of the Closing Date (the "Cure Costs"). Prior to the Closing, Buyer shall cooperate with Seller to resolve any disputes with the

22

nondebtor party to any of the Assumed Contracts or Assumed Leases regarding the amount of the Cure Costs. Subject to entry of the Sale Order and it becoming a Final Order, Seller shall pay the Cure Costs designated in accordance with the terms and conditions of any Order approving the assumption and assignment of the Assumed Contracts.

8.7    **CONFIDENTIALITY**. Buyer acknowledges and agrees that the Confidentiality Agreement remains in full force and effect and, in addition, covenants and agrees to keep confidential, in accordance with the provisions of the Confidentiality Agreement, information provided to Buyer pursuant to this Agreement. Buyer further covenants and agrees that if this Agreement is, for any reason, terminated prior to Closing, Buyer will promptly return to the Seller and will not disclose to third parties any confidential information received from the Seller in the course of investigating, negotiating, and performing the transactions contemplated by this Agreement. Buyer's obligations with regard to the Confidentiality Agreement shall terminate as of the Closing.

## ARTICLE 9
## CONDITIONS TO OBLIGATIONS OF SELLER

Seller's obligations hereunder are subject to the fulfillment or satisfaction, on or before the Closing Date, of each of the following conditions (any one or more of which may be waived by Seller, but only in a writing signed by Seller):

9.1    **ACCURACY OF REPRESENTATIONS AND WARRANTIES.**  The representations and warranties of Buyer set forth in Article 5 shall be true and accurate in every material respect on and as of the Closing with the same force and effect as if they had been made at the Closing, except for changes contemplated by this Agreement and except for those representations and warranties that address matters only as of a particular date (which shall remain true and correct as of such particular date), with the same force and effect as if they had been made at the Closing.

9.2    **BUYER'S COVENANTS.**  Buyer shall have performed and complied in all material respects with all of its covenants contained in Article 8 on or before the Closing.

9.3    **COMPLIANCE WITH LAW.**  There shall be no order, decree, or ruling by any court or governmental agency or threat thereof, or any other fact or circumstance, which would prohibit or render illegal the transactions contemplated by this Agreement.

9.4    **GOVERNMENT CONSENTS.**  There shall have been obtained at or prior to the Closing Date such permits or authorizations, and there shall have been taken such other action, as may be required to consummate the transactions contemplated by this Agreement by any regulatory authority having jurisdiction over the parties and the actions herein proposed to be taken, including but not limited to requirements under applicable federal and state securities laws.

9.5    **CONSENTS.**  Seller and Buyer shall have received either (a) duly executed copies of such consents from parties to the Material Agreements as are required under the terms thereof for such Material Agreements to be assigned and delegated to Buyer hereunder, or (b) the approval of the Bankruptcy Court to assume and assign the Material Agreements.

9.6    **CERTIFICATES OF NO DEFAULT.**  Seller and Buyer shall have received signed certifications from the counterparties to the Material Agreements listed on **Schedule 9.6** to the effect

23

that, as of 5 business days prior to the Closing Date, there are no uncured defaults or events which, with the giving of required notice or otherwise, might constitute an event of default.

**9.7     NO LITIGATION.**  No litigation or proceeding shall be threatened or pending for the purpose or with the probable effect of enjoining or preventing the consummation of any of the transactions contemplated by this Agreement, or which could be reasonably expected to have a Material Adverse Effect.

**9.8     SALE ORDER.**  The Sale Order shall have been entered.

**9.9     EMPLOYMENT OFFERS.**  Buyer shall have made offers of employment to all Employees in accordance with Section 8.4(a).

**9.10     BUYER CLOSING DELIVERABLES.**  Seller shall have received from Buyer those documents and deliverable set forth in Section 3.3 (including executed copies of those items listed therein that call for Buyer's signature).

# ARTICLE 10
## CONDITIONS TO OBLIGATIONS OF BUYER

Buyer's obligations hereunder are subject to the fulfillment or satisfaction, on or before the Closing Date, of each of the following conditions (any one or more of which may be waived by Buyer, but only in a writing signed by Buyer):

**10.1     ACCURACY OF REPRESENTATIONS AND WARRANTIES.**  The representations and warranties of Seller set forth in Article 4 (as qualified by the Seller Disclosure Schedule) shall be true and accurate in every material respect on and as of the Closing with the same force and effect as if they had been made at the Closing, except for changes contemplated by this Agreement and except for those representations and warranties that address matters only as of a particular date (which shall remain true and correct as of such particular date), with the same force and effect as if they had been made at the Closing.

**10.2     COVENANTS.**  Seller shall have performed and complied in all material respects with all of its respective covenants contained in Article 6 on or before the Closing.

**10.3     ABSENCE OF MATERIAL ADVERSE CHANGE.**  There shall not have occurred any event or circumstance which has, or is reasonably likely to have, a Material Adverse Effect upon the Business.

**10.4     COMPLIANCE WITH LAW.**  There shall be no order, decree, or ruling by any court or governmental agency or threat thereof, or any other fact or circumstance, which would prohibit or render illegal the transactions contemplated by this Agreement.

**10.5     ASSUMED CONTRACTS AND ASSUMED LEASES.**  The conditions of Section 1.5 shall be satisfied, which shall include the receipt by Buyer of any Estoppel Certificate requested by Buyer pursuant to Section 1.5(c), except to the extent that the failure to obtain such Estoppel Certificate does not materially adversely affect the Business.

24

**10.6    REQUIRED EMPLOYEES**.  The employees listed in **Schedule 10.6** shall commit to Buyer to become Hired Employees as of the Closing Date.

**10.7    SELLER CLOSING DOCUMENTS.**  Buyer shall have received from Seller those documents set forth in Section 3.2 (including executed copies of those items listed therein that call for Seller's signature), above.

**10.8    CONSENTS**.  Seller and Buyer shall have received either (a) duly executed copies of such consents from parties to the Material Agreements as are required under the terms thereof for such Material Agreements to be assigned and delegated to Buyer hereunder, or (b) the approval of the Bankruptcy Court to assume and assign the Material Agreements.

**10.9    CERTIFICATES OF NO DEFAULT**.  Seller and Buyer shall have received signed certifications from the counterparties to the Material Agreements listed on **Schedule 9.6** to the effect that, as of 5 business days prior to the Closing Date, there are no uncured defaults or events which, with the giving of required notice or otherwise, might constitute an event of default.

**10.10    NO LITIGATION.**  No litigation or proceeding shall be threatened or pending for the purpose or with the probable effect of enjoining or preventing the consummation of any of the transactions contemplated by this Agreement, or which could be reasonably expected to have a Material Adverse Effect.

**10.11    SALE ORDER; FINAL ORDER**.  The Sale Order shall have been entered, and shall contain, among other things, the provisions described in Section 7.2, and shall have become a Final Order in a form reasonably satisfactory to Buyer and consistent in all material respects with the terms of this Agreement as it relates to the sale of the Business.

## ARTICLE 11
## POST CLOSING COVENANTS

**11.1    TRANSACTION COSTS.**  Each party shall pay and be solely responsible for the costs and expenses of its respective counsel and the other costs and fees incurred by such party in connection with negotiating and closing the transactions contemplated by this Agreement; provided, however, that upon Closing (if and only if the Closing occurs), Buyer shall pay to Seller the lesser of (a) $150,000 or (b) one-half of the aggregate expenses incurred by Seller and Ignition Venture Partners in connection with the Agreement and the transactions contemplated thereby (the "Reimbursement Costs").

**11.2    ACCESS TO BOOKS AND RECORDS**.  Upon request from time to time after the Closing, each party shall provide the other party and its representatives reasonable access to the books and records of the Business, together with reasonable usage of photocopying, telephone, fax and other use of such party's facilities, with respect to the period prior to the Closing in order to enable such party (a) to prepare for and complete financial statements and any audits by its independent auditors, auditors of its lenders and other representatives income Tax returns, (b) to prepare and defend any tax audits, (c) to assert and defend any claims with respect to the Business arising prior to the Closing, and (d) any other reasonable purpose.

## ARTICLE 12
## SURVIVAL OF REPRESENTATIONS AND WARRANTIES; INDEMNITY

**12.1    SURVIVAL.**  The representations, warranties and covenants of Seller and Buyer contained in this Agreement, or in any certificate or schedule or instrument delivered pursuant hereto, shall survive the Closing for a period of 1 year (the "Survival Period").  Accordingly, except for claims of fraud, the parties agree that all claims for breach of such representations, warranties or covenants hereunder shall expire unless a written claim therefor is presented hereunder prior to the expiration of such one-year Survival Period; provided that if the covenant which is alleged to have been breached is a covenant that is required to be performed in the first instance after the Closing Date, then the Survival Period for any breach of such covenant shall be 1 year from the date on which the obligations described in such covenant were first required to be performed.

**12.2    ESCROW PERIOD.** The Escrow Amount shall be delivered to Escrow Agent on the Closing Date and shall be distributed by Escrow Agent within 5 business days after the last day of the Survival Period (such period referred to herein as the "Escrow Period"), provided, however, that the portion of the Escrow Amount which is necessary to satisfy any unsatisfied claims specified in any Indemnitee Certificate delivered by an Indemnitee to an Indemnifying Party prior to termination of the Escrow Period or updated thereafter, shall not be paid and shall not be issued, as applicable, until such claims have been finally resolved, or, if earlier, until paid or issued in accordance with Section 12.7 below.

**12.3    INDEMNIFICATION BY SELLER.**  Subject to Section 12.7, Seller shall indemnify, defend (with counsel of its selection), and hold Buyer and its successors, assigns, partners, employees, and other agents (collectively, the "Buyer Indemnitees"), harmless from and against any and all liabilities, obligations, losses, claims, damage, cost, charges or other expenses of every kind and character (including but not limited to attorneys' fees and litigation costs) (collectively, "Damages"), which may accrue or be sustained by any Buyer Indemnitee arising out of or as a result of (a) any pre-Closing Taxes, (b) any Liabilities of Seller (other than the Assumed Liabilities), and (c) any breach of the representations, warranties, or covenants of Seller contained in this Agreement.

**12.4    INDEMNIFICATION BY BUYER.**  Subject to Section 12.7, Buyer shall indemnify, defend (with counsel of its selection), and hold Seller and its successors, assigns, partners, employees, and other agents (collectively, the "Seller Indemnitees" and together with the Buyer Indemnitees, the "Indemnitees"), harmless from and against any and all Damages which may accrue or be sustained by any Seller Indemnitee arising out of or as a result of (a) Assumed Liabilities and (b) any breach of the representations, warranties, or covenants of Buyer contained in this Agreement.

**12.5    SATISFACTION OF INDEMNIFICATION OBLIGATIONS OF SELLER.**  In the event the Buyer Indemnitees are entitled to recover any Damages from Seller pursuant to this Article 12, Escrow Agent shall distribute an amount equal to such damages to the Buyer Indemnitees from the Escrow Amount.

**12.6    INDEMNITY PROCEDURES.**

    **(a)    DELIVERY OF CERTIFICATE**.  In the event that at any time or from time to time after the Closing Date an Indemnitee shall sustain Damage of any nature whatsoever against which such Indemnitee is indemnified under this Agreement, such Indemnitee shall deliver to Seller (if such Indemnitee is a Buyer Indemnitee) or to Buyer (if such Indemnitee is a Seller Indemnitee) (each, an

26

"Indemnifying Party"), in writing, promptly, on or before the last day of the Survival Period, a certificate signed by Indemnitee (a "Indemnitee Certificate"):

(i)    Stating the aggregate amount of the Indemnitee's Damages or an estimate thereof, in each case to the extent known or determinable at such time; and

(ii)    Specifying in reasonable detail the individual items of such Damages included in the amount so stated, the date each such item was paid or properly accrued or arose, the nature of the misrepresentation, breach or claim to which such item is related, and the specific Section of this Agreement alleged to have been violated.

(b)    **RESOLUTION OF CLAIMS**.  If an Indemnifying Party objects in writing to any claim or claims made in any Indemnitee's Certificate, then the Indemnitee shall have 30 days to respond in a written statement to the objection.  If after such 30-day period there remains a dispute as to any claims, the Indemnifying Party and Indemnitee shall attempt in good faith for 30 days to agree upon the rights of the respective parties with respect to each of such claims.  If the Indemnifying Party and Indemnitee should so agree, a memorandum setting forth such agreement shall be prepared and signed by both parties.  If no such agreement can be reached after good faith negotiation, either the Indemnifying Party or Indemnitee may commence an action to pursue such claim.

**12.7    CERTAIN LIMITATIONS**.

(a)    In no event shall the aggregate indemnity payments made by an Indemnifying Party exceed the Escrow Amount.

(b)    An Indemnifying Party shall not be liable to an Indemnitee for indemnification under this Article 12 until the aggregate amount of all Damages in respect of indemnification exceeds $50,000 (the "Basket"), in which event the Indemnifying Party shall be required to pay or be liable all Damages from dollar zero. With respect to any claim as to which an Indemnitee may be entitled to indemnification under this Article 12, the Indemnifying Party shall not be liable for any individual or series of related Damages which do not exceed $2,500, and no such claim shall be counted for determining whether the Basket has been met.

(c)    Payments by an Indemnifying Party under Section 12.2 or Section 12.3 in respect of any Damages shall be limited to the amount of any liability or damage that remains after deducting therefrom any insurance proceeds and any indemnity, contribution or other similar payment received or reasonably expected to be received by the Indemnitee in respect of any such claim. The Indemnitees shall use their commercially reasonable efforts to recover under insurance policies or indemnity, contribution or other similar agreements for any Damages prior to seeking indemnification under this Agreement.

(d)    In no event shall either the Buyer or the Seller be liable to any Indemnitee for any punitive, incidental, consequential, special or indirect damages, including loss of future revenue or income, loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement, or diminution of value or any damages based on any type of multiple.

**12.8    EXCLUSIVE REMEDY.**  Except for a claim based upon fraud, the rights of indemnification set forth in this Article 12 shall be the sole and exclusive remedy of the Indemnitees for any breach of the other party's representations, warranties, or covenants under this Agreement and the assertion of any claim relating to liabilities of the Business with respect to the conduct of the Business

prior to the Closing, the Excluded Liabilities, or otherwise relating to the subject matter of this Agreement.

# ARTICLE 13
## TERMINATION

**13.1**    **TERMINATION.**  This Agreement may be terminated at any time prior to the Closing only as follows:

(a)    By the mutual written consent of the Buyer and Seller;

(b)    By either the Buyer or the Seller, immediately upon the occurrence of any of the following events:

(i)    The Bankruptcy Court approves an Alternative Transaction, or an Alternative Transaction is consummated;

(ii)    The Closing does not occur on or before 90 days following the Petition Date (the "Outside Date"); provided, however, that the right to terminate this Agreement under this Section 13.1(b)(ii) shall not be available to any party whose breach (or whose Affiliate's breach) of this Agreement has resulted in the failure of the Closing to occur on or before the Outside Date;

(c)    By either Buyer or Seller, if any Governmental Authority shall have issued any permanent Order enjoining or otherwise prohibiting the transactions contemplated hereby and all appeals and means of appeal therefrom have been exhausted;

(d)    By Seller, if Buyer shall have materially breached any of its or his representations, warranties, covenants or agreements contained herein and such breach shall not have been cured within 15 days after receipt by the Buyer from Seller of written notice of such breach (provided, however, that no such cure period shall be available or applicable to any such breach which by its nature cannot be cured) and if not cured within the timeframe above and at or prior to the Closing, such breach (individually or together with all other breaches by the Buyer) would result in the failure of any of the conditions set forth in Article 9 to be satisfied;

(e)    By Buyer, if Seller shall have materially breached any of its representation, warranty, covenant or agreement contained herein and such breach shall not have been cured within 15 days after receipt by the Seller from Buyer of written notice of such breach (provided, however, that no such cure period shall be available or applicable to any such breach which by its nature cannot be cured) and if not cured within the timeframe above and at or prior to the Closing, such breach (individually or together with all other breaches by the Seller) would result in the failure of any of the conditions set forth in Article 10 to be satisfied;

(f)    By Seller, if any of the conditions specified in Article 9 have not been met or waived prior to such time as such condition can no longer be satisfied, in which case Seller shall be entitled to receive the Deposit; or

(g)    By Buyer, if any of the conditions specified in Article 10 shall not have been met or waived prior to such time as such condition can no longer be satisfied.

28

**13.2    EFFECT OF TERMINATION.**  The right of termination provided in Section 13.1 is in addition to any other rights and remedies a party may have under this Agreement, applicable Legal Requirements or otherwise.  In the event of termination of this Agreement as provided in Section 13.1, this Agreement shall become void and there shall be no liability or obligation on the part of Buyer, Seller, or their respective officers, directors, shareholders or Affiliates; provided, however, that (a) the provisions of Section 8.7, this Section 13.2, Section 13.3 and Article 14 shall remain in full force and effect and survive any termination of this Agreement and (b) nothing herein shall relieve any party hereto from liability in connection with any willful breach of such party's representations, warranties, covenants or agreements contained herein.

**13.3    DISBURSEMENT OF DEPOSIT.**

**(a)    DISBURSEMENT OF DEPOSIT TO SELLER.**  In the event that (i) the Agreement is terminated by Seller in accordance with Section 13.1(d) or 13.1(f), or (ii) (A) this Agreement is not earlier terminated in accordance with Section 13.1(a), 13.1(b)(i), 13.1(c), 13.1(e) or 13.1(g), (B) the conditions to Closing set forth in Article 10 have been and remain satisfied (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the fulfillment of those conditions), (C) the Seller confirms in writing to Buyer that it stands ready to proceed with the Closing on or before the Outside Date and (D) Buyer fails to complete the Closing on or before the Outside Date by, among other things, failing to pay the Escrow Amount, Closing Payment and/or Reimbursement Costs pursuant to Section 2.1, then the Buyer and Seller shall jointly instruct the Escrow Agent to distribute to the Seller the entire Deposit within 5 business days following the instruction date.

**(b)    DISBURSEMENT OF DEPOSIT UPON CLOSING.**  If the Closing is completed on or before the Outside Date, the Buyer shall instruct the Escrow Agent to retain the Deposit in partial offset against the Escrow Amount, to be included in the Escrow Amount and disbursed accordingly.

**(c)    DISBURSEMENT OF DEPOSIT TO BUYER.**  In the event that the Closing has not occurred on or before the Outside Date under any circumstance not described in Section 13.3(a) and this Agreement has been validly terminated pursuant to Section 13.1, then the Buyer and Seller will jointly instruct the Escrow Agent to distribute to Buyer the entire Deposit within 5 business days following the instruction date.

**(d)    NO EXCLUSIVE REMEDY.**  The Seller's rights provided in this Section 13.3 are not exclusive, and the Seller's receipt of the Deposit hereunder does not preclude the Seller's exercise of any other rights or remedies that may now or subsequently be available at law, in equity, by statute, under this Agreement or under any other agreement between the parties hereto or otherwise.

## ARTICLE 14
## MISCELLANEOUS

**14.1    NOTICES.**  All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be deemed to be given and received (a) when delivered in person, (b) on the date on which transmitted by facsimile or e-mail, *provided that* there is a confirmation of transmission; (c) on the 3rd business day after the date on which deposited in the United States mail in a sealed envelope, postage prepaid, or (d) on the next business day after the date on which deposited in a sealed envelope with a nationally-recognized overnight courier (*e.g.,* Federal Express or DHL), freight prepaid, addressed to the party for whom intended at the address or facsimile number set forth for such party on

29

the signature page, below, or such other address or facsimile number, notice of which is provided in a manner permitted by this Section 14.1.

14.2   **COOPERATION ON TAX MATTERS.**   After the Closing, Seller and Buyer shall cooperate with each other in connection with any official inquiry, audit, determination or proceeding affecting the liability of either of them for Taxes and shall make available to each other within a reasonable period of time, at no cost to the other (except as provided in this Section 14.2), any documents, correspondence, reports, books, records, files, or data of either of them and any other materials bearing on such inquiry, audit, examination, proceeding as such other party may reasonably request, provided, however, that (a) either party may charge the other party for any actual out-of-pocket costs or expenses incurred by it in assisting the other party hereunder, and (b) no party shall have any obligation to the other party pursuant to this Section 14.2 after the 36-month anniversary of the Closing Date.

14.3   **CONSULTATIONS.**   The parties each acknowledge that they have consulted with their respective accounting and tax advisors in connection with the accounting and tax treatment for this transaction, that each such party will bear all risk in connection with its accounting and tax treatment of the transactions contemplated hereby and that no party is relying on any other party in connection with the same.

14.4   **FORCE MAJEURE.**   Neither party shall be liable for delay or failure to perform, in whole or in part, by reason of contingencies beyond the reasonable control of the party affected, whether herein specifically enumerated or not, including among others, acts of God, war, acts of war, revolution, civil commotion, terrorism, riots, acts of public enemies, blockage or embargo, delays of carriers, car shortage, fire, explosion, breakdown of equipment, strike, lockout, labor dispute, casualty or accident, earthquake, epidemic, flood, cyclone, tornado, hurricane or other windstorm, delays of vendors or other contingencies interfering with production or with customary or usual means of transportation, or by reason of any law, order, proclamation, regulation, ordinance, demand, requisition or requirement or any other act of any governmental authority, local, state or federal, including court orders, judgments or decrees, or any other cause whatsoever, whether similar or dissimilar to those above affected; provided, however, that the party so affected shall promptly give notice to the other party whenever such contingency or other act becomes reasonably foreseeable and shall use its best efforts to overcome the effects of the contingency as promptly as possible.  Neither party, however, shall be required to resolve a strike, lockout or other labor problem in a manner which it alone does not deem proper and advisable.

14.5   **WAIVER OF COMPLIANCE.**   Any failure of Seller, on the one hand, or Buyer, on the other, to comply with any provision of this Agreement may be expressly waived in writing by Buyer or Seller, respectively, but such waiver or failure to insist upon strict compliance with such provision shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.  No failure to exercise and no delay in exercising any right, remedy, or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, or power hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, or power provided herein or by law or in equity.  The waiver by any party of the time for performance of any act or condition hereunder does not constitute a waiver of the act or condition itself.

14.6   **ATTORNEYS' FEES.**   If any action or proceeding is commenced to construe or enforce this Agreement or the rights and duties of the parties hereunder, then the party prevailing in such action shall be entitled to recover its costs and attorneys' fees in such action or proceeding, as well as all costs and fees of enforcing or appealing any judgment entered therein.

30

14.7    SURVIVAL OF REPRESENTATIONS AND WARRANTIES.  The respective representations and warranties of each party contained herein shall not be deemed waived or otherwise affected by any investigation made by or on behalf of the other party and such representations and warranties shall survive the Closing and the consummation of the purchase of the Assets as contemplated hereby as provided in Article 12.  All statements contained in this Agreement or in any schedule, exhibit, certificate, list, or other document delivered pursuant hereto shall be deemed representations or warranties, as the case may be (as such terms are used in this Agreement), of the party making such statements.

14.8    ASSIGNMENT; SUCCESSORS AND ASSIGNS.  Except as otherwise provided herein, each party agrees that it will not assign, sell, transfer, delegate, or otherwise dispose of, whether voluntarily or involuntarily, or by operation of law, any right or obligation under this Agreement; notwithstanding the foregoing, Buyer may assign its rights hereunder to an Affiliate without Seller's consent, provided that any such assignment shall not relieve Buyer of its obligations hereunder.  Any purported assignment, transfer, or delegation in violation of this Section shall be null and void.  Subject to the foregoing limits on assignment and delegation, this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns.  Except for those enumerated above, this Agreement does not create, and shall not be construed as creating, any rights or claims enforceable by any Person or entity not a party to this Agreement.

14.9    GOVERNING LAW; DISPUTE RESOLUTION.

(a)  Subject to Section 14.9(b), the validity, interpretation, enforceability, and performance of this Agreement shall be governed by and construed in accordance with the laws of the State of Oregon and the Bankruptcy Code, to the extent applicable.  Each party hereby consents to the jurisdiction of the courts of the State of Oregon for purposes of construing and enforcing the rights created herein.

(b)  During the pendency of the Bankruptcy Case, any proceeding concerning the validity, interpretation, enforceability, and performance of this Agreement may only be brought against any of the parties in the Bankruptcy Court, and the parties consent to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to the venue laid therein.

(c)  COUNTERPARTS; FACSIMILE SIGNATURES.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  A copy of this Agreement that is executed by a party and delivered by facsimile shall be binding on such party to the same extent as a copy hereof containing that party's original signature.  Any party that executes and delivers this Agreement by facsimile shall, upon request from the other party, execute and deliver a copy hereof containing that party's original signature.

14.10    HEADINGS.  The headings of the Sections and Articles of this Agreement are for reference purposes only and shall not constitute a part hereof or affect the meaning or interpretation of this Agreement.

14.11    ENTIRE AGREEMENT.  This Agreement, including the Disclosure Schedule and other documents referred to herein, (a) represents the entire understanding of the parties, and supersedes and replaces all prior and contemporaneous understandings, whether oral or written, regarding the subject

31

matter hereof, and (b) may not be modified or amended, except by a written instrument executed after the date hereof by the party sought to be charged by such modification or amendment.

**14.12    SEVERABILITY.** If any provision of this Agreement, or the application thereof to any Person, place, or circumstance, shall be held by a court of competent jurisdiction to be invalid, unenforceable, or void, the remainder of this Agreement and such provisions as applied to other Persons, places, and circumstances shall remain in full force and effect.

**14.13    RULES OF CONSTRUCTION.** The parties acknowledge that each party has been represented by counsel and has read and negotiated the language used in this Agreement. The parties agree that, because all parties participated in negotiating and drafting this Agreement, no rule of construction shall apply to this Agreement which construes ambiguous language in favor of or against any party by reason of that party's role in drafting this Agreement.

**14.14    ADDITIONAL DOCUMENTS.** Each of the parties agrees, without further consideration, to execute and deliver such other documents and take such further action as may be reasonably required to effectuate the provisions of this Agreement.

**14.15    EXHIBITS.** All Exhibits attached hereto shall be deemed to be a part of this Agreement and are fully incorporated in this Agreement by this reference.

**14.16    CERTAIN DEFINITIONS.** For purposes of this Agreement:

**(a)** "**AFFILIATE**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

**(b)** "**AGENCIES**" shall mean Volt Services Group, a division of Volt Management Corp., Express Services, Inc., dba Express Employment Professionals, TriNet Group, Inc. (or an affiliate thereof) and CampusPoint Corporation.

**(c)** "**CLOSING WORKING CAPITAL**" means (i) the Current Assets of the Seller, less (ii) the Current Liabilities of the Seller, determined as of the open of business on the Closing Date and calculated pursuant to the form of Estimated Closing Working Capital Statement set forth in **Schedule 2.2(a)(ii)**.

**(d)** "**COBRA**" means Section 4980B of the Internal Revenue Code of 1986, as amended (and the regulations and rulings issued thereunder), Part 6 of Subtitle B of Title I of the Employee Retirement Income Security Act of 1974, as amended (and the regulations and rulings issued thereunder), and similar provisions of applicable state Legal Requirements.

**(e)** "**CONFIDENTIALITY AGREEMENT**" means that certain Non-Disclosure and Non-Use Agreement, dated as of August 8, 2014, by and between Buyer and Seller.

**(f)** "**CURRENT ASSETS**" means cash and cash equivalents, accounts receivable, inventory and prepaid expenses, lease and similar deposits (whether current or not) with respect to any

32

real estate leases or other Assumed Contracts, determined in accordance with GAAP applied in a manner consistent with the Seller's past practice.

(g)    "CURRENT LIABILITIES" means accounts payable, accrued Taxes, accrued expenses and Accrued Vacation, determined in accordance with GAAP applied in a manner consistent with the Seller's past practice; provided, however, that Current Liabilities shall not include indebtedness for borrowed money, deferred revenue, deferred rent, and other non-cash GAAP accruals, and any current liabilities that are not being assumed by Buyer.

(h)    "EMPLOYEE" means any full or part-time employee or independent contractor of Seller as of the date of this Agreement.  For the purposes of this Agreement, the term "Employee" shall also refer to any full or part-time employee of the Agencies supplied by the Agencies to perform various job positions pursuant to their respective agreements with Seller.

(i)    "FINAL ORDER" means an action taken or Order issued by the applicable Governmental Authority, including the Sale Order issued by the Bankruptcy Court, as to which: (i) no request for stay of the action or Order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, it is passed, including any extensions thereof; (ii) no petition for rehearing or reconsideration of the action or Order, protest of any kind, is pending before the Governmental Authority and the time for filing any such petition or protest is passed, including any extensions thereof; (iii) the Governmental Authority does not have the action or Order under consideration or review on its own motion and the time for such reconsideration or review has passed, including any extensions thereof; and (iv) the action or Order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof.

(j)    "GAAP" means United States generally accepted accounting principles in effect from time to time.

(k)    "FORMER EMPLOYEE" means any full or part-time employee or independent contractor formerly employed by Seller that is not a current Employee as of the date of this Agreement.

(l)    "GOVERNMENTAL AUTHORITY" shall mean (1) the Bankruptcy Court, and (2) any:

(i)    Nation, principality, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature;

(ii)    Federal, state, local, municipal, foreign or other government;

(iii)    Governmental or quasi governmental authority of any nature (including any governmental division, subdivision, department, agency, bureau, branch, office, commission, council, board, instrumentality, officer, official, representative, organization, unit, body or Entity and any court or other tribunal);

(iv)    Multinational organization or body; or

33

(v)      Individual, entity or body exercising, or entitled to exercise, any executive, legislative, judicial, administrative, regulatory, police, military or taxing authority or power of any nature.

(m)      "**KNOWLEDGE**," with respect to a party, means the knowledge of such party, in the case of an individual, or any officer or director of such party, in the case of an entity, and, in each case, such knowledge as would be imputed to such persons upon due inquiry of Seller's employees and documentation.

(n)      "**LEGAL REQUIREMENT**" means any statute, law, ordinance, regulation, rule, code, constitution, treaty, common law, Order, or other requirement or rule of law of any Governmental Authority.

(o)      "**LIABILITY**" means any debt, loss, claim (as defined in section 101(5) of the Bankruptcy Code), damage, demand, fine, judgment, penalty, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, asserted, unasserted, accrued or unaccrued; matured or unmatured, determined or determinable, liquidated or unliquidated, or due or to become due, and whether in contract, tort, strict liability, successor liability or otherwise)" and including all costs and expenses relating thereto (including fees, discounts and expenses of legal counsel, experts, engineers and consultants and costs of investigations).

(p)      "**LIEN**" means any lien, pledge, mortgage, deed of trust, security interest, charge, claim, easement, encroachment or other similar encumbrance.

(q)      "**MATERIAL ADVERSE EFFECT**" means any circumstance, change in, or effect on a party, its subsidiaries, and its business, taken as a whole, that (i) either (A) is materially adverse to the operations, assets or liabilities (including contingent liabilities), earnings or results of operations, the business (financial or otherwise) of such party and its subsidiaries, taken as a whole, or (B) would reasonably be expected to prevent the ability of such party to consummate the transactions contemplated by this Agreement, and (ii) is not cured within a reasonable period of time following notice from the party claiming the occurrence or circumstance that is materially adverse as to the business, properties, assets, liabilities, operations, operating condition (financial or otherwise) of the party; *provided*, *however*, that such term shall not include any circumstance or change related to (s) general economic or political conditions, (t) conditions generally affecting the industries in which the Business operates, (u) any action required or permitted by this Agreement or any action taken (or omitted to be taken) with the written consent of or at the written request of Buyer; (v) any matter of which Buyer is aware on the date hereof; (w) any changes in applicable Legal Requirements or accounting rules (including GAAP); (x) the announcement, pendency or completion of the Bankruptcy Case or the transactions contemplated by this Agreement, including losses or threatened losses of employees, customers, suppliers, distributors or others having relationships with the Seller and the Business (y) any act of God, war, terrorism, or other similar event beyond the control of the party that does not directly and peculiarly impact the assets or premises of the party, or (z) credit markets, securities markets or the economy, unrelated to any event that would otherwise constitute a Material Adverse Effect on the party.

(r)      "**ORDER**" means any decree, writ, assessment, award, decision, injunction, judgment, order, ruling, subpoena, verdict or arbitration award entered, issued, made, or rendered by any Governmental Authority.

34

      **(s)**    "**PERMITTED LIEN**" means (i) Liens for Taxes not yet due and payable or being contested in good faith by appropriate procedures, and (ii) mechanics', carriers', workmen's, repairmen's or other like Liens arising or incurred in the ordinary course of business.

      **(t)**    "**PERSON**" shall include any individual, partnership, joint venture, corporation, trust, unincorporated organization, any other entity and any government or any department or agency thereof, whether acting in an individual, fiduciary, or other capacity.

      **(u)**    "**PRE-CLOSING PERIOD**" means, with respect to the Seller and its subsidiaries, any taxable year or period that ends on or before the Closing Date and, in the case of any straddle period, the portion of such period ending on and including the day prior to the Closing Date.

      **(v)**    "**PRE-CLOSING TAXES**" shall mean any Taxes for which the Seller or its Subsidiaries is or could be liable with respect to (i) any Pre-Closing Period (and in case of any straddle period, Seller's portion of the straddle period), (ii) pursuant to Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or foreign Tax law), or by reason of having been a member of any consolidated, combined or unitary group on or prior to the Closing Date, (iii) resulting from the Transaction (including any Transfer Taxes) and (iv) pursuant to any contractual agreement entered into on or before the Closing Date or as a transferee or successor, if the event giving rise to such liability occurred prior to the Closing Date, in each case together with any interest, penalties and additions to Tax with respect to any of the foregoing and any Losses incurred in connection with any of the foregoing.

      **(w)**    "**TAX**" shall mean any tax (including any income tax, franchise tax, capital gains tax, estimated tax, gross receipts tax, value added tax, surtax, excise tax, ad valorem tax, transfer tax, stamp tax, sales tax, use tax, property tax, business tax, occupation tax, inventory tax, occupancy tax, withholding tax or payroll tax), levy, assessment, tariff, impost, imposition, toll, duty (including any customs duty), deficiency or fee, and any related charge or amount (including any fine, penalty or interest), (a) imposed, assessed or collected by or under the authority of any Governmental Authority, or (b) payable pursuant to any tax sharing agreement or similar contract.

*[Signatures appear on the following page.]*

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Asset Purchase
Agreement as of the date first written above.

"**BUYER:**"                                                  "**SELLER:**"

**DELIVERED.IO, INC.**, a Delaware corporation    **EARTH CLASS MAIL CORPORATION**, an Oregon
corporation

By_____          By_____
   Jonathan Siegel, President                    James L. Wilson, President

**Notices**:                                                  **Notices**:

Jonathan Siegel                                          Jim Wilson
548 Market Street, #7142                            9450 SW Gemini Dr.
San Francisco, CA 94104                            ECM  #101
Email: jonathan@siegel.io                          Beaverton, OR 97008
                                                             Email: Jim.Wilson@earthclassmail.com

**with a copy to:**                                       **with a copy to:**

Reicker, Pfau, Pyle & McRoy LLP               Perkins Coie, LLP
ATTN:  Fernando Velez, Jr., Esq.                ATTN: Brentley M. Bullock
1421 State Street, Suite B                           1120 NW Couch Street, 10th Floor
Santa Barbara, CA 93101                           Portland, OR  97209
Facsimile No.:  (805) 966-3320                   Facsimile No.:  (503) 346-2020
Email: fvelez@rppmh.com                          Email: bbullock@perkinscoie.com

*[Signature Page to Asset Purchase Agreement]*

**EXHIBIT A - PAGE 37**

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Asset Purchase Agreement as of the date first written above.

"BUYER:"

DELIVERED.IO, INC., a Delaware corporation

By _____
    Jonathan Siegel, President

**Notices**:

Jonathan Siegel
548 Market Street, #7142
San Francisco, CA 94104
Email: jonathan@siegel.io

**with a copy to:**

Reicker, Pfau, Pyle & McRoy LLP
ATTN: Fernando Velez, Jr., Esq.
1421 State Street, Suite B
Santa Barbara, CA 93101
Facsimile No.: (805) 966-3320
Email: fvelez@rppmh.com

"SELLER:"

EARTH CLASS MAIL CORPORATION, an Oregon corporation

By _James L Wilson_____
    James L. Wilson, President

**Notices**:

Jim Wilson
9450 SW Gemini Dr.
ECM #101
Beaverton, OR 97008
Email: Jim.Wilson@earthclassmail.com

**with a copy to:**

Perkins Coie, LLP
ATTN: Brentley M. Bullock
1120 NW Couch Street, 10th Floor
Portland, OR 97209
Facsimile No.: (503) 346-2020
Email: bbullock@perkinscoie.com

*[Signature Page to Asset Purchase Agreement]*

EXHIBIT A - PAGE 38

*CONFIDENTIAL*

**SELLER DISCLOSURE SCHEDULE**

**February 13, 2015**

This Seller Disclosure Schedule (this "<u>Seller Disclosure Schedule</u>") is provided in connection with that certain Asset Purchase Agreement, dated as of February 13, 2015 (the "<u>Agreement</u>"), by and between Delivered.io, Inc., a Delaware corporation (the "<u>Buyer</u>"), and Earth Class Mail Corporation, an Oregon corporation, in anticipation of it becoming a Debtor in the United States Bankruptcy Court for the District of Oregon (the "<u>Seller</u>").

Capitalized terms used in this Seller Disclosure Schedule and not defined herein shall have the meanings set forth in the Agreement, unless the context indicates otherwise.

The disclosure set forth in any particular section or subsection of this Seller Disclosure Schedule shall be deemed to be an exception to (or, as applicable, a disclosure for purposes of) (a) the representations and warranties of the Seller that are set forth in the corresponding section or subsection of the Agreement and (b) any other representations and warranties of the Seller that are set forth in the Agreement if such matter disclosed relates to more than one representation and warranty and the level of particularity and manner of the disclosure of the matter expressly disclosed in one section or subsection of the Seller Disclosure Schedule would make a reasonable person aware that such disclosure is relevant to such other section or subsection.

* * *

-1-

*CONFIDENTIAL*

**Schedule 1.4(a)**

**Accounts Payable**

| Vendor Name | Total Amount ($) |
|---|---|
| Amazon | 5,236.17 |
| 230 PAS L.L.C. | 2,539.30 |
| BankServ | 7,270.24 |
| Chelsea Cleaning Services, Inc. | 163.32 |
| Dell Business Credit | (118.68) |
| Endicia USPS Postage | 1,500.00 |
| Express Services GA | 7,451.62 |
| Fed Ex | 4,514.90 |
| Google | 500.00 |
| Provantage | 10,130.35 |
| Saitech | 3,404.31 |
| Sprint | 113.68 |
| USPS CAPS fee | 905.00 |
| Volt Management Corp. | 1,840.26 |
| Westmark Industries Inc. | 319.90 |
| Perkins Coie LLP | 160,000.00* |

*Reflects an estimated amount.

-2-

*CONFIDENTIAL*

### Schedule 1.5(a)

### Material Agreements

Microsoft BizSpark Startup Agreement by and between Microsoft Corporation and the Seller, dated July 2012, as amended by Graduation Amendment for Microsoft BizSpark Startup Program and related End User License Agreement (the "<u>BizSpark License</u>").

PrimeOCR Software License Agreement by and between Prime Recognition Corporation and the Seller, dated February 9, 2015 (the "<u>Prime OCR License</u>").

Services Contract for Document & Data Processing by and between iBridge LLC and the Seller, dated October 15, 2008.

Lease Agreement by and between Baron Messenger and the Seller and Hot Shot Delivery, dated as of September 20, 2010 (382 NE 191st Street, Miami, Florida 33179).

Lease Agreement by and between Sunrise Delivery and the Seller and Hot Shot Delivery, dated as of September 20, 2010 (538 W. 21st Street, Houston, Texas 77008).

Lease Agreement by and between Chicago Messenger and the Seller and Hot Shot Delivery, dated as of September 20, 2010 (1608 S. Ashland Ave., Chicago, Illinois 60608-2013).

License Agreement by and between Flynn Realty Services, LLC and the Seller, dated October 2009 (427 N. Tatnall Street, Wilmington, Delaware 19801).

Standard Form of Store Lease by and between 230 PAS (15 (Cliff)) L.L.C. and 230 PAS (RRPIII) LLC and the Seller, dated April 2008 (228 Park Avenue South, New York, New York 10003).

Lease Agreement by and between Merrill Place LLC and the Seller, dated October 4, 2007 (93 South Jackson Street, Seattle, Washington 98104). [*Note: the Seller is currently negotiating a lease in a different location.  The letter of intent is being finalized.*]

Office Lease Agreement by and between Nimbus Center, LLC and the Seller, dated December 19, 2012 (9450 SW Gemini Drive, Beaverton, Oregon 97008).

Standard Industrial/Commercial Multi-Tenant Lease - Net by and between Santa Monica Center Ltd. and the Seller, dated May 27, 2008 (8605 Santa Monica Blvd., West Hollywood, California 90069), as amended.

Retail Lease by and between Flatiron Associates I and the Seller, dated May 16, 2008, as amended by the First Amendment to Lease dated December 2, 2014 (548 Market Street, San Francisco, California 94104).

Employment Agreement by and between James Wilson and the Seller, dated September 24, 2014.

*CONFIDENTIAL*

Employment Agreement by and between Stacey Lee and the Seller, dated September 24, 2014.

Various widely-available commercial software contracts for software used by the Seller in the Business, including, but not limited to, Kayako Fusion Customer Support Ticketing, Microsoft Visual Studio Premium with MSDN, McAfee Secure and Microsoft Office and related products.

-4-

*CONFIDENTIAL*

**Schedule 1.5(b)**

**Cure Costs**

None.

-5-

*CONFIDENTIAL*

**Schedule 4.1**

**Organization of Seller**

The Seller is qualified to do business as a foreign corporation in California, New York and Washington.  [*Note:  New York and Washington qualifications are in the process of being reactivated.  It is expected this will be completed before Closing.*]

-6-

*CONFIDENTIAL*

**Schedule 4.2**

**Authority and Consents**

The Board of Directors of the Seller has authorized the Seller to enter into this Agreement.  The Board of Directors of the Seller may be required to take certain additional actions to the extent required by the Bankruptcy Court in order to consummate the transactions contemplated by the Agreement.

-7-

*CONFIDENTIAL*

**Schedule 4.3**

**No Violation**

The Seller has licensed certain Intellectual Property Rights with regard to Microsoft Excel spreadsheet models used to model the Seller's financial performance and track the Seller's capitalization (the "Financial Model IP"), from Mitchell Hymowitz, a former consultant and CFO of the Seller.  Under the terms of Mr. Hymowitz' Proprietary Information, Invention Assignment and Non-Solicitation Agreement, Mr. Hymowitz granted Seller a fully-paid, non-exclusive and non-transferable license to the Financial Model IP to the extent that Mr. Hymowitz used the Financial Model IP while performing services for the Seller (the "Financial Model IP License").  There can be no assurance that the Financial Model IP License will be assignable to Buyer under the Agreement, even after giving effect to the Sale Order.

The Seller was granted a license to use certain Microsoft software without charge as a result of Seller's participation in the Microsoft BizSpark Startup Program (as defined above, the BizSpark License).  Although software is readily available, there can be no assurance that the BizSpark License will be assignable to the Buyer under the Agreement without consent, even after giving effect to the Sale Order.

The Seller disclaims the last sentence of Section 4.3 of the Agreement to the extent that any instrument or agreement which restricts or otherwise limits the Seller's right to transfer the Purchased Assets will not, in fact, prohibit such transfer after giving effect to the Sale Order.

*CONFIDENTIAL*

### Schedule 4.5(b)

### Fundamental Intellectual Property Representations

**(i)(A)**

The proprietary Iris platform is the software platform used by the Seller for substantially all customer and internal facing aspects of the Seller's services.  (See **Appendix A** attached hereto for additional information related to the Iris platform.)

Various widely-available, commercial Microsoft support and development products, including, but not limited to, Microsoft Visual Studio Premium with MSDN, Microsoft SQL Server, Microsoft System Center, Microsoft Windows Server and Windows.

The Prime OCR License.

The BizSpark License.

*CONFIDENTIAL*

**(i)(B)**

| Name | License | Usage | Distributed | Version |
|------|---------|-------|-------------|---------|
| 7-Zip | LGPL 2.1 | Compression for build and deployment tools. | No | 9.20.0.0 |
| 7ZipSharp | LGPL 2.1 | Compression for build and deployment tools. | No | 0.5.8.0 |
| AntiXssLibrary | Ms-PL | XSS protection for ASPX pages. Used for OperationsWeb project (CS tools) and one page in Client project. | No | 1.5.0.0 |
| Big.js | MIT Expat | Decimal math in signup, avoids floating point math. | Yes | 2.5.0 |

-10-

*CONFIDENTIAL*

| Name | License | Usage | Distributed | Version |
|------|---------|-------|-------------|---------|
| DynamicPDF Rasterizer | Commercial | Rasterize PDFs for virtual item insertion. Virtual item insertion used for automatic check deposit summaries. | No | 2.0.0.20524 |
| DynamicPDF Rasterizer | Commercial | Rasterize PDFs for virtual item insertion. Virtual item insertion used for automatic check deposit summaries. | No | 1.0.0.3610 |
| ComponentArt Web.UI | Commercial | UI components for OperationsWeb project (CS tools). | No | 2008.2.1267.35 |
| Extended WPF Toolkit Community Edition | Ms-PL | UI components for OpsWizard. | Yes | 2.0.0.0 |

-11-

*CONFIDENTIAL*

| Name | License | Usage | Distributed | Version |
|------|---------|-------|-------------|---------|
| FedACH Database | Unknown | Routing number database for electronic check deposit.<br><br>Newer versions are automatically downloaded. | Yes | Unknown |
| GeoLite Country Database | Open Data License | GeoIP database for IP to country mapping.<br><br>Newer versions are automatically downloaded. | No | 20110802 |

-12-

**EXHIBIT A - PAGE 50**

*CONFIDENTIAL*

| Name | License | Usage | Distributed | Version |
|------|---------|-------|-------------|---------|
| GeoLite Country Database | Open Data License | GeoIP database for IP to country mapping.<br><br>Newer versions are automatically downloaded. | No | 20010802 |
| AForge.Net | LGPL 3 | General image processing, including binarization. Used client-side (OpsWizard) and server-side.<br><br>Custom build with modifications. | Yes | 2.1.4.0 |

-13-

*CONFIDENTIAL*

| Name | License | Usage | Distributed | Version |
|------|---------|-------|-------------|---------|
| ClearImage SDK | Commercial | MICR detection for finding checks in content scans. | No | 1.1.3181.18729 |
| ClearImage SDK | Commercial | MICR detection for finding checks in content scans. | No | 1.0.0.0 |
| ClearImage SDK | Commercial | MICR detection for finding checks in content scans. | No | 16.1.0.0 |
| ClearImage SDK | Commercial | MICR detection for finding checks in content scans. | No | 6.0.0.0 |

*CONFIDENTIAL*

| Name | License | Usage | Distributed | Version |
|------|---------|-------|-------------|---------|
| iTextSharp | MPL 1.1 or LGPL 2 | General server-side PDF processing.<br><br>Newer versions are AGPL or Commercial. | No | 4.1.6.0 |
| JavaScript Debug | MIT | JavaScript debug library, currently unused. | Yes | 0.4 |
| Javascript.NET | New BSD License | Support library for JSLint during build process. | No | Unknown |
| jQuery | MIT | jQuery used in OperationsWeb project and Client project. | Yes | 1.4.2 |

-15-

*CONFIDENTIAL*

| Name | License | Usage | Distributed | Version |
|------|---------|-------|-------------|---------|
| jQuery | MIT | jQuery used in Client project. | Yes | 1.7.1 |
| jQuery UI | MIT | jQuery module used in Client project. | Yes | 1.7.1 |
| jQuery UI Date Picker | MIT | jQuery module used in Client project.<br><br>Custom download from jQuery UI website. | Yes | 1.8.16 |
| jQuery.dimensions | MIT | jQuery module used in Client project. | Yes | 1.2 |

-16-

*CONFIDENTIAL*

| Name | License | Usage | Distributed | Version |
|------|---------|-------|-------------|---------|
| jQuery Globalization | Unknown | jQuery module used in Client project. | Yes | Unknown |
| jQuery Globalization | Unknown | jQuery module used in Client project. | Yes | Unknown |
| jQuery Hotkeys | MIT | jQuery module used in OperationsWeb. | Yes | 0.7.8 |
| jqGrid | MIT | jQuery module used in Client project. | Yes | 3.3.2 |
| jQuery Plugin: jqModal | MIT | jQuery module used in Client project. | Yes | r12 |

-17-

*CONFIDENTIAL*

| Name | License | Usage | Distributed | Version |
|------|---------|-------|-------------|---------|
| jQuery BBQ: Back Button & Query Library | MIT | jQuery module used in Client project. | Yes | 1.2.1 |
| jQuery resize event | MIT | jQuery module used in Client project. | Yes | 1.1 |
| jQuery Data Link plugin | MIT | jQuery module used in Client project. | Yes | 1.0.0pre |
| jQuery Plugin: Mobile | MIT | jQuery module used in Client project.<br><br>Custom patched. | Yes | 1.0b2 |

-18-

*CONFIDENTIAL*

| Name | License | Usage | Distributed | Version |
|---|---|---|---|---|
| jQuery Plugin: Mobile Date Box | MIT-like | jQuery module used in Client project. | Yes | 1.0a4.1 |
| jQuery Templating Plugin | MIT | jQuery module used in Client project. | Yes | Unknown |
| jQuery Templating Plugin | MIT | jQuery module used in Client project. | Yes | Unknown |
| hoverIntent | MIT | jQuery module used in Client project. | Yes | Unknown |
| jQuery.bgiframe | MIT | jQuery module used in Client project. | Yes | 2.1 |

-19-

*CONFIDENTIAL*

| Name | License | Usage | Distributed | Version |
|------|---------|-------|-------------|---------|
| Superfish | MIT | jQuery module used in Client project. | Yes | 1.4.8 |
| Supersubs | MIT | jQuery module used in Client project. | Yes | 0.2b |
| jQuery blockUI plugin | MIT | jQuery module used in Client project. | Yes | 2.33 |
| jQuery Globalization | Unknown | jQuery module used in Client project. | Yes | Unknown |
| LINQ for JavaScript | Ms-PL | jQuery module used in Client project. | Yes | 2.2.0.2 |

-20-

*CONFIDENTIAL*

| Name | License | Usage | Distributed | Version |
|------|---------|-------|-------------|---------|
| jQuery.splitter | MIT | jQuery module used in Client project. | Yes | 1.5.1 |
| JSLint | JSLint License | JavaScript syntax checker run during build process. | Yes | 2010-07-14 |
| Leptonica | CC-BY-2.5 | Native code image binarization used client-side (OpsWizard) and server-side.<br><br>Custom build with modifications. | Yes | Unknown |

*CONFIDENTIAL*

| Name | License | Usage | Distributed | Version |
|---|---|---|---|---|
| log4net | Apache 2.0 | Logging framework used client-side (OpsWizard) and server-side.<br><br>Custom build with modifications. | Yes | 1.2.10.0 |
| Microsoft MEF | Ms-PL | Dynamic component loading used in StaticLoader. | No | 2009.1.23.0 |
| Microsoft SQL Server CE | Commercial | Database for build server tools. | No | 3.5.5386.0 |
| Microsoft Visual C Runtime | Commercial | Visual C runtime required for Leptonica image processing. | Yes | 10.0.30319.1 |

-22-

*CONFIDENTIAL*

| Name | License | Usage | Distributed | Version |
|---|---|---|---|---|
| Microsoft Ajax Control Toolkit | New BSD License | UI components used in OperationsWeb. | No | 3.0.20229.0 |
| Microsoft Ajax Min | Apache 2.0 | CSS and JS minification tool used during build process. | No | 4.21.4169.30113 |
| Microsoft CCI | Commercial | Code analysis (FxCop) support library for use during builds. | No | 10.0.30319.1 |
| Mono | MIT X11 | Mono support library used during build process. | No | 0.9.4.0 |

-23-

*CONFIDENTIAL*

| Name | License | Usage | Distributed | Version |
|------|---------|-------|-------------|---------|
| Mono | MIT X11 | Mono support library used during build process.<br><br>POSIX support library for DownloaderTool running on Mono on POSIX platforms. | No | 4.0.0.0 |
| Mono | GPL | Debug symbol converter used during build process for DownloaderTool. | No | 0.0.0.0 |
| Neodynamic Barcode Professional | Commercial | Barcode rendering library used for OperationsWeb and OpsWizard. | No | 4.0.2000.2 |

-24-

*CONFIDENTIAL*

| Name | License | Usage | Distributed | Version |
|------|---------|-------|-------------|---------|
| Neodynamic Barcode Professional | Commercial | Barcode rendering library used for OperationsWeb and OpsWizard. | No | 4.0.2000.4 |
| Ookii Dialogs | BSD-style | UI components used in OpsWizard. | No | 1.0.0.0 |
| Microsoft Visual C Runtime | Commercial | Visual C runtime required for PDFLib pCOS library. | No | 7.10.3052.4 |
| PDFLib pCOS | Commercial | PDF parsing to extract hyperlinks for virtual item insertion. | No | 2.0.0.0 |
| PdfSharp | MIT-style | PDF processing for file validation on the image servers. | No | 1.31.1789.0 |

-25-

*CONFIDENTIAL*

| Name | License | Usage | Distributed | Version |
|------|---------|-------|-------------|---------|
| Fizzler | LGPL 3 | Support library for PreMailer.Net.<br><br>Custom build with modifications. | No | 1.0.11812.112 |
| HtmlAgilityPack | Ms-PL | Support library for PreMailer.Net. | No | 1.4.0.0 |
| PreMailer.Net | MIT-style | HTML email processor for CSS/HTML manipulation. | No | 0.5.0.0 |
| Prime OCR | Commercial | OCR for content scans and envelope images. | No | 4.0.0.4 |

-26-

*CONFIDENTIAL*

| Name | License | Usage | Distributed | Version |
|------|---------|-------|-------------|---------|
| Prime OCR | Commercial | OCR for content scans and envelope images. | No | 4.0.1.3 |
| Script# | Apache 2.0 | Script# component. Used for generating client-side JavaScript from C#. | Yes | 0.7.4.0 |
| Script# | Apache 2.0 | Script# component. Used for generating client-side JavaScript from C#. | No | 0.7.6.0 |
| SharpZipLib | GPL 2 w/ Linking Exception | ZIP processing used client-side (OpsWizard) and server-side. Custom build with modifications. | Yes | 0.85.5.452 |

-27-

*CONFIDENTIAL*

| Name | License | Usage | Distributed | Version |
|------|---------|-------|-------------|---------|
| Tasman Bars | Commercial | Barcode recognition used in OpsWizard. | Yes | 3.61.0.0 |
| NetReflector | LGPL 3 | Support library for build tools. | No | 1.1.2009.1214 |
| CruiseControl.NET | BSD-style | Support library for build tools. | No | 1.6.7981.1 |
| GNU GZip | GPL 2 | Compression during build process. | No | 1.3.12.2844 |
| Vintasoft Annotation | Commercial | Vintasoft support library. | Yes | 3.3.1.1 |
| Vintasoft Barcode | Commercial | Barcode recognition used in OpsWizard. | Yes | 7.0.0.1 |

-28-

*CONFIDENTIAL*

| Name | License | Usage | Distributed | Version |
|---|---|---|---|---|
| Vintasoft Imaging | Commercial | Image processing used in OpsWizard. | Yes | 3.3.1.1 |
| Vintasoft Twain | Commercial | TWAIN scanning access used in OpsWizard. | Yes | 5.1.0.1 |
| Litle API Contracts | Commercial | Service contracts for interfacing with Litle/Vantiv for credit card processing. Used to generate code. | No | Unknown |
| Authorize.Net API Contracts | Commercial | Service contracts for interfacing with Authorize.Net (deprecated in favor of Litle). Used to generate code. | No | Unknown |

-29-

*CONFIDENTIAL*

| Name | License | Usage | Distributed | Version |
|------|---------|-------|-------------|---------|
| USPS API Contracts | Commercial | Service contracts for USPS estimates (deprecated in favor of Stamps.com). Used to generate code. | No | Unknown |
| FedEx API Contracts | Commercial | Service contracts for FedEx estimates and labels. Used to generate code. | No | Unknown |
| Stamps.com API Contracts | Commercial | Service contracts for USPS estimates and labels. Used to generate code. | No | 36 |

-30-

*CONFIDENTIAL*

| Name | License | Usage | Distributed | Version |
|------|---------|-------|-------------|---------|
| Endicia API Contracts | Commercial | Service contracts for Endicia estimates and labels (never deployed, Stamps.com used instead). Used to generate code. | No | Unknown |
| Fundtech API Contracts | Commercial | Service contracts for Fundtech used for electronic check deposit. Used to generate code. | No | Unknown |
| Google Closure Compiler | Apache 2.0 | Used to minify custom build of jQuery.<br><br>Required to minify custom jQuery build. Not present in SVN. | No | 20091218 |

-31-

*CONFIDENTIAL*

| Name | License | Usage | Distributed | Version |
|---|---|---|---|---|
| ARSoft.Tools.Net | Apache 2.0 | DNS library used server-side for email transmission. | No | 1.7.2 |
| Microsoft.AspNet.WebApi | MVC 4 | Microsoft Web API support assemblies for the Client and PlatformServices project. | No | 4.0.20710.0 |
| Microsoft.AspNet.WebApi.Client | MVC 4 | Microsoft Web API support assemblies for the Client and PlatformServices project. | No | 4.0.30506.0 |
| Microsoft.AspNet.WebApi.Core | MVC 4 | Microsoft Web API support assemblies for the Client and PlatformServices project. | No | 4.0.30506.0 |

-32-

*CONFIDENTIAL*

| Name | License | Usage | Distributed | Version |
|------|---------|-------|-------------|---------|
| Microsoft.AspNet.WebApi.WebHost | MVC 4 | Microsoft Web API support assemblies for the Client and PlatformServices project. | No | 4.0.30506.0 |
| Microsoft.Net.Http | MVC 4 | Support assemblies for Microsoft Web API. | No | 2.0.20710.0 |
| Microsoft.Web.Infrastructure | MVC 3 | Support assemblies for Microsoft Web API. | No | 1.0.0.0 |
| Newtonsoft.Json | MIT | JSON serialization library required by Microsoft .NET. | No | 5.0.6 |

*CONFIDENTIAL*

| Name | License | Usage | Distributed | Version |
|---|---|---|---|---|
| NUnit | zlib-like | Unit testing library for internal tests, mostly around validation of integrations with 3rd parties. | No | 2.6.3 |
| ScriptSharp | Apache 2.0 | Script# component. Used for generating client-side JavaScript from C#. | No | 0.7.5.1 |
| ScriptSharp.FxCop | Apache 2.0 | Script# component. Used for generating client-side JavaScript from C#. | No | 0.7.5.0 |
| ScriptSharp.Lib.HTML | Apache 2.0 | Script# component. Used for generating client-side JavaScript from C#. | No | 0.7.5.0 |

-34-

*CONFIDENTIAL*

| Name | License | Usage | Distributed | Version |
|------|---------|-------|-------------|---------|
| SSH.NET | New BSD License | SSH library used for communicating with Fundtech for electronic check deposit. | No | 2013.4.7 |

-35-

*CONFIDENTIAL*

**(i)(C)**

None.

**(i)(D)**

The Company previously granted a license to use the IRIS Platform to Swiss Post Box (the "Swiss Post Box Agreement").  The Swiss Post Box Agreement was not renewed and the license granted thereunder expired according to its terms.

The Company previously granted a license to use the IRIS Platform to Sprint (the "Sprint Agreement").  The Sprint Agreement was not renewed and the license granted thereunder expired according to its terms.

**(i)(E)**

The Seller provided source code to Swiss Post Box under the Swiss Post Box Agreement and under the terms of the Swiss Post Box Agreement such source code was to be deposited with an escrow agent.  However, the source code was never deposited with an escrow agent and Swiss Post Box advised the Seller that such source code was destroyed when Swiss Post Box ceased using such source code in its business activities.

**(i)(F)**

| Name of Employee or Contractor | Copy of Proprietary Information, Invention Assignment and Non-Solicitation Agreement Provided in Virtual Data Site? |
|---|---|
| Amann, Kyle J | Y |
| Banos, Yoel | Y |
| Becdach, Jalil | Y |
| Buganan, Michelle T | Y |
| Camacho, Jessica | Y |
| Clark, Damarcus R | Y |
| Clay, Charles M | Y |
| Duke, Justin J | Y |
| Farley, Jacob M | Y |
| Finkle, Daniel K | Y |
| Gorman, John S | Y |
| Gorman, Joseph W | Y |
| Hensley, Amber J | Y |
| Horton, John H | Y |

-36-

*CONFIDENTIAL*

| Name of Employee or Contractor | Copy of Proprietary Information, Invention Assignment and Non-Solicitation Agreement Provided in Virtual Data Site? |
|---|---|
| La Sac, Joseph | Y |
| Lee, Stacey L | Y |
| Lee, Steven J | Y |
| Parada, Barbara | Y |
| Rivera, Melissa | Y |
| Roe, Christopher J | Y |
| Russo, Anthony M | Y |
| Russo, Timothy P | Y |
| Savicki, Stephanie L | Y |
| Snyder, Andrea | Y |
| Smith, David D | Y |
| Vargas, Carlos | Y |
| Vega, Nelson | Y |
| Walsh, Phil T | Y |
| Wilson, James L | Y |
| Bloodworth, Don A | Y |
| Boden, Sarah G | Y |
| Cosgrove, Claudia L | Y |
| Hymowitz, Mitchell I | Y |
| Miller, LeeAnne | Y |
| Ramirez, Ariana E | Y |
| Ribary, Stacye J | Y |
| Saini, Susan | Y |
| Wiener, Ron | Y |
| Womack, Shani J. | Y |
| Woodruff, Dana J | Y |
| Bennett, Beth E | Y |
| Bowman, Clifford G. | Y |
| Brandis, Timothy | Y |
| Campbell, Russell D | Y |
| Cho, Daniel S | Y |
| Cole, Brian A | Y |
| Davis, Matthew R | Y |
| Davis, William M. | Y |
| Dreke, Christian | Y |
| Dujari, Rajeev | Y |

-37-

*CONFIDENTIAL*

| Name of Employee or Contractor | Copy of Proprietary Information, Invention Assignment and Non-Solicitation Agreement Provided in Virtual Data Site? |
|---|---|
| Dunlop, Tara L | Y |
| Fang, Li | Y |
| Hill, Derek P | Y |
| Irvine, Paul | Y |
| Isaac, Steven A | Y |
| Johnson,Courtney Corey | Y |
| LaMar,James | Y |
| Long,Gregory Q | Y |
| Ly,Tam C | Y |
| Meldrum, Christopher A | Y |
| Miles, Michael D | Y |
| Newton, Brent H | Y |
| Pearce, Cynthia E. | Y |
| Plaza, Vincent M | Y |
| Prochaska, Brett R | Y |
| Pulliam, Jacob | Y |
| Rochat, Deborah L | Y |
| Rosinski, Zigmund | Y |
| Smith, Jeremy B | Y |
| Snelgrove-Simpson, Carl Adam | Y |
| Staub, Carl V | Y |
| Van Ommen,Seth L | Y |
| Weldy, Tome J | Y |
| White, Kelly | Y |
| Wick, Ronald A | Y |
| Wilhelm, Gregory L | Y |
| Zilka, Nathan B | Y |
| Zitkovich, Steven M | Y |
| Walsh, Ethan N | Y |
| Weil, Austin P | Y |
| Elashmawi, Khalid N | Y |
| Lublin, Andy P | Y |
| Palmer, Tyler J | Y |
| Salvage, Chris A | Y |
| Walters, Joseph V | Y |
| Ortiz, Armando F | Y |

-38-

*CONFIDENTIAL*

| Name of Employee or Contractor | Copy of Proprietary Information, Invention Assignment and Non-Solicitation Agreement Provided in Virtual Data Site? |
|---|---|
| Salinas, Arcadio | Y |
| Fulgham, Matthew A | Y |
| Betzina, John S | Y |
| Lloyd, Brittani K | Y |
| Groh, Wesley C | Y |
| Bandfield, Lee A | Y |
| Rice, Sara A | Y |
| Little, Craig | Y |
| Luu, Kevin | Y |
| Fulgham, Travis L | Y |
| Tauber, Raven A | Y |
| Terwelp, Russel I | Y |
| King, James B | Y |
| Cawley, Stephen J | Y |
| Babione, Cassandra M | Y |
| Jordan, Crystal R | Y |
| Lamar, Alicia | Y |
| Bosch, Stephanie D | Y |
| Brokaw, Heather M | Y |
| Brown, Tiffany R | Y |
| Zagorski, Ricky A | Y |
| Williams, Brian T | Y |
| Smith, Kyle D. | Y |
| Scoles, Noah J | Y |
| McCasland, Maria L.A. | Y |
| Barrett, Andrew Michael | Y |
| Young, David J | Y |
| Woods, Tiana A | Y |
| Crawford, James L | Y |
| Rodgers, Janean M | Y |
| Rymer, Eric A | Y |
| Mcintyre, Brandon D | Y |
| Garaventa, Kevin P | Y |
| Moe, Jeff C | Y |
| Smith, Curtis J | Y |
| Chang, Richard | Y |

-39-

*CONFIDENTIAL*

| Name of Employee or Contractor | Copy of Proprietary Information, Invention Assignment and Non-Solicitation Agreement Provided in Virtual Data Site? |
|---|---|
| Sherman, Marc N. | Y |
| Collazo, Suzzette T | Y |
| Lopez, Gamaliel J | Y |
| Marchessi, Lorenzo | Y |
| Parada, Lester | Y |
| Rivas, Xavier E | Y |
| Lizardy, Robert J | Y |
| Lum, James Christopher | Y |
| Laing, Jessica C | Y |
| Sullivan, Kristin R | Y |
| Kane, Joanna W | Y |
| Shelly, Nicole J | Y |
| Haskell, Sarah C | Y |
| Baxter, Charles R | Y |
| Soloway, Peter J | Y |
| Sirek-Love, Samara | Y |
| Monson, Erica L. | Y |
| Khandoker, Rakin | Y |
| Moua, Rebecca I | Y |
| Koppy, Julie A | Y |
| Walker, Mary M | Y |
| Sellers, Daniel J | Y |
| Gallagher, James O | Y |
| Bevis, George W | Y |
| Sprute, Philip | Y |
| Hicks JR, Carl | Y |
| Abel, Kara A | Y |
| Gilbert, Robert | Y |
| Weiss, Adam S. | Y |
| Powell, Cameron C | Y |
| Roan, Natalee R | Y |
| Groenier, Steven W | Y |
| Grimes, Jessica L | Y |
| Dusche, Michael S. | Y |
| Enrico, Ellen | Y |
| Wenker, Jeffrey | Y |

-40-

*CONFIDENTIAL*

| Name of Employee or Contractor | Copy of Proprietary Information, Invention Assignment and Non-Solicitation Agreement Provided in Virtual Data Site? |
|---|---|
| Mott, Kasey E | Y |
| Larralde, Chris P | Y |
| Robison, Ariella N | Y |
| Diniro, Nathan W | Y |
| Valenti, Ross P | Y |
| Widner, David E | Y |
| Hymowitz, Nava C | Y |
| Kirchner, Max | Y |
| Cox, Joshua D | Y |
| Banks, Robert L | Y |
| Maynor, Benvenido | Y |
| Ralston Jr, David F | Y |
| Faulkner, Chris[1] | N |

(1)     Mr. Faulkner was employed by the contracting firm ProDX when he performed work for the Seller.  All intellectual property developed by Mr. Faulkner for the Seller belongs to the Seller.

**(ii)(A)**


The Seller has not provided a copy of the Swiss Post Box Agreement.

The Seller has not provided a copy of the Sprint Agreement.

The Seller has not provided copies of Proprietary Information, Invention Assignment and Non-Solicitation Agreements for the following individuals:

- Katherine Grace Graham
- Kendal L. Portugal
- Maria L. Montalvo
- Laura C. Kirby
- Philips R. Andrews
- Anthony J. Slyter
- Megan L. Loflin
- Chris Faulkner

-41-

*CONFIDENTIAL*

- Ken Hall

The Seller has not provided contracts for the various widely-available, commercial Microsoft support and development products, including, but not limited to, Microsoft Visual Studio Premium with MSDN, Microsoft SQL Server, Microsoft System Center, Microsoft Windows Server and Windows.

Although Seller has not provided the contracts listed in this Schedule 4.5(b)(ii)(A), to the Knowledge of the Seller, all such contracts are valid and enforceable.

**(ii)(B)**

Prior to November 4, 2014, the Seller's source code relating to its online signup process referenced an HTC Script (essentially JavaScript) which the Seller believes was licensed under the GPL v3. This HTC Script was only used in customer's browsers (specifically Internet Explorer 8 and earlier).

**(ii)(C)**

See Schedule 4.5(c)(iii).

**(ii)(D)**

None.

**(ii)(E)**

The Seller installed the following Software:

- one of the Seller's computers has SQL Server 2008 R2 Standard installed instead of SQL Server 2008 R2 Workgroup;

- at least one of the Seller's computers has Office 2007 Professional Plus installed instead of Office 2007 Enterprise.

- two of the Seller's computers have Windows 7 Ultimate installed instead of Windows 7 Enterprise.

The Seller is in the process of installing the intended versions.

**(ii)(F)**

-42-

*CONFIDENTIAL*

In an executive status report prepared during the first part of 2008, there was a mention of a possible claim against the Seller for infringement of the Intellectual Property Rights of another Person.  The Seller has not been able to find a copy of that executive status report.  The Seller has not received any further written communication regarding the potential infringement discussed in the executive status report.

**(ii)(G)**

Reference is hereby made to Liens securing indebtedness for borrowed money which the Seller expects to be discharged by the Bankruptcy Court in the Bankruptcy Case, including:

| UCC File No. | Filing Date | Secured Party |
|---|---|---|
| 7962906<br>7962906-1 | 05/12/2008<br>12/13/2012 | Comerica Bank |
| 8470213 | 03/01/2010 | Ignition Ventures Management, LLC, as collateral agent |
| 8524983 | 05/12/2010 | Hewlett-Packard Financial Services Company |
| 89934447 | 01/14/2014 | Marlin Business Bank |
| 89958938 | 02/12/2014 | Erving Leasing Company |

-43-

*CONFIDENTIAL*

## Schedule 4.5(c)

## Additional Intellectual Property Disclosures and Representations

**(ii)**

Patent Applications

| Country | Application No Filing Date | Patent No. Issue Date | Inventors | Title |
|---|---|---|---|---|
| Australia | 2007233075 03/30/2007 | | Ron Wiener Michael D. Miles Brett Prochaska | Item Management Systems and Associated Methods |
| United States | 60/592,648 07/30/2004 | | Ron Wiener | System and Method for Providing a Virtual Mailbox |
| United States | 60/619,367 10/15/2004 | | Ron Wiener Michael D. Miles | Automated Material Storage and Retrieval System |
| United States | 60/626,571 11/09/2004 | | Ron Wiener Michael D. Miles | Automated Storage and Retrieval System-Sequencing and Sortation Utility |
| United States | 11/195,491 08/01/2005 | | Ron Wiener Michael D. Miles | System and Method for Providing a Virtual Mailbox |
| United States | 11/253,091 10/17/2005 | | Ron Wiener Michael D. Miles Brett Prochaska | Item Management Systems and Associated Methods |
| United States | 60/787,319 03/30/2006 | | Ron Wiener Michael D. Miles | Docubotic Sorters for Universal Service Providers (National Post Offices) |

-44-

*CONFIDENTIAL*

| Country | Application No Filing Date | Patent No. Issue Date | Inventors | Title |
|---|---|---|---|---|
| | | | Brett Prochaska | |
| United States | 60/787,271 03/30/2006 | | Ron Wiener Michael D. Miles | Autonomous Mail Dispensing Kiosk |
| United States | 60/787,320 03/30/2006 | | Ron Wiener Michael D. Miles | Handheld Printer for Making Information Directly on Items Without Use of Labels |
| United States | 60/787,321 03/30/2006 | | Ron Wiener | Documentary Retroactive Video Editing and Surveillance System |
| United States | 60/861,357 11/27/2006 | | Michael D. Miles | Sortation and Extraction System for Item Management Systems |
| United States | 60/893,539 03/07/2007 | | Ron Wiener Michael D. Miles | Handheld Printer for Marking Information Directly on Items Without the Use of Labels |
| United States | 11/694,751 03/30/2007 | | Ron Wiener Michael D. Miles Brett Prochaska | Item Management Systems and Associated Methods |
| PCT | PCT/US05/037613 10/17/2005 | | Michael D. Miles | Item Management Systems and Associated Methods |
| PCT | PCT/US07/065712 03/30/2007 | | Michael D. Miles | Item Management Systems and Associated Methods |
| Canada | 2,584,336 10/17/2005 | | Ron Wiener Michael D. Miles Brett Prochaska | Item Management Systems and Associated Methods |
| Europe | 05815144.0 | | Ron Wiener | Item Management Systems and Associated Methods |

-45-

*CONFIDENTIAL*

| Country | Application No Filing Date | Patent No. Issue Date | Inventors | Title |
|---|---|---|---|---|
| | 10/17/2005 | | Michael D. Miles<br><br>Brett Prochaska | |
| Europe | 07759894.4<br><br>03/30/2007 | | Ron Wiener<br><br>Michael D. Miles<br><br>Brett Prochaska | System and Method for Providing a Virtual Mailbox |
| Israel | 194451<br><br>09/28/2008 | | Michael D. Miles | Item Management Systems and Associated Methods |
| Japan | 2007-537030<br><br>10/17/2005 | | Michael D. Miles | Item Management Systems and Associated Methods |
| Japan | 2009-503321<br><br>03/30/2007 | | Michael D. Miles | Item Management Systems and Associated Methods |
| Korea, Republic of | 10-2008-7026548<br><br>03/30/2007 | | Ron Wiener<br><br>Michael D. Miles<br><br>Brett Prochaska | Item Management Systems and Associated Methods |
| New Zealand | 571635<br><br>03/30/2007 | | Ron Wiener<br><br>Michael D. Miles<br><br>Brett Prochaska | Item Management Systems and Associated Methods |
| United States | 11/946,023<br><br>11/27/2007 | | Michael D. Miles | Sortation and Extraction System for Item Management Systems and Associated Methods |
| PCT | PCT/US07/085679<br><br>11/27/2007 | | Michael D. Miles | Sortation and Extraction System for Item Management Systems and Associated Methods |

-46-

*CONFIDENTIAL*

| Country | Application No Filing Date | Patent No. Issue Date | Inventors | Title |
|---|---|---|---|---|
| United States | 61/054,073<br><br>05/16/2008 | | Rajeev Dujari<br>Matt Davis<br>Matt Clay<br>Paul Irvine<br>Tam Ly | Systems for Electronic Deposit of Financial Instruments and Associated Methods |
| United States | 12/467,825<br><br>05/18/2009 | | Rajeev Dujari<br>Matt Davis<br>Matt Clay<br>Paul Irvine<br>Tam Ly | Systems for Electronic Deposit of Financial Instruments and Associated Methods |
| United States | 61/143,347<br><br>01/08/2009 | | Ron Wiener | Trusted Postal Email |

None of the foregoing patents have been issued.

Trademarks

| Country | Registration No. | Registration Date | Mark |
|---|---|---|---|
| United States | 4,000,763 | July 26, 2011 | EARTH CLASS MAIL |

**(iii)**

From time to time the Seller may have disclosed source code or other material confidential information or material Trade Secrets of the Seller to Employees or Former Employees. Although these Employees or Former Employees are subject to confidentiality or non-disclosure agreements that prohibit the use or disclosure of such confidential information, the Seller has not provided signed confidentiality or non-disclosure agreements for the following individuals:

- Katherine Grace Graham
- Kendal L. Portugal
- Maria L. Montalvo
- Laura C. Kirby
- Philips R. Andrews
- Anthony J. Slyter
- Megan L. Loflin

-47-

*CONFIDENTIAL*

- Chris Faulkner[1]
- Ken Hall

_____

[1]    Chris Faulkner was employed by the contracting firm ProDX when he performed work for the Seller. All intellectual property developed by Mr. Faulkner for the Seller belongs to the Seller.

**(iv)**

All rights to Intellectual Property Rights developed since June 1, 2007 and assigned by Former Employees pursuant to invention assignment agreements in the form provided to the Buyer.

The Prime OCR License.

BizSpark License.

**(v)**

None.

**(vi)**

None.

**(vii)**

None.

**(viii)**

None.

**(ix)**

Although no material defects exists in the software that comprises or that enables or is embedded within any Seller Product, there have been in the past, and may be in the future, certain defects that require intervention by the Seller's technical personnel which, absent such intervention, would likely constitute a material defect that adversely affects the use, functionality, performance or value of the software.  Such defects include, but are not limited to, the following:

-48-

*CONFIDENTIAL*

- A custom workflow for a single customer receives, electronically deposits and reports rent checks received from the customer's tenants. Although this process is largely automated, issues arise that require further attention, such as returned checks.

- On occasion, an item is scanned and entered into the delivery pipeline which will crash the envelope OCR process, requiring all delivery to be done manually until the issue is resolved.

- On occasion, operations staff will need to cancel a shipping label generated by the system after the shipment has been completed and recorded.

- Former customers often desire to reclaim their old customer number from a terminated account and there is no means for performing this function in the user interface.

- There is no user interface for making corrections to incorrect weight or dimensions entered into the system, which can cause a customer to be charged incorrect storage fees and to have trouble shipping the mail item.

- On occasion, the electronic check deposit service has failed when the check magnetic ink character recognition is incorrectly detected and it is not detected during the quality assurance processes.

- Although this feature is supported by the Iris platform, there is no user interface to configure the transfer of items between multiple accounts held by a single customer.

- The Iris platform makes extensive use of database backed queues for most services. There are certain failure scenarios which are not handled by automated processes and occasionally require an engineer to manually trigger a retry, or if necessary, cancel the failed queue operation. This can impact activities like delivery of mail, completion of content scans, transmission of email, or any number of other actions.

**(x)**

None.

**(xi)**

The Seller is obligated to pay license and maintenance fees with respect to widely-available commercial software products that are used in conjunction with Seller Products and are licensed by Seller pursuant to a non-exclusive, internal-use licenses.

**(xii)**

As described in Schedule 4.3, there can be no assurance that the BizSpark License will be assignable to Buyer without consent.

-49-

**(xiii)**

Reference is hereby made to the Financial Model IP License, which is not fully transferable, alienable and licensable by the Seller without consent.

As described in Schedule 4.3, there can be no assurance that the BizSpark License will be assignable to the Buyer without consent.

**(xiv)**

As described in Schedule 4.3, the Financial Model IP License may not be assignable to the Buyer without consent.

As described in Schedule 4.3, the BizSpark License may not be assignable to the Buyer without consent.

-50-

*CONFIDENTIAL*

**Section 4.6**

**Privacy; Data Protection**

**4.6(a)**

The Seller uploads certain personal and behavioral information to the Google Analytics platform. Under the terms of the policies applicable to the Google Analytics platform, the Seller may not upload information to Google Analytics if that information permits Google Analytics to identify the individuals to whom the information relates. Currently, the Seller does upload certain personal and behavioral information to the Google Analytics platform that would allow Google Analytics to identify the relevant individuals. In order to comply with the policies applicable to the Google Analytics platform, the Seller needs to purge the identifying information and modify its future practices to comply with the policies. For the avoidance of doubt, the Seller has not receive any communication from Google Analytics regarding the potential non-compliance described above.

**4.6(b)**

The current version of the Seller's privacy policy is available on the Seller's website at https://www.earthclassmail.com/Privacy. Copies of previous versions of the Seller's privacy policy have been provided to the Buyer.

**4.6(c)**

The Seller has begun the process of implementing a security plan. However, the Seller disclaims any representation or warranty as to whether (a) such security plan identifies all internal and external risks to the security of data and confidential information and (b) the administrative, electronic and physical safeguards implemented by such security plan are adequate and effective. In order to reduce the likelihood of data loss, the Seller backs-up data to a disk. However, the Seller has not implemented any offline or "cold" back-ups (e.g. tape back-up) and as a result, the Seller's security plan may not be adequate to prevent data loss.

The Seller is not required to submit a Self-Assessment Questionnaire ("SAQ") until December 2015. If the Seller were to submit an SAQ as of the date hereof, the Seller would not be compliant with all information and data security requirements of the PCI DSS. As of the date hereof, the PCI DSS does not require the Seller to be audited by a Qualified Security Assessor or Approved Scanning Vendor. However, if the Seller were to submit a SAQ as of the date hereof, the Seller would be required to have an independent third party perform penetration testing, which testing has not been conducted to date. If, as a result of the Transactions, the Seller's credit card processor Litle/Vantiv requires the

-51-

*CONFIDENTIAL*

Seller to submit a new SAQ, the Seller would not be able to claim PCI compliance and would be required to submit the SAQ under the new PCI DSS 3.0 requirements.

-52-

*CONFIDENTIAL*

**Section 4.7**

**Compliance with Law; Permits**

**4.7(a)**

Worker's Compensation

In early January 2015, a representative from American International Group, Inc. ("AIG"), the Seller's workers' compensation insurance carrier, came to its Beaverton location to perform an audit.  AIG subsequently advised the Seller that operational employees would need to be changed to a different class code.  Such a change may cause the rate to increase.  It is unclear as to how much this will increase the Seller's rate and whether the new rate will be applied retroactively.

Revenue Allocation and Effect on State Taxes

The Seller has never received (or requested) an opinion from any state supporting its approach to revenue allocation.  If a state were to disagree with the Seller's approach to revenue allocation, this could result in an increase in taxes, including business and occupation taxes.

**4.7(b)**

Except as otherwise noted below, the Seller is in compliance in all material respects with the following Permits used in the conduct of the Business:

- Each customer must complete and have notarized a PS Form 1583 and the Commercial Mail Receiving Agency (the "CMRA") must remit the original to the postmaster.  Seller has received customer completed PS Form 1583s from substantially all of its customers.
- As a CMRA, Seller is required to file a PS Form 1583-A Application for each location Seller operates as a CMRA.  The Seller is in compliance with this requirement.
- All CMRA's must remain in compliance with Domestic Mail Manual Sections 508.1.8.1 through 508.1.8.4.
- Any changes to the information contained on the PS Form 1583, including a change in the CMRA, requires the filing of a revised PS Form 1583.
- City of Beaverton Business License.
- Beaverton Police Department Alarm Permit.
- City of San Francisco Business License.
- City of San Francisco Alarm Permit.
- City of West Hollywood Business License.
- City of West Hollywood Alarm Permit.
- City of Seattle Business License.
- Seller is registered with the following Secretaries of State:
  - Oregon

-53-

*CONFIDENTIAL*

- o California
- o Washington [*Note: see Schedule 4.1.*]
- o New York [*Note: see Schedule 4.1.*]

-54-

*CONFIDENTIAL*

**EXHIBIT A**

**Tangible Personal Property**

**(See attached)**

-55-

## EXHIBIT A

### Computer Equipment

| Description | Serial Number | Vendor Name | Location |
|---|---|---|---|
| MacBook Pro, Chris Roe | W802335HAGZ | Apple | Beaverton |
| Optiplex 980 Dev System | FCTBDP1 | Dell Marketing Services | Beaverton |
| Optiplex 980 Dev System | FCV9DP1 | Dell Marketing Services | Beaverton |
| Optiplex 980 Dev System | FCTDDP1 | Dell Marketing Services | Beaverton |
| Optiplex 980 Dev System | FCTCDP1 | Dell Marketing Services | Beaverton |
| Western Digital hard drives | | CC | Beaverton |
| Western Digital hard drives | | CC | Beaverton |
| Western Digital hard drives | | CC | Beaverton |
| Western Digital hard drives | | CC | Beaverton |
| Western Digital hard drives | | CC | Beaverton |
| Western Digital hard drives | | CC | Beaverton |
| Western Digital hard drives | | CC | Beaverton |
| Western Digital hard drives | | CC | Beaverton |
| Western Digital hard drives | | CC | Beaverton |
| Western Digital hard drives | | CC | Beaverton |
| Western Digital hard drives | | CC | Beaverton |
| Western Digital hard drives | | CC | Beaverton |
| Data center image and backup server discs | | CC | Beaverton |
| Data center image and backup server discs | | CC | Beaverton |
| Discs, data center VM Server | | CC | Beaverton |

| Description | Serial Number | Vendor Name | Location |
|---|---|---|---|
| Dell R730 Server | CS4DR22 | Dell Business Credit | Data Center-PDX |
| Dell R730 Server | CS4FR22 | Dell Business Credit | Data Center-PDX |

**Hosting Equipment**

| Description | Serial Number | Vendor Name | Location |
|---|---|---|---|
| Ratitan Dominion DKX2 32 port KVM switch, Data Center | HKB7800081 | James Wilson WF CC | Data Center-PDX |
| PowerEdge R720 Server | 1LNCMV1 | Dell Marketing L.P. | Data Center-PDX |
| PowerEdge R720 Server | JKNCMV1 | Dell Marketing L.P. | Data Center-PDX |
| CyberPower PR6000LCDRTXL5U Smart App Sinewave 6000 VA rack-mountable UPS | PQN0N2000040 | Amex | Beaverton |
| Disks new VM servers purchased 6/20/12 | | Provantage via. M. Clay Wells card | Data Center-PDX |
| Juniper EX2200 48 Switch | CT0213050620 | CDW Direct | Beaverton |
| Juniper EX2200 48 Switch | CT0213050922 | CDW Direct | Beaverton |
| Juniper SRX Firewall | SBU1913AA0440 | CDW Direct | Data Center-PDX |
| Juniper SRX Firewall | SBU1913AA0645 | CDW Direct | Data Center-PDX |
| Juniper EX4200 48PT Switch | BP0212478108 | CDW Direct | Data Center-PDX |
| Juniper EX4200 48PT Switch | BP0212489719 | CDW Direct | Data Center-PDX |
| SRX210 Rack Mount | | CDW Direct | Beaverton |
| SRX210 Rack Mount | | CDW Direct | Beaverton |
| SRX210 Rack Mount | | CDW Direct | ua-ny |
| SRX210 Rack Mount | | CDW Direct | ua-ny |
| SRX210 Rack Mount | | CDW Direct | ua-sea |
| SRX210 Rack Mount | | CDW Direct | ua-sea |
| Juniper EX2200 24PT Switch | CW0213040500 | CDW Direct | ua-ny |
| Juniper EX2200 24PT Switch | CW0213071704 | CDW Direct | ua-ny |

**EXHIBIT A - PAGE 96**

| Description | Serial Number | Vendor Name | Location |
|---|---|---|---|
| Juniper EX2200 24PT Switch | CW0213071819 | CDW Direct | ua-sea |
| Juniper EX2200 24PT Switch | CW0213071837 | CDW Direct | ua-sea |
| Juniper EX2200 24PT Switch | CW0213071843 | CDW Direct | ua-sf |
| Juniper EX2200 24PT Switch | CW0213071853 | CDW Direct | ua-sf |
| Juniper EX2200 24PT Switch | CW0213071909 | CDW Direct | ua-la |
| Juniper EX2200 24PT Switch | CW0213072012 | CDW Direct | ua-la |
| Juniper EX2200 48PT Switch | CU0213208659 | CDW Direct | Data Center-PDX |
| SRX210 Rack Mount | | CDW Direct | ua-sf |
| SRX210 Rack Mount | | CDW Direct | ua-sf |
| Juniper EX2200 48PT Switch | CU0213125989 | CDW Direct | Beaverton |
| Juniper SRX 210HE Firewall | SBL2813AK0424 | CDW Direct | Beaverton |
| Juniper SRX 210HE Firewall | SBL2813AK0619 | CDW Direct | Beaverton |
| Juniper SRX 210HE Firewall | SBL2813AK0025 | CDW Direct | ua-la |
| Juniper SRX 210HE Firewall | SBL2813AK0032 | CDW Direct | ua-la |
| Juniper SRX 210HE Firewall | SBL2813AK0048 | CDW Direct | ua-ny |
| Juniper SRX 210HE Firewall | SBL2813AK0051 | CDW Direct | ua-ny |
| Juniper SRX 210HE Firewall | SBL2813AK0079 | CDW Direct | ua-sea |
| Juniper SRX 210HE Firewall | SBL2813AK0100 | CDW Direct | ua-sea |
| Juniper SRX 210HE Firewall | SBL2813AK0101 | CDW Direct | ua-sf |
| Juniper SRX 210HE Firewall | SBL2813AK0128 | CDW Direct | ua-sf |
| Dell PowerEdge T320 | 96NVGX1 | Dell Marketing L.P. | ua-la |
| Dell PowerEdge T320 | 96PTGX1 | Dell Marketing L.P. | ua-ny |

| Description | Serial Number | Vendor Name | Location |
|---|---|---|---|
| Dell PowerEdge T320 | 96PSGX1 | Dell Marketing L.P. | ua-sea |
| Dell PowerEdge T320 | 96NWGX1 | Dell Marketing L.P. | ua-sf |
| Dell PowerEdge R720 | 9QCWGX1 | Dell Marketing L.P. | Data Center-PDX |
| Dell PowerEdge R720xd | 2WM48Y1 | Dell Marketing L.P. | Data Center-PDX |
| Dell PowerEdge R720xd | 2WN48Y1 | Dell Marketing L.P. | Data Center-PDX |
| Dell PowerEdge R720xd | 2WN38Y1 | Dell Marketing L.P. | Data Center-PDX |
| Dell PowerEdge R720xd | 2WN28Y1 | Dell Marketing L.P. | Data Center-PDX |
| Hard drive - T320 above | | Dell Marketing L.P. | ua-la |
| Hard drive - T320 above | | Dell Marketing L.P. | ua-ny |
| Hard drive - T320 above | | Dell Marketing L.P. | ua-sea |
| Hard drive - T320 above | | Dell Marketing L.P. | ua-sf |
| Ethernet adapter - T320 above | | Dell Marketing L.P. | ua-la |
| Ethernet adapter - T320 above | | Dell Marketing L.P. | ua-ny |
| Ethernet adapter - T320 above | | Dell Marketing L.P. | ua-sea |
| Ethernet adapter - T320 above | | Dell Marketing L.P. | ua-sf |
| Data center rack - returned | | TBD | Data Center-PDX |
| Infrastructure for new datacenter | | Credit Card | Data Center-PDX |
| Server room keyboard/monitor control panel | | Dell Business Credit | Data Center-PDX |

EXHIBIT A - PAGE 98

**Mail Handling Equipment**

| Description | Serial Number | Vendor Name | Location |
|---|---|---|---|
| i1420 Kodak Scanner | 45636176 | Pacific Office Automation | ua-sea |
| A3 flatbed attachment | 45953429 | Pacific Office Automation | ua-sea |
| i1420 Kodak scanner | 45635971 | Pacific Office Automation | ua-sea |
| i1420 Kodak scanner | 45636174 | Pacific Office Automation | hub-bvr |
| i1420 Kodak scanner | 45635791 | Pacific Office Automation | hub-bvr |
| A3 flatbed attachment | 45953444 | Pacific Office Automation | hub-bvr |
| i1420 Kodak scanner | 45636175 | Pacific Office Automation | hub-bvr |
| A3 flatbed attachment | 45953446 | Pacific Office Automation | hub-bvr |
| i1420 Kodak scanner | 45636171 | Pacific Office Automation | hub-bvr |
| A3 flatbed attachment | 45953435 | Pacific Office Automation | hub-bvr |
| i1420 Kodak scanner | 45635968 | Pacific Office Automation | ua-ny |
| i1420 Kodak scanner | 45638075 | Pacific Office Automation | ua-sea |
| i1420 Kodak scanner | 45638699 | Pacific Office Automation | ua-ny |
| i1420 Kodak scanner | 45638856 | Pacific Office Automation | hub-bvr |
| i1420 Kodak scanner | 45647044 | Ervin Leasing | hub-bvr |

| Description | Serial Number | Vendor Name | Location |
|---|---|---|---|
| i1420 Kodak scanner | 45647046 | Ervin Leasing | hub-bvr |
| i1420 Kodak scanner | 45647041 | Ervin Leasing | ua-la |
| i1420 Kodak scanner | 45647045 | Ervin Leasing | ua-ny |
| i1420 Kodak scanner | 45647069 | Ervin Leasing | ua-ny |
| i1420 Kodak scanner | 45647071 | Ervin Leasing | ua-sea |
| i1420 Kodak scanner | 45647040 | Ervin Leasing | ua-sf |

**Furniture Fixtures**

| Description | Serial Number | Vendor Name | Location |
|---|---|---|---|
| Check for $3,300 to Jobster Â– to purchase furniture | | | |
| Anthro Technology furniture | | | |
| Panal 5x3 GY/frame GY, connector F/P-series GY | | Office Depot | |
| Workstation-demo counter; graphics; corrugated shipping. | | Exhibit Concepts Inc. | |
| Workstation/demo counter for UA-SEA | | Exhibit Concepts Inc. | |
| Seville 36 inch, wide, four-shelf unit | | Costco | |
| 5 corner office desks, 5, 36 inch desks | | Office Depot | |
| Cubes | | Office Depot | |
| Desks for UA-LA | | Tyler Palmer WF cc charge | |
| Refrigerator, Gemini Drive office | | Stacey Lee Expense Reimbursement | |

**Software**

| Description | Serial Number | Vendor Name | Location |
|---|---|---|---|
| Windows datacenter licenses for new VM servers | | CDW Direct via M. Clay Wells card | Data Center-PDX |

**Leasehold Improvements**

| Description | Serial Number | Vendor Name | Location |
|---|---|---|---|
| Architect drawing | | hooksASD | UA-SF |
| Store signage | | Revolution | UA-SF |
| Design work | | SEAS | UA-NY |
| Design work | | SEAS | UA-NY |
| Design work | | SEAS | UA-SF |
| Design work | | SEAS | UA-SF |
| Design work | | SEAS | UA-LA |
| UA build-out - UA-NY | | Manhattan Contracting | UA-NY |
| Electrical components | | SEAS | UA-SF |
| Arakawa hardware | | SEAS | UA-LA |
| UA design consultation for casework details, design, space planning | | 5ive Creative | UA-LA |
| UA design consultation for casework details, design, space planning | | 5ive Creative | UA-SF |
| UA design consultation for casework details, design, space planning | | 5ive Creative | UA-NY |
| Light fixtures - UA-NY | | Albertson Electric | UA-NY |
| Retainer-construction permits/inspections | | Outsource Consultants | UA-NY |
| Design work | | SEAS | UA-LA |
| Build-out architect | | Armstrong Association | UA-LA |
| Build-out contractor | | Aureus | UA-LA |
| Electrical contractor-UA build-out | | Arguello Group | UA-LA |
| Space planning | | 5ive Creative | UA-LA |
| Design work | | SEAS | UA-NY |
| Space planning | | 5ive Creative | UA-NY |
| Permits | | Outsource Consultants | UA-NY |
| Permits | | NYC Build Dept | UA-NY |

| Description | Serial Number | Vendor Name | Location |
|---|---|---|---|
| Electrical contractor-UA build-out | | Albertson Electric | UA-NY |
| Build-out contractor | | Manhattan Contracting | UA-NY |
| Steel shelving brackets | | SEAS | UA-NY |
| Design work | | SEAS | UA-SF |
| Architect | | hooksASD | UA-SF |
| Build-out contractor | | Aureus | UA-SF |
| Electrical contractor-UA build-out | | Arguello Group | UA-SF |
| Space planning | | 5ive Creative | UA-SF |
| Signage | | Revolution | UA-SF |
| Awning fabrication & install | | Zebra Awning | UA-SF |
| Flag pole manufacturing & install | | Messenger | UA-NY |
| Architect | | hooksASD | UA-SF |
| Store signage | | Messenger | UA-NY |
| Store signage | | Messenger | UA-NY |
| Store signage | | Messenger | UA-LA |
| Store signage | | Messenger | UA-SF |
| Store signage | | Messenger | UA-NY |
| Store signage | | Messenger | UA-SF |
| Architect | | hooksASD | UA-SF |
| Store signage | | Messenger | UA-LA |
| Build-out contractor | | Manhattan Contracting | UA-NY |
| Design work | | SEAS | UA-NY |
| Design work | | SEAS | UA-SF |
| Build-out architect | | Armstrong Assoc | UA-LA |
| Air conditioning installation | | Aureus | UA-SF |
| Complete awning install | | Zebra Awning | UA-SF |
| Front door glass | | Rosen Paramount Glass | UA-NY |
| Gemini Drive cabling - 1st half | | Technocom, Inc. | hub-bvr |
| Carpeting - Gemini Drive office | | Nimbus Center LLC | hub-bvr |
| Gemini Drive cabling - 2nd half | | Technocom, Inc. | hub-bvr |

**EXHIBIT A - PAGE 104**

| Description | Serial Number | Vendor Name | Location |
|---|---|---|---|
| Alarm system install - deposit | | AACT | hub-bvr |
| Alarm system install - 2nd installment | | AACT | hub-bvr |
| Cabling change order | | Technocom, Inc. | hub-bvr |
| Alarm system install - change order | | AACT | hub-bvr |
| Final billing, Gemini Drive alarm system | | AACT | hub-bvr |
| TI allowance | | Gemini Landlord | hub-bvr |
| Gemini Drive fire alarm system | | AACT | hub-bvr |
| Gemini Drive fire alarm system-2nd half | | AACT | hub-bvr |
| NY wiring - back up Internet connection | | Litespeed Electric | UA-NY |
| NY storefront repair | | Full Force Contracting | UA-NY |

**Car**

| Description | VIN | Vendor Name | Location |
|---|---|---|---|
|  |  | Lexus |  |

**Office Equipment**

| Description | Serial Number | Vendor Name | Location |
|---|---|---|---|
| Shoretel Shoregear 90, Shore Tel 120/24 voice switch etc. | | Network Computing Architects Inc. | Beaverton |
| Shoretel IP560g-Black (6.1 or later) | | Network Computing Architects Inc. | Beaverton |
| | | Network Computing Architects Inc. | Beaverton |

**Office Equipment (Assets No Longer in Service)**

| Description | Serial Number | Vendor Name | Location |
|---|---|---|---|
| Printer I-4208 | | Westmark Industries Inc | hub-kc |
| Alarm equipment | | AACT | hub-bvr |
| Alarm equipment | | AACT | hub-bvr |
| Ricoh Afico MP C3000 multifunction color copier, maple, 17 foot, conference table and matching credenza | | Clearsight Systems Inc | Seattle |

**Computers**

| Description | Serial Number | Vendor Name | Location |
|---|---|---|---|
| ahensley-dt | 9BD50G1 | Dell | Beaverton |
| asnyder-dt | 9J6TRG1 | Dell | Beaverton |
| cbowman-dt | FCTBDP1 | Dell | Beaverton |
| csspare-dt | 7F23HF1 | Dell | Beaverton |
| dfinkle-dt | 3F23HF1 | Dell | Beaverton |
| dsellers-dt | 4MPLJH1 | Dell | Beaverton |
| eco-pdx02 | 21JVTG1 | Dell | Beaverton |
| eco-pdx03 | 5CVFTF1 | Dell | Beaverton |
| eco-pdx05 | 535R9G1 | Dell | Beaverton |
| eco-pdx06 | FJW0ZD1 | Dell | Beaverton |
| eco-pdx10 | G00BRD1 | Dell | Beaverton |
| eco-pdx11 | 2CVFTF1 | Dell | Beaverton |
| eco-pdx12 | C00BRD1 | Dell | Beaverton |
| eco-qax02 | 600BRD1 | Dell | Beaverton |
| jgorman-dt | FCTDDP1 | Dell | Beaverton |
| jlasac-dt | 5FVYDH1 | Dell | Beaverton |
| mclay-dt | FCV9DP1 | Dell | Beaverton |
| mdavis-dt | FCTCDP1 | Dell | Beaverton |
| pwalsh-dt | 19XJNH1 | Dell | Beaverton |
| spare-dt | 5MPLJH1 | Dell | Beaverton |
| ssavicki-dt | DFVYDH1 | Dell | Beaverton |
| croe-lt | 2WTCPC1 | Dell | Beaverton |
| dsmith-lt | 2CM85F1 | Dell | Beaverton |

**EXHIBIT A - PAGE 108**

| Description | Serial Number | Vendor Name | Location |
|---|---|---|---|
| dsmith-lt | CB5L0G1 | Dell | Beaverton |
| it-lt | 2D0GWD1 | Dell | Beaverton |
| jwilson-lt | 2BVP5F1 | Dell | Beaverton |
| mclay-lt | 861LRF1 | Dell | Beaverton |
| slee-lt | G59FWD1 | Dell | Beaverton |
| devstor01bvr | JG8VCD1 | Dell | Beaverton |
| iwdc01bvr | JB9DYD1 | Dell | Beaverton |
| iwphone02pdx | 30XZSF1 | Dell | Beaverton |
| iwvm10bvr | 9WC1DD1 | Dell | Beaverton |
| iwvm11bvr | 9ZDWCD1 | Dell | Beaverton |
| iwvm20bvr | 2WN48Y1 | Dell | Beaverton |
| iwvm21bvr | JS01DD1 | Dell | Beaverton |
| iwvm10pdx | 1LNCMV1 | Dell | Data Center |
| iwvm11pdx | JKNCMV1 | Dell | Data Center |
| iwvm12pdx | 9QCWGX1 | Dell | Data Center |
| iwvm20pdx | 2WN38Y1 | Dell | Data Center |
| iwvm21pdx | 2WN28Y1 | Dell | Data Center |
| iwvm22pdx | 2WM48Y1 | Dell | Data Center |
| iwvm30pdx | CS4FR22 | Dell | Data Center |
| iwvm31pdx | CS4DR22 | Dell | Data Center |
| devdb01bvr | 2UX01001ZY | Hewlett-Packard | Data Center |
| pwdb01pdx | 2UX00905VJ | Hewlett-Packard | Data Center |
| pwdb02pdx | 2UX00200KX | Hewlett-Packard | Data Center |
| pwidw02pdx | 2UX0100204 | Hewlett-Packard | Data Center |

**EXHIBIT A - PAGE 109**

| Description | Serial Number | Vendor Name | Location |
|---|---|---|---|
| eco-lax02 | 5WX7BG1 | Dell | Los Angeles |
| eco-lax03 | DJW0ZD1 | Dell | Los Angeles |
| eco-lax04 | 9F23HF1 | Dell | Los Angeles |
| iwvm01lax | 96NVGX1 | Dell | Los Angeles |
| eco-jfk03 | DF366F1 | Dell | New York |
| eco-jfk04 | FF366F1 | Dell | New York |
| eco-jfk05 | J0JVTG1 | Dell | New York |
| eco-jfk06 | 28GP8F1 | Dell | New York |
| eco-jfk08 | 78GP8F1 | Dell | New York |
| iwvm01jfk | 96NWGX1 | Dell | New York |
| eco-sfo02 | 6GXKCF1 | Dell | San Francisco |
| eco-sfo04 | 2WX7BG1 | Dell | San Francisco |
| eco-sfo05 | 1MPLJH1 | Dell | San Francisco |
| iwvm01sfo | 96PTGX1 | Dell | San Francisco |
| eco-sea01 | C8GP8F1 | Dell | Seattle |
| eco-sea03 | BGXKCF1 | Dell | Seattle |
| eco-sea07 | 6MPLJH1 | Dell | Seattle |
| eco-sea08 | 6CVFTF1 | Dell | Seattle |
| trusso-lt | FMWJPD1 | Dell | Seattle |
| iwvm01sea | 96PSGX1 | Dell | Seattle |

**Switches & Firewalls**

| Description | Serial Number | Vendor Name | Location |
|---|---|---|---|
| Juniper Care 3 Year Prepaid Core Support | BL2913AK0032 | | Beaverton |
| Juniper Care 3 Year Prepaid Core Support | BL2813AK0424 | | Beaverton |
| Juniper Care 3 Year Prepaid Core Support | CD5213AK0009 | | Beaverton |
| Juniper Care 3 Year Prepaid Core Support | CT0213050922 | | Beaverton |
| Juniper Care 3 Year Prepaid Next Day Support | CT0213050620 | | Beaverton |
| Juniper Care 3 Year Prepaid Next Day Support | CU0213208659 | | Beaverton |
| Juniper Care 3 Year Prepaid Core Support | CU0213125989 | | Beaverton |
| Juniper Care 3 Year Prepaid Core Support | BL2913AK0101 | | New York |
| Juniper Care 3 Year Prepaid Next Day Support | BL2913AK0100 | | New York |
| Juniper Care 3 Year Prepaid Next Day Support | CW0213071909 | | New York |
| Juniper Care 3 Year Prepaid Core Support | CW0213072012 | | New York |
| Juniper Care 3 Year Prepaid Core Support | BL2913AK0079 | | Los Angeles |
| Juniper Care 3 Year Prepaid Next Day Support | BL2913AK0025 | | Los Angeles |
| Juniper Care 3 Year Prepaid Next Day Support | CW0213071819 | | Los Angeles |
| Juniper Care 3 Year Prepaid Core Support | CW0213071843 | | Los Angeles |
| Juniper Care 3 Year Prepaid Core Support | BU1913AA0440 | | Data Center |
| Juniper Care 3 Year Prepaid Next Day Support | BU1913AA0465 | | Data Center |

| Description | Serial Number | Vendor Name | Location |
|---|---|---|---|
| Juniper Care 3 Year Prepaid Next Day Support | BP0212478108 | | Data Center |
| Juniper Care 3 Year Prepaid Core Support | BP0212489719 | | Data Center |
| Juniper Care 3 Year Prepaid Core Support | BL2813AK0619 | | Seattle |
| Juniper Care 3 Year Prepaid Next Day Support | BL2913AK0128 | | Seattle |
| Juniper Care 3 Year Prepaid Next Day Support. | CW0213071837 | | Seattle |
| Juniper Care 3 Year Prepaid Core Support | CW0213071853 | | Seattle |
| Juniper Care 3 Year Prepaid Core Support | BL2913AK0051 | | San Francisco |
| Juniper Care 3 Year Prepaid Next Day Support | BL2913AK0048 | | San Francisco |
| Juniper Care 3 Year Prepaid Core Support | CW0213040500 | | San Francisco |
| Juniper Care 3 Year Prepaid Core Support | CW0213071704 | | San Francisco |

**Laser Printers**

| Description | Serial Number | Vendor Name | Location |
|---|---|---|---|
| prt01bvr | NWS3201519 | Kyocera | Beaverton |
| prtops01bvr | Z64AB8GD1F00CMX | Samsung | Beaverton |
|  |  | HP | Beaverton |
| prt01lax |  | HP | Los Angeles |
| prt01jfk |  | HP | New York |
| prt01sfo |  | HP | San Francisco |
| prt01sfo | Z64AB8GC7F00XRN | Samsung | Seattle |
|  | Z64ABJACB000F6M | Samsung | Beaverton |

**Label Printers**

| Description | Serial Number | Vendor Name | Location |
|---|---|---|---|
| I-4208 | | DataMax | New York |
| ZP500 Plus | | Zebra | New York |
| I-4208 | | DataMax | Seattle |
| ZP500 Plus | | Zebra | Seattle |
| I-4208 | | DataMax | San Francisco |
| ZP500 Plus | | Zebra | San Francisco |
| I-4208 | | DataMax | Los Angeles |
| ZP500 Plus | | Zebra | Los Angeles |
| I-4208 | | DataMax | Beaverton |
| ZP500 Plus | | Zebra | Beaverton |
| LP2844 | | Zebra | Beaverton |
| GX420d | | Zebra | Beaverton |

**Scanners**

| Description | Serial Number | Vendor Name | Location |
|---|---|---|---|
| | 45629022 | Kodak | Beaverton |
| | 45638699 | Kodak | Beaverton |
| | 45647044 | Kodak | Beaverton |
| | 45635791 | Kodak | Beaverton |
| | 45609245 | Kodak | Beaverton |
| | 45635971 | Kodak | Beaverton |
| | 45636176 | Kodak | Beaverton |
| | 45647046 | Kodak | Beaverton |
| | 45636175 | Kodak | Beaverton |
| | 45635968 | Kodak | Beaverton |
| | 45629652 | Kodak | Beaverton |
| | 45630484 | Kodak | Beaverton |
| | 45630471 | Kodak | Beaverton |
| | 45630492 | Kodak | Beaverton |
| | 45636171 | Kodak | Los Angeles |
| | 45630490 | Kodak | Los Angeles |
| | 45647041 | Kodak | Los Angeles |
| | 45630491 | Kodak | Los Angeles |
| | 45636174 | Kodak | New York |
| | 45638856 | Kodak | New York |
| | 45647045 | Kodak | New York |
| | 45647069 | Kodak | New York |

| Description | Serial Number | Vendor Name | Location |
|---|---|---|---|
| | 45630977 | Kodak | San Francisco |
| | 45647040 | Kodak | San Francisco |
| | 45630972 | Kodak | Seattle |
| | 45638075 | Kodak | Seattle |
| | 45647071 | Kodak | Seattle |

**Barcode Scanners**

| Description | Serial Number | Vendor Name | Location |
|---|---|---|---|
| Focus MS1690 | | Honeywell | Seattle |
| Xenon 1900 | | Honeywell | Seattle |
| Focus MS1690 | | Honeywell | Beaverton |
| Xenon 1900 | | Honeywell | Beaverton |
| Focus MS1690 | | Honeywell | Los Angeles |
| Xenon 1900 | | Honeywell | Los Angeles |
| Focus MS1690 | | Honeywell | San Francisco |
| Xenon 1900 | | Honeywell | San Francisco |
| Focus MS1690 | | Honeywell | New York |
| Xenon 1900 | | Honeywell | New York |

**Scales**

| Description | Serial Number | Vendor Name | Location |
|---|---|---|---|
| PS15 | | Mettler-Toledo | New York |
| PS60 | | Mettler-Toledo | New York |
| PS15 | | Mettler-Toledo | Seattle |
| PS60 | | Mettler-Toledo | Seattle |
| PS15 | | Mettler-Toledo | San Francisco |
| PS60 | | Mettler-Toledo | San Francisco |
| PS15 | | Mettler-Toledo | Los Angeles |
| PS60 | | Mettler-Toledo | Los Angeles |
| PS15 | | Mettler-Toledo | Beaverton |
| PS60 | | Mettler-Toledo | Beaverton |

**Phones**

| Description | Serial Number | Vendor Name | Location |
|---|---|---|---|
| Data center | | ShoreTel | Data Center |
| Gemini Drive server room | | ShoreTel | Beaverton |
| Scan 2 | | ShoreTel | Beaverton |
| Shipping | | ShoreTel | Beaverton |
| Scan 1 | | ShoreTel | Beaverton |
| VW office | | ShoreTel | Beaverton |
| Matt Clay | | ShoreTel | Beaverton |
| John Gorman | | ShoreTel | Beaverton |
| Chris Roe | | ShoreTel | Beaverton |
| Phil Walsh | | ShoreTel | Beaverton |
| Danny Sellers | | ShoreTel | Beaverton |
| Amber Hensley | | ShoreTel | Beaverton |
| Andrea Snyder | | ShoreTel | Beaverton |
| Test phone | | ShoreTel | Beaverton |
| Jim Wilson | | ShoreTel | Beaverton |
| Stacy Lee | | ShoreTel | Beaverton |
| Stephanie Savicki | | ShoreTel | Beaverton |
| Conference room | | ShoreTel | Beaverton |
| Cliff Bowman | | ShoreTel | Beaverton |
| Spare office | | ShoreTel | Beaverton |
| Break room BVR | | ShoreTel | Beaverton |

| Description | Serial Number | Vendor Name | Location |
|---|---|---|---|
| Joe La Sac | | ShoreTel | Beaverton |
| David Smith | | ShoreTel | Beaverton |
| Daniel Finkle | | ShoreTel | Beaverton |
| Daniel, office spare | | ShoreTel | Beaverton |
| Jessica Camacho | | ShoreTel | New York |
| UA Seattle Ops | | ShoreTel | Seattle |
| Tim Russo | | ShoreTel | Seattle |
| UA San Francisco | | ShoreTel | San Francisco |
| Justin Duke | | ShoreTel | San Francisco |
| Jay Becdach | | ShoreTel | Los Angeles |
| UA Los Angeles Ops | | ShoreTel | Los Angeles |
| UA Los Angeles front | | ShoreTel | Los Angeles |

**Kiosks**

| Description | Serial Number | Vendor Name | Location |
|---|---|---|---|
| iMac | | Apple | Los Angeles |
| iMac | | Apple | San Francisco |
| OptiPlex 330 | | Dell | Seattle |
| iMac | | Apple | New York |

**Other**

| Description | Serial Number | Vendor Name | Location |
|---|---|---|---|
| Switched power distribution unit | | APC | Data Center |
| Switched power distribution unit | | APC | Data Center |
| Environmental sensor | | ServersCheck | Beaverton |
| Remote keyboard/video/mouse | | Raritan | Beaverton |
| Remote keyboard/video/mouse | | Raritan | Data Center |
| Uninterruptible power supply | | CyberPower | Beaverton |
| Uninterruptible power supply | | Tripp Lite | Beaverton |
| VoIP voice switch | S90F14493D0AFA | ShoreTel | Beaverton |
| VoIP voice switch | T1JC08090B1109 | ShoreTel | Beaverton |
| VoIP voice switch | | ShoreTel | Beaverton |
| VoIP voice switch | | ShoreTel | Beaverton |

*CONFIDENTIAL*

**EXHIBIT B**

**Contracts**

Contracts not being assigned:

Secured Credit Facility Agreement by and between certain lenders signatory thereto and the Seller, dated March 1, 2010.

Loan and Security Agreement by and between Comerica Bank and the Seller, dated May 9, 2008, as amended on September 9, 2009 and accompanying Letters of Credit, dated June 6, 2008, as amended on January 9, 2014 and January 22, 2014.

Forbearance Agreement by and between Comerica Bank and the Seller, dated November 30, 2009, as amended on October 29, 2010, May 4, 2011, September 7, 2011, January __ 2012, May 9, 2012 and December 2, 2013.

Note and Warrant Purchase Agreement by and between certain investors signatory thereto and the Seller, dated May 9, 2008, as amended on September 6, 2008.

Series A Preferred Stock Purchase Agreement by and between certain investors signatory thereto and the Seller, dated August 9, 2007, as amended on February 13, 2008, and accompanying Voting Agreement, Investors' Rights Agreement and Right of First Refusal and Co-Sale Agreement.

Advisory Agreement by and between Cascadia Capital LLC and the Seller, dated October 7, 2014.

Engagement Letter by and between Perkins Coie LLP and the Seller, dated December 1, 2014.

The Seller's Management Carve-Out Plan.

Contracts to be assigned:

Microsoft BizSpark Startup Agreement by and between Microsoft Corporation and the Seller, dated July 2012, as amended by Graduation Amendment for Microsoft BizSpark Startup Program and related End User License Agreement.

The Prime OCR License.

Services Contract for Document & Data Processing by and between iBridge LLC and the Seller, dated October 15, 2008.

Lease Agreement by and between Baron Messenger and the Seller and Hot Shot Delivery, dated as of September 20, 2010 (382 NE 191st Street, Miami, Florida 33179).

Lease Agreement by and between Sunrise Delivery, the Seller and Hot Shot Delivery, dated as of September 20, 2010 (538 W. 21st Street, Houston, Texas 77008).

-56-

*CONFIDENTIAL*

Lease Agreement by and between Chicago Messenger, the Seller and Hot Shot Delivery, dated as of September 20, 2010 (1608 S. Ashland Ave., Chicago, Illinois 60608-2013).

License Agreement by and between Flynn Realty Services, LLC and the Seller, dated October 2009 (427 N. Tatnall Street, Wilmington, Delaware 19801).

Standard Form of Store Lease by and between 230 PAS (15 (Cliff)) L.L.C. and 230 PAS (RRPIII) LLC and the Seller, dated April 2008 (228 Park Avenue South, New York, New York 10003).

Lease Agreement by and between Merrill Place LLC and the Seller, dated October 4, 2007 (93 South Jackson Street, Seattle, Washington 98104).

Office Lease Agreement by and between Nimbus Center, LLC and the Seller, dated December 19, 2012 (9450 SW Gemini Drive, Beaverton, Oregon 97008).

Standard Industrial/Commercial Multi-Tenant Lease - Net by and between Santa Monica Center Ltd. and the Seller, dated May 27, 2008 (8605 Santa Monica Blvd., West Hollywood, California 90069).

Retail Lease by and between Flatiron Associates I and the Seller, dated May 16, 2008 (548 Market Street, San Francisco, California 94104).

Letter Agreement by and between CBRE, Inc. and the Seller, dated February 9, 2015.

Letter Agreement by and between Desh Urs and the Seller, dated October 20, 2014.

Service Contract for Development by and between Cliff Bowman and the Seller, dated November 7, 2014.

Agreements to Furnish Employees USA by and between Volt Services Group and the Seller, dated November 30, 2007.

Staffing Agreement by and between Express Services, Inc., dba Express Employment Professionals, and the Seller, dated February 20, 2009.

Terms of Service by and between CampusPoint Corporation and the Seller, undated.

Lease Agreement by and between Erving Leasing Company and the Seller, dated January 24, 2014.

Lease Agreement by and between Pacific Office Automation, Inc. and the Seller, dated May 6, 2010.

Lease Agreement by and between Pacific Office Automation, Inc. and the Seller, dated April 22, 2011.

Office Equipment Lease Contract by and between Solutions Yes and the Seller, dated August 21, 2013.

-57-

*CONFIDENTIAL*

API License and Development Agreement, API Naming and Advertising Restrictions and App Center Addendum by and between Bill.com and the Seller, dated December 4, 2013.

Employment Agreement by and between James Wilson and the Seller, dated September 24, 2014.

Employment Agreement by and between Stacey Lee and the Seller, dated September 24, 2014.

Customer Contracts provided to the Buyer.

Reseller Agreement by and between BServ, Inc. and the Seller, dated July 20, 2009, as amended July 9, 2010.

Services Contract for Document & Data Processing by and between iBridge LLC and the Seller, dated October 15, 2008.

Payment Processing Agreement by and between Litle & Co. and the Seller, dated November 8, 2012.

Service Order Agreement by and between XO Communications Services, LLC and the Seller, dated February 24, 2014.

Master Service Agreement by and between Atlantic Metro Communications II, Inc. and the Seller, dated April 18, 2014 (Los Angeles).

Master Service Agreement by and between Atlantic Metro Communications II, Inc. and the Seller, dated April 18, 2014 (San Francisco).

Master Service Agreement by and between Atlantic Metro Communications II, Inc. and the Seller, dated March 31, 2014 (New York).

Business Service Order Agreement by and between Comcast Cable Communications Management LLC and its operating affiliates and the Seller, dated April 17, 2014 (Beaverton).

Business Service Order Agreement by and between Comcast Cable Communications Management LLC and its operating affiliates and the Seller, dated April 17, 2014 (Seattle).

Service Agreement by and between Integra Telecom and the Seller, dated February 21, 2014.

Service Agreement by and between Time Warner Cable Enterprises LLC and the Seller, dated September 25, 2014.

Master Service Agreement by and between ViaWest, Inc. and the Seller, dated May 30, 2013.

-58-

*CONFIDENTIAL*

AT&T (Internet for San Francisco and Los Angeles) (contract not readily available)

Frontier (Internet for Beaverton) (contract not readily available)

Email Agreement by and between Matt Clark and the Seller, dated April 8, 2014.

Various widely-available commercial software and service contracts used by the Seller in the Business, including, but not limited to, the following:

| Contracting Party | Description |
|---|---|
| Dyn DNS | DNS service |
| License Agreement - Shoretel | Phone system |
| Service Agreement - viawest | Data center |
| Service Agreement - Azure | Website hosting |
| Microsoft Office Professional Plus Licenses | Provantage |
| Juniper Care | Firewall & Switch Maintenance |
| Microsoft Visual Studio Premium with MSDN | Software development tools --- purchased through Provantage |
| Workstation Maintenance | Dell |
| Various Microsoft Perpetual Licenses | |
| Various Microsoft Subscription Licenses | Purchased through Provantage |
| Server Maintenance | Dell |
| Dynamic PDF Maintenance | CeTe |
| Message Labs | Email spam & virus filtering |
| Kayako Fusion | Customer support ticketing software |
| Kaspersky | Anti-virus software |

-59-

*CONFIDENTIAL*

| Contracting Party | Description |
|---|---|
| JIRA Maintenance | Bug tracking software |
| GoDaddy | Domain registration |
| eFax | Digital fax service |
| McAfee Secure | External PCI scanning |
| Service Agreement - Baron Messenger | Miami address |
| Service Agreement - Chicago Messenger | Chicago address |
| Service Agreement - Sunrise Delivery | Houston address |
| Royalty Agreement - Share a sale | Fixed amount per sign up |
| AACT | Alarm services |
| Adword Agreement - Google | |
| Google Analytics - Google | |
| Endicia | Postage |
| Service Agreement - Hot Shot Delivery, Inc. | Courier Service |
| Service Agreement - Intacct | GL software |
| Stamps.com | Postage |
| TriNet | HR services vendor |
| FedEx | Shipping Vendor |
| Jim Elliot - CPA | Tax preparation |

*CONFIDENTIAL*

## APPENDIX A

### Components

| Component | Description |
|---|---|
| Desktop UI | Standard web interface for customers to access their accounts. |
| Mobile UI | Mobile web interface for customers to access their accounts. |
| CS Tools | Standard web interface for internal use by operations and customer service. |
| Ops Wizard | .NET client program for inventory management, scanning and shipping operations as well as some customer service tasks. |
| Bulk Scan Downloader | .NET client for customers to perform unattended, bulk downloading of mail from their accounts. |
| Downloader Tool | Experimental cross-platform .NET client for customers to perform unintended bulk downloading of mail from their accounts. |
| Signup | Standard web interface for customers to sign up for service. |
| Iris Setup | Server-side setup and configuration tool for provisioning and managing certain aspects of Iris services. |
| Billing Service | Server-side processes for customer billing. |
| Credit Card Vault | Server-side processes for credit card processing. |
| Check Deposit Vault | Server-side processes for electronic check deposit processing. |
| App Services | Server-side processes for core account functionality such as inventory and account management. |
| Facility Services | Server-side processes for inventory management within each facility. |
| Deployment Tools | Custom tools for central management and deployment of Iris |

-61-

*CONFIDENTIAL*

| | releases. |
|---|---|
| Build Tools | Custom tools for building Iris releases. |
| Development Tools | Custom tools for developing the Iris platform. |
| Static Loader | Upgrade and provisioning tool used during the release process. |
| Miscellaneous Tools | Miscellaneous custom tools for various tasks. |
| Image Server | Server-side process for handling distributed image storage and retrieval. |
| ID Tracker Service | Server-side process for centralized management of barcode allocations for multiple deployments of the Iris platform. |

**Programs**

| Program | Description |
|---|---|
| setup.exe | Microsoft ClickOnce installation wrapper generated as part of the build process. |
| DownloaderTool.exe | Tool provided to customers to download envelope images and content scans from their account. |
| CachePoker.exe | Management tool used to force cache updates in the production environment. |
| IrisServiceHost.exe | General purpose service host, the core container for all Iris services. |
| IrisSetup.exe | Setup tool to manage configuration of Iris services. |
| StaticLoader.exe | Setup tool used during the deployment of new Iris releases. |
| BulkScanDownloader.exe | Tool provided to customers to download envelope images and content scans from their account. |
| OpsWizard.exe | Operations client used by company staff to manage inventory, |

-62-

*CONFIDENTIAL*

| | |
|---|---|
| | process customer requests, etc. |

**Databases**

| Database | Description |
|---|---|
| IrisIDTrackingDB | Master tracking database for item barcode allocation. |
| IrisPlatformDB | Primary application database, including all inventory, billing and customer details. |
| IrisScanOCRDB | Storage for all content scan OCR text. |
| IrisCheckDepositVaultDB | Check deposit vault. |
| IrisVaultDB | Credit card vault. |
| IrisFacilityDB | Facility specific cache database, one per facility. |

-63-

1

2                                 EXHIBIT B
                    SALE PROCEDURES ORDER

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1

2

3

4

5

6

7

8

9

10           UNITED STATES BANKRUPTCY COURT

11             FOR THE DISTRICT OF OREGON

12 In re

13 Earth Class Mail Corporation,

14         Debtor.

Case No.  15-30982-tmb11

ORDER (1) AUTHORIZING AND
SCHEDULING AN AUCTION FOR THE
SALE OF SUBSTANTIALLY ALL ASSETS
OF THE DEBTOR FREE AND CLEAR OF
LIENS AND OTHER INTERESTS, (2)
APPROVING SALE PROCEDURES, (3)
APPROVING PROCEDURES FOR
ASSUMPTION AND ASSIGNMENT OF
EXECUTORY CONTRACTS AND
UNEXPIRED LEASES, (4) DIRECTING
APPOINTMENT OF CONSUMER
PRIVACY OMBUDSMAN

22     This matter came before the Court on April 6, 2015, on the Debtor's Motion for Orders

23 (1) Authorizing and Scheduling an Auction for the Sale of Substantially All Assets of the Debtor

24 Free and Clear of Liens and Other Interests, (2) Approving Sale Procedures, (3) Approving

25 Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases, (4)

26 Directing Appointment of Consumer Privacy Ombudsman, (5) Approving Purchase Agreement

PAGE  1-  ORDER AUTHORIZING AND SCHEDULING AN AUCTION
FOR THE SALE OF SUBSTANTIALLY ALL ASSETS OF THE
DEBTOR, AND RELATED RELIEF

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

EXHIBIT B - PAGE 1

1  or Subsequent Overbid, (6) Scheduling a Hearing to Consider Approval of the Sale, (7)

2  Establishing the Form and Manner of Notices Related Thereto, (8) Authorizing Interim

3  Distribution from Sale Proceeds, and (9) Requesting Waiver of the Stay Under Bankruptcy Rule

4  6004(f) and 6006(d) filed on March 20, 2015 (Docket No. __ ) (the "Motion").   The Court

5  having held an initial hearing on the Motion on April 6, 2015, and having considered the

6  submissions and arguments of counsel and the files and records herein, and being now fully

7  advised in of the premises,

8         THE COURT FINDS as follows:

9         A.      This Court has jurisdiction over this matter and the case of Earth Class Mail

10 Corporation (the "Debtor"), the Motion and the parties and property affected pursuant to 28

11 U.S.C. §§ 157(b) and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This

12 matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  To the extent required by law,

13 each creditor and party in interest has acknowledged and consented to this Court's authority to

14 enter this Sale Procedures Order as a final order of this Court, or all challenges to this Court's

15 authority have been overruled or waived.

16        B.      Findings of fact herein shall be construed as conclusions of law and conclusions

17 of law shall be construed as findings of fact as appropriate.

18        C.      The notice provided regarding the Motion constitutes sufficient and adequate

19 notice.  No further notice in connection with the entry of this Order is or shall be required.

20        D.      The Sale Procedures (attached as **Exhibit 1** to this Order) were proposed by the

21 Debtor in good faith with the goal of maximizing the value of the Purchased Assets for the

22 benefit of all creditors of the estate and other parties-in-interest.  Debtor has articulated good and

23 sufficient reasons for authorizing and approving the Sale Procedures, which are reasonable and

24 appropriate under the circumstances and designed to maximize the recovery on, and realizable

25 value of, the Purchased Assets.

26

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

1
2
3
E.      Debtor's proposed Sale Notice (attached as **Exhibit 2** to this Order) is appropriate
and reasonably calculated to provide all interested parties with timely and proper notice of this
Order, the sale, the auction, and the assumption procedures.

4
5
6
F.      On February 13, 2015, Debtor and Buyer entered into the Asset Purchase
Agreement (the "Agreement") pursuant to which Buyer agreed to purchase the Purchased Assets,
subject to the conditions set forth in the Agreement.

7
8
9
G.      The Debtor has established and proved good and sufficient reasons for approval
of the proposed sale under the terms of the Agreement, subject to the sale procedures set forth in
this Order.

10
11
H.      Entry of this Order is in the best interests of Debtor, its estate, creditors and other
parties-in-interest.

12
NOW, THEREFORE, IT IS HEREBY ORDERED as follows:

13
1.      The Motion is GRANTED as set forth below.

14
15
16
2.      All responses or objections to the relief requested in the Motion and the exhibits
thereto that have not been withdrawn, waived or settled are overruled.

17
18
3.      The Sale Procedures attached as **Exhibit 1** are hereby approved and shall be used
in connection with the proposed sale of the Purchased Assets.[1]

19
20
21
22
23
24
4.      Any objections to the proposed Sale shall be in writing and filed with this Court
no later than _____, **2015** at 5:00 p.m. Pacific Time. Any party filing such an
objection must attend the Sale Hearing (described below) and advocate its objection at such
hearing. Any objection not filed, served, and/or advocated in accordance with this paragraph may
be deemed waived and may be forever barred.

25
26

---

[1] Capitalized terms used but not defined herein have the meaning ascribed to them in the Motion and/or the Agreement.

PAGE  3-    ORDER AUTHORIZING AND SCHEDULING AN AUCTION
FOR THE SALE OF SUBSTANTIALLY ALL ASSETS OF THE
DEBTOR, AND PROVIDING RELATED RELIEF

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

EXHIBIT B - PAGE 3

5.      The Auction for the Purchased Assets will be held on _____, **2015**, at 9:00 a.m. Pacific Time, at the U.S. Bankruptcy Court, 1001 SW Fifth Avenue, Room No. _____, Portland, Oregon 97204.   The auction will be conducted openly, and all creditors will be permitted to attend.  A record will be made of bidding at the Auction.

6.      The Sale Hearing will be conducted on _____, **2015,** at _____a.m. Pacific Time before the Honorable Trish M. Brown in Courtroom 4 of the U.S. Bankruptcy Court, 1001 SW Fifth Avenue, 7th Floor, Portland, Oregon 97204, to consider the entry of an order providing and approving, inter alia, the following: (a) the sale or other disposition of Debtor's assets to the Successful Bidder or Bidders free and clear of all liens, claims, interests obligations, and encumbrances in accordance with 11 U.S.C. § 363(f); (b) that Successful Bidder or Bidders have not assumed any liability or obligations (except as specifically assumed by the successful bidder in the Asset Purchase Agreement signed by the respective bidder, as may be amended in a writing signed by the respective bidder or otherwise specifically provided in the Order Confirming the Plan); (c) that Successful Bidder or Bidders are not successors to Debtor; (d) that all persons who have received the Notice are bound by the order and are enjoined from pursuing Successful Bidder or Bidders to recover on any claims they may have against Debtor; and (e) that the sale agreement or agreements were entered into in good faith, without collusion, and from arms' length bargaining positions. Debtor shall be deemed to have accepted a bid and the Successful Bidder determined only when the bid for the Assets has been approved by the Court at the Sale Hearing.

7.      The Assumption Procedures are hereby approved as set forth below.

a.      Notice.  On or before _____, 2015, the Debtor will provide notice in the form of the Assumption and Assignment Notice attached hereto as **Exhibit 3** (the

PAGE 4-    ORDER AUTHORIZING AND SCHEDULING AN AUCTION
FOR THE SALE OF SUBSTANTIALLY ALL ASSETS OF THE
DEBTOR, AND PROVIDING RELATED RELIEF

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

"Assumption and Assignment Notice") to each non-debtor counterparty to a Material Agreement that Purchaser designates for assumption and assignment. The Assumption and Assignment Notice shall identify the proposed amount to be paid to such counterparty to cure all defaults under such agreement that are required to be cured pursuant to section 365 of the Bankruptcy Code as a prerequisite to assumption (together with the timing of such payments, if any)(the "Cure Schedule").

b.    Objections. Objections, if any, to the proposed assumption and assignment of any Material Agreements to Purchaser, including any objection to the cure amount set forth on the Cure Schedule or to adequate assurance of future performance, must be made in writing and filed with the Court no later than _____, 2015. (the "Objection Deadline").

c.    Resolution of Objections. If no objection to assumption or assignment is filed by a counterparty to a Material Agreement before the Objection Deadline, the counterparty to the assumed agreement shall be deemed to consent to the assumption and assignment of such assumed agreement. If no objection to the proposed cure amount with respect to an assumed agreement, then the cure amount set forth in the Cure Schedule shall be binding upon the non-debtor party with respect to such assumed agreement for all purposes in this Chapter 11 case, and will constitute a final determination of the total cure amount required to be paid in connection with the assumption and assignment thereof. In that event, the Debtor and Purchaser may provide in the Sale Order for the assumption and assignment of the applicable Material Agreement to Purchaser (or other Successful Bidder) and for payment of the cure amount, if any, specified in the Assumption and Assignment Notice, all without further notice to that counterparty. If a timely Contract Objection is filed by the Objection Deadline and such objection cannot otherwise be resolved by the parties, the Bankruptcy Court may hear such

PAGE 5-    ORDER AUTHORIZING AND SCHEDULING AN AUCTION FOR THE SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTOR, AND PROVIDING RELATED RELIEF

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone: (503) 417-0500
Fax: (503) 417-0501

EXHIBIT B - PAGE 5

1    objection at the Sale Hearing, or any adjourned date thereof.  The pendency of a dispute relating

2    to a proposed cure amount will not delay the closing of the sale, including the assumption and

3    assignment of Material Agreements necessary to effectuate such closing.

4               d.      <u>Effect of Qualified Alternative Bids</u>.  If Acceptable Bids are received by

5    the Debtor, and if Purchaser is not the Successful Bidder at the Auction, the Debtor will provide

6    an amended assumption and assignment notice to each non-Debtor counterparty to any contracts

7    or leases designated by the Successful Bidder for assumption and assignment.  Such amended

8    assumption and assignment notice shall identify the Successful Bidder, and shall provide

9    information to the non-debtor counterparties regarding the ability of the Successful Bidder to

10    provide adequate assurance of future performance as required by section 365 of the Bankruptcy

11    Code.  Objections, if any, to the proposed assumption and assignment of any contract or lease

12    designated a Successful Bidder other than Purchaser must be made in writing and filed with the

13    Court on a date to be fixed by the Court at the Sale Hearing.

14               e.      <u>Timing of Assignment</u>.  Each Material Agreement will be assumed and

15    assigned to Purchaser or the Successful Bidder (as applicable) on the date (the "Assumption

16    Effective Date") that is the later of (i) the Proposed Assumption Effective Date, and (ii) the

17    Assumption Resolution Date (as defined below).  The "Assumption Resolution Date" shall be,

18    (i) if no Contract Objection has been filed on or prior to the Contract Objection Deadline, the

19    business day after the Contract Objection Deadline, or (ii) if a Contract Objection has been filed

20    on or prior to the Contract Objection Deadline, the date of the Assumption Resolution

21    Stipulation or the date of a Court order authorizing the assumption and assignment to Purchaser

22    or the Successful Bidder (as applicable) of the Assumed Contract or Assumed Lease.   If

PAGE 6-     ORDER AUTHORIZING AND SCHEDULING AN AUCTION
               FOR THE SALE OF SUBSTANTIALLY ALL ASSETS OF THE
               DEBTOR, AND PROVIDING RELATED RELIEF

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

EXHIBIT B - PAGE 6

1  Purchaser is the Successful Bidder, the Assumption Effective Date shall not be later than the

2  Closing Date.

3        8.      The Sale Notice in the form attached hereto as **Exhibit 2**, is hereby approved.

4        9.      The failure of any third party to file and serve an objection as ordered and

5  directed herein shall be deemed the consent of such a party to the sale and transfer of the

6  Purchased Assets to Buyer or the Successful Bidder (including the assumption and assignment of

7  the Material Agreements and the fixing of any applicable Cure Costs).

8

9        10.     Unless already accomplished, the United States Trustee is directed to appoint a

10 consumer privacy ombudsman under section 322 of the Bankruptcy Code.

11       11.     As provided by Bankruptcy Rule 6004(h) and 6006(d), this Order shall not be

12 stayed for 14 days after the entry thereof and shall be effective and enforceable immediately on

13 its entry on the docket.

14

15       12.     Unless otherwise specified, all time periods set forth in this Order shall be

16 calculated in accordance with Bankruptcy Rule 9006(a)

17                                    ###

18

19       I certify that I have complied with the requirements of LBR 9021-1(a)(2)(A).

20 **Presented by:**

   MOTSCHENBACHER & BLATTNER, LLP

21 By: _____EXHIBIT_____
22      Nicholas J. Henderson, OSB No. 074027
        nhenderson@portlaw.com
23 117 SW Taylor Street, Suite 200
   Portland, OR 97204
24 Telephone: (503) 417-0500
   Facsimile: (503) 417-0501
25
   Proposed Attorneys for Earth Class Mail
26 Corporation

   cc: List of Interested Parties

PAGE 7-   ORDER AUTHORIZING AND SCHEDULING AN AUCTION
          FOR THE SALE OF SUBSTANTIALLY ALL ASSETS OF THE
          DEBTOR, AND PROVIDING RELATED RELIEF

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone: (503) 417-0500
Fax: (503) 417-0501

EXHIBIT B - PAGE 7

1

2                        **EXHIBIT 1**

3                     **SALE PROCEDURES**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

*Motschenbacher & Blattner, LLP*
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

EXHIBIT B - PAGE 8

1   Nicholas J. Henderson
    nhenderson@portlaw.com
2   MOTSCHENBACHER & BLATTNER, LLP
    117 SW Taylor Street, Suite 200
3   Portland, OR 97204
    Telephone:  (503) 417-0500
4   Facsimile:  (503) 417-0501

5   Proposed Attorneys for Debtor
    Earth Class Mail Corporation

6

7

8                UNITED STATES BANKRUPTCY COURT

9                  FOR THE DISTRICT OF OREGON

10

11  In re                                    Case No.    15-30982-tmb11

12  Earth Class Mail Corporation,            NOTICE RE: SALE PROCEDURES FOR THE
                                             SUBMISSION, RECEIPT AND ANALYSIS OF
13               Debtor.                     BIDS IN CONNECTION WITH THE SALE OF
                                             SUBSTANTIALLY ALL OF DEBTOR'S
14                                           BUSINESS ASSETS

15

16          These Sale Procedures have been approved by order of the United States Bankruptcy
17  Court for the District of Oregon (the "Court") in connection with the above captioned bankruptcy
    case of Earth Class Mail Corporation (the "Debtor") (the "Sale Procedures Order").
18
            These Sale Procedures set forth the process by which Debtor is authorized to conduct the
19  sale (the "Sale") by auction (the "Auction") of substantially all of Debtor's business assets as
    more particularly described in the Agreement (defined below). These Sale Procedures also set
20  forth the terms by which prospective bidders may qualify for and participate in the Auction,
    thereby competing to make the highest and/or best offer for the assets being sold.
21
        **A. Stalking Horse Bidder**
22
            On February 13, 2015 Debtor and Delivered.io, Inc. ("Delivered.io") entered into an
23  Asset Purchase Agreement (the "Agreement") for the acquisition of all of Debtor's assets as
    described in the Agreement (the "Purchased Assets"). Among other things, Buyer agreed to pay
24  a purchase price in an amount equal to $5,000,000, plus or minus the amount by which Debtor's
    Closing Working Capital exceeds or is less than $500,000 (the "Purchase Price") for the
25  Purchased Assets, plus Reimbursement Costs defined in Section 11.1 of the Agreement, subject
    to the outcome of the Auction and the entry of an order of the Court (the "Sale Order")
26  approving the sale of the Purchased Assets.  A copy of the Agreement has been filed with the
    Court and may be obtained by contacting Christopher Sturgeon, Bankruptcy Assistant to
    Debtor's Counsel, at (503) 417-0511.

PAGE  1-    NOTICE REGARDING SALE PROCEDURES

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

EXHIBIT B - PAGE 9

## B. Participation Requirements

To participate in the bidding process and to obtain access to due diligence materials, any person interested in purchasing the Assets (an "Potential Bidder") must deliver (unless previously delivered) to both Debtor and counsel for Debtor the following (the "Preliminary Bid Documents"):

1. An executed confidentiality agreement in form and substance acceptable to Debtor and its counsel;

2. Preliminary written proof by the Potential Bidder of its financial capacity to close the proposed transaction, to pay the amounts that would be due to the Debtor at Closing, including, but not limited to, its ability to satisfy the standards to provide adequate assurance of future performance of any contracts and leases to be assumed and assigned under Section 365 of the Bankruptcy Code, which may include current unaudited or verified financial statements of, or verified financial commitments (i.e., banking or capital references) obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the property to be sold, the party that will bear liability for a breach), the adequacy of which must be deemed satisfactory to Debtor in its business judgment.

As soon as practicable, and in any event within two business days after a Potential Bidder delivers the Preliminary Bid Documents, Debtor shall determine and notify the Potential Bidder whether such Potential Bidder has submitted acceptable Preliminary Bid Documents. Debtor shall work with Potential Bidders during the two business-day period (as it may be extended by Debtor) to attempt to correct or cure any deficiencies in any Preliminary Bid Documents. Only those Potential Bidders whose Preliminary Bid Documents have been deemed acceptable at the end of such two business-day period (as it may be extended by Debtor) (each, an "Acceptable Bidder") may conduct a due diligence review with respect to the Assets or submit bids to acquire the Assets. Delivered.io is deemed an Acceptable Bidder

## C. Due Diligence Access

After receipt of an executed confidentiality agreement and notification of Acceptable Bidder status, Debtor will provide each Acceptable Bidder reasonable due diligence information, as requested as soon as reasonably practicable after such request. Debtor shall be entitled to use its business judgment in determining the extent to which an Acceptable Bidder is entitled to receive confidential competitive information.

## D. Bid Requirements

Any Acceptable Bidder that is interested in being a participant in the Auction and acquiring all or substantially all of the Assets (each a "Bidder") must submit a "Bid" as provided herein prior to 5:00 p.m. Pacific Time on _____, 2015 (the "Bid Deadline"). Any such Bid must:

PAGE 2-   NOTICE REGARDING SALE PROCEDURES

*Motschenbacher & Blattner, LLP*
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone: (503) 417-0500
Fax: (503) 417-0501

1. Identify the proponent of the Bid and an officer or employee who is authorized to appear, act on behalf of and bind the Bidder;

2. Identify any party for whom the Bidder may be bidding with or on behalf of, indicate whether the bidder is a party to any agreement limiting the bidders at the Auction, and identify any relation of such parties to Debtor.

3. Contain (a) a signed definitive asset purchase agreement in substantially the form of the Agreement (a "Competing Purchase Agreement") and (b) a comparison of such Competing Purchase Agreement to the Agreement, showing all the differences between the two. A Competing Purchase Agreement must:

   i. Be in form and substance satisfactory to Debtor;

   ii. Clearly designate the assets to be acquired (which must be all or substantially all of the Purchased Assets);

   iii. agree that the purchase price shall be at least $5,050,000 (i.e., $50,000 more than the $5,000,000 Purchase Price contained in section 2.1 of the Agreement executed by Purchaser)[2], plus the Break-up Fee (collectively, "Minimum Initial Overbid Amount"), and that the Break-up Fee, and the purchase price will be paid in cash, subject to the same adjustments, escrow, and other terms of the Agreement;

   iv. be accompanied by a deposit in the form of cash, cashier's check or letter of credit issued by a federal or state chartered domestic bank in the amount of $150,000 representing a portion of the Purchaser's Break-up Fee);

   v. Not be subject to any (a) financing contingency; (b) contingency relating to the completion of unperformed due diligence; (c) contingency relating to the approval of the Bidder's board of directors or other internal approvals or consents; or (d) any conditions precedent to the Bidder's obligation to purchase the Assets, other than those conditions included in the Agreement; and

   vi. Not provide for the payment to the Bidder of any Break-Up Fee, topping fee, expense reimbursement or other similar fee or arrangement.

4. be accompanied by financial information for the bidder sufficient to enable the Debtor to determine the bidder's creditworthiness and ability to close a sale of the Assets, and pay the full Break-Up Fee to Purchaser within three days after entry of the Sale Order if the bidder is the Successful Bidder, including information sufficient to demonstrate the bidder's ability to provide adequate assurance of

---

[2] The $50,000 minimum bid increment varies from the $10,000 bid increment set forth in Section 7.5(c) of the Agreement. The $50,000 bid increment in this Notice controls.

PAGE  3-    NOTICE REGARDING SALE PROCEDURES

Motschenbacher & Blattner, LLP
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone: (503) 417-0500
Fax: (503) 417-0501

EXHIBIT B - PAGE 11

1
2

future performance of obligations under any executory contracts or unexpired leases to be assumed and assigned to the bidder;

5. by its terms, remain open and irrevocable through the conclusion of the Sale Hearing, unless extended by agreement of the parties.

6. Be submitted to counsel for Debtor so as to be received not later than the Bid Deadline. Any Bid that meets all of the foregoing requirements, as determined by Debtor in its good faith discretion, shall be considered a "Qualified Bid." Counsel for Debtor shall, as soon as practicable, send a copy of each Qualified Bid received, if any, to the following parties: (i) counsel to the secured creditors, (ii) the United States Trustee; and (iii) counsel to each Bidder submitting a Qualified Bid (or if a Bidder does not have counsel, to the Bidder).

## E. Evaluation of Qualified Bids

Prior to the Auction, Debtor shall evaluate the Qualified Bids and identify the Qualified Bid that is, in Debtor's business judgment, the highest or otherwise best bid (the "Starting Bid"). No later than 2:00 p.m. two days prior to the Auction, Debtor shall notify Delivered.io and all parties who have submitted Qualified Bids (each a "Qualified Bidder") as to whether there will be an Auction, and if so, which Qualified Bid is the Starting Bid. If any interested bidder is deemed to be "unqualified" by the Debtor and will therefore be precluded from participating in the auction, on the request to such unqualified bidder, the auction will be delayed, or if commenced, temporarily adjourned, while Debtor shall bring the issue to the Court for an immediate determination. Thereafter, the auction shall proceed with or without the participation of the affected potential bidder, in accordance with the court's ruling.

## F. No Qualified Bids

If no Qualified Bids are received by the Bid Deadline, then the Auction will not occur and Delivered.io will be deemed the Successful Bidder. Subject to the termination rights under the Agreement, Debtor will immediately pursue entry of a Sale Order by the Court approving the Purchase Agreement and authorizing the sale of the Assets to Delivered.io.

## G. Auction

In the event Debtor determines that one or more Bids are Qualified Bids, then Debtor will conduct the Auction on _____, 2015 at 9:00 a.m. (the "Auction") with respect to the sale of the Purchased Assets at the U.S. Bankruptcy Court, 1001 SW Fifth Avenue, Room No. _____, Portland, Oregon 97204, or at such other location as may be designated by Debtor. The Auction will be conducted in accordance with the following procedures (the "Auction Procedures"):

1. The Qualified Bidders, including Delivered.io, shall appear in person or through duly-authorized representatives at the Auction.

2. Only Qualified Bidders, including Delivered.io, shall be entitled to bid at the Auction.

3. Bidding at the Auction shall begin at the Starting Bid.

PAGE 4-    NOTICE REGARDING SALE PROCEDURES

Motschenbacher & Blattner, LLP
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone: (503) 417-0500
Fax: (503) 417-0501

4. Subsequent bids at the Auction, including any bids by Delivered.io, shall be made in minimum increments of $50,000 or as otherwise agreed by the Bidders or as set by the Debtor.

5. All bidding will be open, and all creditors are permitted to attend.

6. A record of bidding at the Auction will be made. Such record may be transcribed by a certified court reporter to ensure an accurate recording of the bidding at the Auction.

7. Each Qualified Bidder will be required to confirm on the record at the Auction that it has not colluded with any other person with respect to the bidding or the Sale.

8. The Auction shall be governed by such other procedures as may be announced by Debtor or its counsel from time to time at the Auction; provided that any such other procedures shall not be inconsistent with the Sale Procedures Order or any other order in Debtor's Chapter 11 case.

**H. Acceptance of the Successful Bid**

Upon the conclusion of the Auction (if such Auction is conducted), Debtor, in the exercise of its reasonable, good-faith business judgment, shall identify the highest or otherwise best bid (the "Successful Bid"). The Qualified Bidder having submitted the Successful Bid will be deemed the "Successful Bidder." The Successful Bidder and Debtor shall, as soon as commercially reasonable and practicable, complete and sign all agreements, contracts, instruments or other documents evidencing and containing the terms upon which the Successful Bid was made.

Debtor will present the results of the Auction to the Court at the Sale Hearing, at which certain findings will be sought from the Court regarding the Auction, including, among other things, that (1) the Auction was conducted, and the Successful Bidder was selected, in accordance with these Sale Procedures, (2) the Auction was fair in substance and procedure, (3) the Successful Bid was a Qualified Bid, and (4) consummation of the Sale contemplated by the Successful Bid is in the best interests of Debtor and its estate.

If an Auction is held, Debtor shall be deemed to have accepted a Qualified Bid only when (1) such bid is declared the Successful Bid at the Auction or by the Court, and (2) definitive documentation has been executed in respect thereof. Such acceptance is conditioned on approval by the Court of the Successful Bid and the entry of an Order approving such Successful Bid.

**I. Bankruptcy Court Approval of Sale**

A hearing to consider approval of the sale to the Successful Bidder (or to approve the Purchase Agreement if no Auction is held) (the "Sale Hearing") and seek entry of a Sale Order is presently scheduled to take place at _____ **a.m. on _____, 2015**, Pacific Time or at such other time as is announced at the Auction by Debtor. The Sale Hearing will be held before the Honorable Trish M. Brown, United States Bankruptcy Judge for the United States Bankruptcy Court for the District of Oregon, in Courtroom No. 4 of the U.S. Bankruptcy Court,

PAGE 5- NOTICE REGARDING SALE PROCEDURES

Motschenbacher & Blattner, LLP
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone: (503) 417-0500
Fax: (503) 417-0501

1001 SW Fifth Avenue, 7th Floor, Portland, Oregon.  Debtor and the Successful Bidder, once the Successful Bidder has been determined, shall each use their commercially reasonable efforts, and shall cooperate, assist and consult with each other, to secure the entry of a Sale Order in a form reasonably acceptable to Debtor and the Successful Bidder.  Any objections to the Auction results must be filed with the Court by 5:00 p.m. Pacific Time on _____, **2015**.

The Sale Hearing may be continued to a later date by Debtor by sending notice to all prospective bidders prior to, or making an announcement at, the Sale Hearing. No further notice of any such continuance will be required to be provided to any party.

## J.  Designation of Back-Up Bidder

Upon the conclusion of the Auction and the selection of the Successful Bidder, Debtor shall select the person submitting the next highest or otherwise best bid (the "Back-Up Bidder"). The bid of the Back-Up Bidder shall remain open until the second business day following the closing of a sale to the Successful Bidder. If for any reason the Successful Bidder is unable or unwilling to consummate an approved sale because of breach or failure to perform on the part of the Successful Bidder, the Back-Up Bidder shall be deemed to be the Successful Bidder. The purchase price shall be the amount of such Back-Up Bidder's last bid, and Debtor shall be authorized to effectuate the sale to the Back-Up Bidder without further order of the Bankruptcy Court. If, for any reason, the Back-Up Bidder fails to perform, Delivered.io agrees that if Debtor tenders full performance of all of its obligations under the Purchase Agreement to Delivered.io on or before _____, **2015**, and the Purchase Agreement is not otherwise materially breached by Debtor, Delivered.io shall purchase the Purchased Assets under the terms of the Agreement.

## K.  Reservation of Rights to Modify Sale Procedures

Debtor reserves the right to modify these Sale Procedures in any manner that will best promote the goals of the bidding process and may impose, at or prior to the Auction, additional customary terms and conditions on the sale, including, without limitation, extending the deadlines set forth in these Sale Procedures, adjourning the Auction at the Auction, and/or adjourning the Sale Hearing in open court without further notice. Unless all qualified bidders agree to a change in the auction procedures, the auction procedures will not be changed absent a future Court order.

DATED:  _____, 2015

**MOTSCHENBACHER & BLATTNER, LLP**

By: _____
    Nicholas J. Henderson, OSB No. 074027
    nhenderson@portlaw.com
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone:  (503) 417-0500
Facsimile:  (503) 417-0501

Proposed Attorneys for Debtor
Earth Class Mail Corporation

PAGE  6-    NOTICE REGARDING SALE PROCEDURES

*Motschenbacher & Blattner, LLP*
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

EXHIBIT B - PAGE 14

1

**EXHIBIT 2**

2

**SALE NOTICE**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

*Motschenbacher & Blattner, LLP*
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

EXHIBIT B - PAGE 15

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| In re | Case No.    15-30982-tmb11 |
|---|---|
| Earth Class Mail Corporation, | NOTICE OF (1) MOTION TO APPROVE SALE OF SUBSTANTIALLY ALL OF DEBTOR'S BUSINESS ASSETS; (2) AUCTION; (3) BIDDING PROCEDURES; (4) SALE HEARING; AND (5) OBJECTION DEADLINES |
| Debtor. | |

**PLEASE TAKE NOTICE** that Earth Class Mail Corporation ("Debtor") moved for approval of the sale of all or substantially all of its business assets as more particularly described in the Asset Purchase Agreement described below (the "Purchased Assets") free and clear of all liens, claims and encumbrances to Delivered.io, Inc. ("Delivered.io"), if there are no higher and better offers from qualified bidders at an auction scheduled for _____, **2015**, commencing at 9:00 a.m.

The sale to Delivered.io is for the sum of $5,000,000, subject to adjustment, consisting of cash at closing and, pursuant to an Asset Purchase Agreement dated February 13, 2015 (the "Agreement"), entered into between Debtor and Delivered.io.  A copy of the Agreement was filed with the Court, and may also be obtained by contacting Debtor's counsel at (503) 417-0511.

Debtor believes that the sale to Delivered.io is in the best interests of the estate because the sale will maximize the amount that the Debtor, its estate and its creditors may realize for the value of the assets.  Additionally, the Debtor's existing cash flow does not satisfy its debt service requirements.  While the Debtor's cash flow has been consistent, the Debtor's cash flow will not increase without substantial additional capital investment, and Debtor has found that it is impossible to raise additional capital with Debtor's current equity and debt structure.  Delaying a sale could seriously jeopardize the value of the Debtor's business assets.

The proposed order approving the sale provides that Delivered.io shall have no liability or responsibility for any liability or other obligation of Debtor arising under or related to the Purchased Assets other than as expressly set forth in the Agreement, and that the transfer of the Purchased Assets to Delivered.io will not subject Delivered.io or its affiliates, successors or assigns, or their respective properties, to any liability for claims against Debtor or the Purchased Assets by reason of such transfer.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to 11 U.S.C. §§ 105 and 363, Debtor proposes to sell its assets to the Successful Bidder or Bidders and obtain an order providing and authorizing, inter alia, the following: (1) that the sale is free and clear of all Liens and Liabilities, as defined in the Agreement; (2) that the Successful Bidder or Bidders have not assumed any liability or obligation (except as specifically assumed); (3) that Successful Bidder or Bidders is not or are not successors to Debtor; (4) that all persons that have been served with this Notice are bound by the order and are enjoined from pursuing Successful Bidder or Bidders to recover on any claims they may have against Debtor; and (5) that the sale agreement or agreements were entered into in good faith, without collusion, and from arms' length bargaining positions.

PAGE  1-   NOTICE OF (1) MOTION TO APPROVE SALE OF SUBSTANTIALLY ALL OF
DEBTOR'S BUSINESS ASSETS; (2) AUCTION; (3) BIDDING PROCEDURES;
(4) SALE HEARING; AND (5) OBJECTION DEADLINES

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

EXHIBIT B - PAGE 16

1
2
3          **PLEASE TAKE FURTHER NOTICE** that the Court entered an order authorizing Debtor to hold an auction to sell the Assets free and clear of all liens, claims, encumbrances and other interests, as provided in the Purchase Agreement if an overbid is received. The auction, if one occurs, is scheduled for _____, at 9:00 a.m. Pacific Time at the U.S. Bankruptcy Court, 1001 SW Fifth Avenue, Room No. _____, Portland, Oregon 97204.

4
5          **PLEASE TAKE FURTHER NOTICE** that the Court entered an order approving bidding procedures in connection with the sale and the auction. A copy of the Sale Procedures can be obtained from Debtor's counsel.

6
7          **PLEASE TAKE FURTHER NOTICE** that competing bidders are required to submit competing bids of at least $5,050,000, plus a Break-Up Fee of $150,000, plus the amount of the Reimbursement Costs as defined in the Agreement, and otherwise qualify as bidders in accordance with the approved Sale Procedures prior to 5:00 p.m. Pacific Time on
8          _____, **2015.**

9
10          **PLEASE TAKE FURTHER NOTICE** that a hearing on the proposed sale to Delivered.io, or any higher and better bidder at the auction (the "Sale Hearing"), is scheduled to be held on _____, 2015, at _____ a.m. Pacific Time, or at such later time as
11          may be announced at the auction by Debtor, in Courtroom 4 of the United States Bankruptcy Court for the District of Oregon, 1001 SW Fifth Avenue, 7th Floor, Portland, Oregon.

12
13          **PLEASE TAKE FURTHER NOTICE** that if you wish to object to the sale of the Purchased Assets, you must, on or before _____, 2015, at 5:00 p.m. Pacific Time, file a written objection to the sale with the Clerk of the Court, United States Bankruptcy Court
14          for the District of Oregon, 1001 SW Fifth Avenue, 7th Floor, Portland, Oregon 97204.

15          **PLEASE TAKE FURTHER NOTICE** that _____, 2015, at 5:00 p.m. Pacific Time (the "Deadline") is the deadline for any party to a contract or lease (the "Material
16          Agreements") that Debtor proposes to assume and assign to Delivered.io (or other higher and better bidder at the auction) to object to the amount Debtor asserts must be paid to cure any
17          existing defaults under the Material Agreements (the "Cure Amounts"). The Material Agreements and the Cure Amounts proposed by the Debtor will be set forth on an Assumption and Assignment Notice mailed to parties to those executory contracts or unexpired leases on or
18          before _____, 2015.

19
20          **PLEASE TAKE FURTHER NOTICE** that any party to a Material Agreement who disagrees with the Cure Amount or who objects to the assumption of its Material Agreement or to the assignment of its Material Agreement, must, on or before _____, 2015, file
21          with the Clerk of the Court, United States Bankruptcy Court for the District of Oregon, 1001 SW Fifth Avenue, 7th Floor, Portland, Oregon 97204, a written objection stating the specific facts
22          upon which the objection is based.

23          **PLEASE TAKE FURTHER NOTICE** that unless a timely objection is filed as to a Cure Amount listed on Exhibit 1 to the Assumption and Assignment Notice shall be binding
24          upon the non-debtor party to such Material Agreement for all purposes in this Chapter 11 case and will constitute a final determination of the total Cure Amount required to be paid in
25          connection with the assumption and assignment of such Material Agreement. Further, unless a timely objection is filed, no further evidence shall be required to satisfy the requirements for
26          assumption and assignment, including, without limitation, any further evidence of adequate assurance of performance by Delivered.io or other qualified purchaser, and the non-debtor party to the Material Agreement shall be barred from objecting to the assumption and assignment of

PAGE  2-    NOTICE OF (1) MOTION TO APPROVE SALE OF SUBSTANTIALLY ALL OF
             DEBTOR'S BUSINESS ASSETS; (2) AUCTION; (3) BIDDING PROCEDURES;
             (4) SALE HEARING; AND (5) OBJECTION DEADLINES

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

1   such Material Agreement and shall be deemed to consent to the assumption and assignment of
    the Material Agreement.

2
        **PLEASE TAKE FURTHER NOTICE** that a hearing on the Cure Amounts and
3   Debtor's proposed assumption and assignment of the Material Agreements is scheduled to be
    held on _____, **2015** at _____ a.m. Pacific Time, or at such later time as may be
4   announced at the auction by Debtor, in Courtroom 4 of the United States Bankruptcy Court for
    the District of Oregon, 1001 SW Fifth Avenue, 7th Floor, Portland, Oregon.
5
        **PLEASE TAKE FURTHER NOTICE** that the Debtor is requesting the Court to waive
6   the 14-day stay under Bankruptcy Rule 6006(d).

7
        Copies of any of the pleadings or documents referenced herein may be obtained by
8   contacting Christopher M. Sturgeon, assistant to Debtor's counsel (e-mail:
    csturgeon@portlaw.com; telephone: 503-417-0511).
9

10  DATED: _____, 2015
                                        MOTSCHENBACHER & BLATTNER, LLP
11

12                                      By: _____
                                            Nicholas J. Henderson, OSB No. 074027
13                                          nhenderson@portlaw.com
                                        117 SW Taylor Street, Suite 200
14                                      Portland, OR 97204
                                        Telephone:  (503) 417-0500
15                                      Facsimile:  (503) 417-0501

16                                      Proposed Attorneys for Debtor
                                        Earth Class Mail Corporation
17

18

19

20

21

22

23

24

25

26

PAGE  3-   NOTICE OF (1) MOTION TO APPROVE SALE OF SUBSTANTIALLY ALL OF
           DEBTOR'S BUSINESS ASSETS; (2) AUCTION; (3) BIDDING PROCEDURES;
           (4) SALE HEARING; AND (5) OBJECTION DEADLINES

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

EXHIBIT B - PAGE 18

**EXHIBIT 3**

**NOTICE OF ASSUMPTIONAND ASSIGMENT OF
EXECUTORY CONTRACTS AND CURE AMOUNTS**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

*Motschenbacher & Blattner, LLP*
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

In re

Earth Class Mail Corporation,

    Debtor.

Case No. 15-30982-tmb11

NOTICE OF ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND CURE AMOUNTS

Earth Class Mail Corporation ("Debtor") previously filed a motion for approval of the sale of all or substantially all of its assets to Delivered.io, Inc. ("Delivered.io") or such higher and better offers from qualified bidders at an auction scheduled for _____a.m. on _____, 2015.  On _____, 2015, the Court entered an Order (1) Authorizing and Scheduling an Auction for the Sale of Substantially All Assets of the Debtor Free and Clear of Liens and Other Interests, (2) Approving Sale Procedures, (3) Approving Procedures For Assumption and Assignment of Executory Contracts and Unexpired Leases, (4) Directing Appointment of Consumer Privacy Ombudsman (the "Sale Procedures Order") [Dkt. ____] in connection with the sale and the auction, including procedures for the assumption and assignment of executory contracts. A copy of the Sale Procedures Order can be obtained from Debtor's counsel.

**PLEASE TAKE NOTICE** that _____, 2015 at 5:00 p.m. Pacific Time (the "Deadline") is the deadline for any party to a contract or lease (the "Material Agreements") that Debtor proposes to assume and assign to Delivered.io(or other higher and better bidder at the auction) to object to the amount Debtor asserts must be paid to cure any existing defaults under the Material Agreements (the "Cure Amounts"). The list of Material Agreements and the Proposed Cure Amounts are set forth on the attached **Exhibit 1**.

**PLEASE TAKE FURTHER NOTICE** that any party to a Material Agreement who disagrees with the Cure Amount or who objects to the assumption of its Material Agreement or to the assignment of its Material Agreement, must, on or before _____, 2015, file with the Clerk of the Court, United States Bankruptcy Court for the District of Oregon, 1001 SW Fifth Avenue, Seventh Floor, Portland, Oregon 97204, with a copy to Debtor's counsel, a written objection stating the specific facts upon which the objection is based.

**PLEASE TAKE FURTHER NOTICE** that unless a timely objection is filed as to a Cure Amount listed on **Exhibit 1**, the Cure Amount listed on **Exhibit 1** shall be binding upon the non-debtor party to such Material Agreement for all purposes in this Chapter 11 case and will constitute a final determination of the total Cure Amount required to be paid in connection with the assumption and assignment of such Material Agreement. Further, unless a timely objection is filed, no further evidence shall be required to satisfy the requirements for assumption and assignment, including, without limitation, any further evidence of adequate assurance of performance by Delivered.io or other qualified purchaser, and the non-debtor party to the Material Agreement shall be barred from objecting to the assumption and assignment of such Material Agreement and shall be deemed to consent to the assumption and assignment of the Material Agreement.

PAGE  1- NOTICE OF ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND CURE AMOUNTS

Motschenbacher & Blattner, LLP
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

1

**PLEASE TAKE FURTHER NOTICE** that if a timely objection is filed, a hearing on

2   the Cure Amounts and Debtor's proposed assumption and assignment of the Material
Agreements will be held on _____, 2015 at 11:00 a.m. Pacific Time, or at such

3   time as may be announced at that time, at the United States Bankruptcy Court for the District of
Oregon, Courtroom 4, 1001 SW Fifth Avenue, Seventh Floor, Portland, Oregon.

4

**PLEASE TAKE FURTHER NOTICE** that the Debtor is requesting the Court to waive

5   the 14-day stay under Bankruptcy Rule 6006(d).

6          Copies of any of the pleadings or documents referenced herein may be obtained by
contacting Christopher M. Sturgeon, assistant to Debtor's counsel (e-mail:

7   csturgeon@portlaw.com; telephone: 503-417-0511).

8
DATED: _____, 2015

9                                                     MOTSCHENBACHER & BLATTNER, LLP

10

11                                                    By: _____
                                                          Nicholas J. Henderson, OSB No. 074027

12                                                        nhenderson@portlaw.com
                                                      117 SW Taylor Street, Suite 200

13                                                    Portland, OR 97204
                                                      Telephone:  (503) 417-0500

14                                                    Facsimile:  (503) 417-0501

15                                                    Proposed Attorneys for Debtor
                                                      Earth Class Mail Corporation

16

17

18

19

20

21

22

23

24

25

26

PAGE  2-    NOTICE OF ASSUMPTION AND ASSIGNMENT OF
EXECUTORY CONTRACTS AND CURE AMOUNTS

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

| EXHIBIT 1 | | |
|---|---|---|
| **LIST OF EXECUTORY CONTRACTS TO BE ASSUMED AND ASSIGNED** | | |
| **Name of Non-Debtor Counterparty** | **Description of Contract** | **Cure Amount** |
| Microsoft Corporation | Microsoft BizSpark Startup Agreement dated 7/2012, as amended by Graduation Amendment for Microsoft BizSpark Startup Program and related End User License Agreement. | $0.00 |
| Prime Recognition Corporation | PrimeOCR Software License Agreement dated 2/9/15 | $0.00 |
| iBridge LLC | Services Contract for Document & Data Processing dated 10/15/08 | $0.00 |
| Hot Shot Delivery | Lease Agreement dated 9/20/2010 (382 NE 191st Street, Miami, FL 33179) | $0.00 |
| Hot Shot Delivery | Lease Agreement dated 9/20/2010 (538 W. 21st Street, Houston, TX 77008) | $0.00 |
| Hot Shot Delivery | Lease Agreement dated 9/20/2010 (1608 S. Ashland Ave., Chicago, IL 60608-2013) | $0.00 |
| Flynn Realty Services, LLC | License Agreement dated 10/2009 (427 N. Tatnall Street, Wilmington, DE 19801) | $0.00 |
| 230 PAS (15 (Cliff)) L.L.C. and 230 PAS (RRPIII) LLC | Standard Form of Store Lease dated 4/2008 (228 Park Avenue South, New York, NY 10003) | $0.00 |
| Merrill Place LLC | Lease Agreement dated 10/4/2007 (93 South Jackson Street, Seattle, WA 98104) | $0.00 |
| Nimbus Center, LLC | Office Lease Agreement dated 12/19/12 (9450 SW Gemini Drive, Beaverton, OR 97008) | $0.00 |

PAGE  1-    CURE SCHEDULE

1

| EXHIBIT 1 (Continued) LIST OF EXECUTORY CONTRACTS TO BE ASSUMED AND ASSIGNED | | |
|---|---|---|
| Name of Non-Debtor Counterparty | Description of Contract | Cure Amount |
| Santa Monica Center, Ltd. | Standrd Industrial/Commercial Multi-Tenant Lease – Net dated 5/27/08 (8605 Santa Monica Blvd., West Hollywood, CA 90069) | $0.00 |
| Flatiron Associates I | Retail Lease dated 5/16/08, as amended by the First Amendment to Lease dated 12/2/14 (548 Market Street, San Francisco, CA 94104) | $0.00 |
| James Wilson | Employment Agreement dated 9/24/14 | $0.00 |
| Stacey Lee | Employment Agreement dated 9/24/14 | $0.00 |

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

PAGE 2-   NOTICE OF ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND CURE AMOUNTS

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

**EXHIBIT B - PAGE 23**

1

2                                EXHIBIT C
                               SALE ORDER
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1

2

3

4

5

6

7

8

9

10

11            UNITED STATES BANKRUPTCY COURT

12               FOR THE DISTRICT OF OREGON

13   In re

14   Earth Class Mail Corporation,              Case No.  15-30982-tmb11

15                          Debtor.             ORDER (1) APPROVING SALE OF ASSETS
                                                TO DELIVERED.IO, INC. OTHER THAN IN
16                                              THE ORDINARY COURSE OF BUSINESS
                                                FREE AND CLEAR OF LIENS, CLAIMS,
17                                              INTERESTS AND ENCUMBRANCES; and
                                                (2) AUTHORIZING INTERIM
18                                              DISTRIBUTION FROM SALE PROCEEDS

19

20        On April 6, 2015, the Court conducted a hearing  (the "Sale Hearing") pursuant to

21   Debtor's Motion for Orders Authorizing and Scheduling an Auction for the Sale of Substantially

22   All Assets of the Debtor Free and Clear of Liens and Other Interests, (2) Approving Sale

23   Procedures, (3) Approving Procedures for Assumption and Assignment of Executory Contracts

24   and Unexpired Leases, (4) Directing Appointment of Consumer Privacy Ombudsman, (5)

25   Approving Purchase Agreement or Subsequent Overbid, (6) Scheduling a Hearing to Consider

26   Approval of the Sale, (7) Establishing the Form and Manner of Notices Related Thereto, (8)

PAGE  1-   ORDER APPROVING SALE AND AUTHORIZING
           INTERIM DISTRIBUTION OF SALE PROCEEDS

EXHIBIT C - PAGE 1

1  Authorizing Interim Distribution of Sale Proceeds, and (9) Requesting Waiver of the Stay Under

2  Bankruptcy Rule 6004(f) and 6006(d) filed on March 20, 2015 [Dkt No. _____] (the "Motion")

3  seeking approval of, among other things, bid procedures, form and manner of notice of sale,

4  auction protocols, a break-up fee, and final approval of sale to the Successful Bidder of

5  substantially all of the assets of Debtor's business, including the Material Contracts to be

6  assumed (collectively, the "Purchased Assets"), free and clear of Liens, Liabilities, claims, debts,

7  interests or encumbrances (except for the Permitted Liens and Assumed Liabilities) in

8  accordance with the Asset Purchase Agreement ("Agreement") with Delivered.IO, Inc.

9  ("Purchaser").

10      Having considered the written submissions, arguments of counsel and evidence presented

11  at the Sale Hearing, together with the files and records in this case; and now being fully advised

12  and after due deliberation, the Court FINDS as follows:

13      A.    This Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 157 and 1334.

14  Venue is proper pursuant to 28 U.S.C. § 1408.  This matter is a core proceeding pursuant to

15  28 U.S.C. § 157(b)(2).  To the extent required by law, each creditor and party in interest has

16  acknowledged and consented to this Court's authority to enter this Sale Order as a final order of

17  this Court, or all challenges to this Court's authority have been overruled or waived.

18

19      B.    The statutory predicates for the sale and assignment of the Purchased Assets are

20  §§ 105(a), 363 and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of

21  Bankruptcy Procedure (the "Bankruptcy Rules").

22      C.    Findings of fact herein shall be construed as conclusions of law and conclusions

23  of law shall be construed as findings of fact as appropriate.

24

25      D.    On February 13, 2015, Debtor and Purchaser entered into the Agreement pursuant

26  to which Purchaser agreed to purchase the Purchased Assets, subject to the conditions set forth in

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

EXHIBIT C - PAGE 2

the Agreement.

E.      As evidenced by the certificates of service filed with this Court (the "Certificates of Service") [Dkt No. _____], and based on representations of the Debtor and their counsel at the Sale Hearing, good, proper, timely, adequate and sufficient notice of the Motion, the Sale Procedures Order [Dkt No. _____], the Notice of Sale Procedures, the Notice of Sale, and the Assumption and Assignment Notice, and a reasonable opportunity to object, has been provided in compliance with §§ 102(1), 363(b) and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014, the local rules of this Court, and any other applicable requirements.  Debtor has served the required notices on:

> (i) the Purchaser); (ii) the Creditors' Committee, if any; (iii) the Secured Creditors[1]; (iv) all shareholders (v) all other persons or entities holding or claiming to have liens or interests in any of the Purchased Assets; (vi) the Office of the United States Trustee; (vii) all creditors of the Debtor; (viii) the Internal Revenue Service, the Oregon Department of Revenue, and any other entity to whom any tax or other charge may be due, or owing; (ix) all individuals or entities, if any, which have contacted the Debtor to express interest in purchasing the Purchased Assets; (x) all individuals or entities, if any, whom the Debtor believes might have an interest in purchasing the Purchased Assets; (xi) all parties requesting special notice in this Chapter 11 case; and (xii) all other persons or entities required to be served pursuant to orders of this Court, or known counsel for any of the foregoing.

F.      The procedural due process requirements of the United States Constitution were satisfied by Debtor's service of the documents described in Section E, above. Service of each of

---

[1] As used throughout this Order, Secured Creditors is defined in Paragraph 6 of the Motion.

PAGE  3-    ORDER APPROVING SALE AND AUTHORIZING
            INTERIM DISTRIBUTION OF SALE PROCEEDS

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

EXHIBIT C - PAGE 3

1   the foregoing was good, proper, timely, adequate and sufficient under the circumstances and no

2   other or further notice of the proposed sale of the Purchased Assets is or shall be required.

3         G.      After the Debtor filed the Sale/Bid Procedures Motion, the Court entered the Sale

4   Procedures Order, and approved the Sale Notice, which the Debtor served as provided in

5   paragraph E above, the Debtor either received no competitive bids, or received no competing

6   bids conforming to the Sale Procedures Order and/or any competing bid that may have been

7   received was inferior to that submitted by the Purchaser, with the result that the Purchaser

8   submitted the highest and best bid, and is entitled to be the Successful Bidder as described in the

9

10   Sale Procedures Order,.

11         H.      All creditors with liens on the Purchased Assets were given the opportunity to

12   credit bid pursuant to §363(k) of the Bankruptcy Code and no such creditor submitted a credit

13   bid.

14

15         I.      Prior to the Petition Date, the Debtor engaged in significant marketing efforts to

16   sell the Purchased Assets.  In accordance with the procedures described in the Sale Procedures

17   Order, the Debtor exposed the Purchased Assets to potential purchasers in the most effective

18   means available under the circumstances.  The Debtor has proven that its business could not

19   withstand a lengthier or more extensive marketing process, which would be costly and result in

20   undue delay, and any such process is not likely to produce a higher bid.

21

22         J.      The Debtor is the sole and lawful owner of the Purchased Assets and following

23   the closing of the sale of the Purchased Assets to Purchaser, the Purchaser will be the sole and

24   lawful owner of the Purchased Assets. Debtor is authorized to sell the Purchased Assets free and

25   clear of all Liens, Liabilities, claims, debts, interests or encumbrances (except for the Permitted

26   Liens and Assumed Liabilities) because each entity, including the Secured Creditors holding a

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

EXHIBIT C - PAGE 4

lien or security interest in the Purchased Assets to be transferred on the Closing Date either (i) has consented to the sale; (ii) could be compelled in a legal or equitable proceeding to accept a money satisfaction of such interest; or (iii) otherwise falls within the provisions of §363(f) of the Bankruptcy Code, and therefore, in each case, one or more of the standards set forth in § 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.

K.    Any and all holders of Liens, Liabilities, claims, debts, interests or encumbrances have received good, proper, and sufficient notice, and did not object to the sale pursuant to the Sale Procedures Order and the Sale Notice, and are deemed to have consented pursuant to § 363(f) of the Bankruptcy Code.  Moreover, The Secured Creditors have affirmatively consented to the sale, and therefore the sale complies with § 363(f)(2).

L.    The Debtor has established and proved good and sufficient reasons for approval of the proposed sale under the terms of the Agreement.  The Agreement with Purchaser previously was approved by this Court in Sale Procedures Order. The relief requested in the Motion is in the best interests of the estate, its creditors and other parties in interest.

M.    The Debtor has also established and proved (i) good, sufficient, and sound business purpose and justification; (ii) the sale is in the best interest of the estate; and (iii) compelling circumstances for the sale other than in the ordinary course of business, pursuant to § 363(b) of the Bankruptcy Code, in that, among other things, the immediate consummation of the sale to the Purchaser is necessary and appropriate to maximize the value of the estate; the sale will provide the means for Debtor to maximize distributions to creditors; and absent consummation of the sale, Debtor or a Chapter 7 trustee will be forced to surrender the assets to the Secured Creditors, or liquidate the assets in a piecemeal fashion, or convert this case to a case under Chapter 7, either of which would yield a lesser recovery for distribution to creditors than

PAGE  5-    ORDER APPROVING SALE AND AUTHORIZING
INTERIM DISTRIBUTION OF SALE PROCEEDS

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

EXHIBIT C - PAGE 5

1    the sale pursuant to the Agreement with the Purchaser.

2        N.    The Agreement constitutes the highest or best offer for the Purchased Assets,  is

3    fair value, and constitutes reasonably equivalent and reasonable market value and fair

4    consideration for the Purchased assets, and will provide a greater recovery for the Debtor's estate

5    than would be provided by any other available alternative. The value of the Purchased Assets is

6    maximized by a sale in one lot rather than in piecemeal sales. A sale of the Purchased Assets,

7    other than free and clear as provided for in this Sale Order, would yield substantially less value

8    for the Estate, with less certainty than provided by the sale of the Purchased Assets to Purchaser.

9    The Debtor's determination that the Agreement constitutes the highest or best offer for the

10   Purchased Assets constitutes a valid and sound exercise of the Debtor's business judgment.

11

12       O.    The Agreement was negotiated, proposed and entered into by the parties in good

13   faith, from arm's-length bargaining positions and without collusion or fraud of any kind.  No

14   provision of the Agreement is in conflict with or violates this Sale Order.  The Purchaser is not

15   an "insider" or "affiliate" of the Seller as those terms are defined in the Bankruptcy Code. The

16   Purchaser is not a mere continuation of the Debtor or its estate and there is no continuity between

17   the Purchaser and the Debtor.  The Purchaser is not holding itself out to the public as a

18   continuation of the Debtor.  The Purchaser is not a successor to the Debtor or its estate and the

19   purchase of the Assets does not amount to a consolidation, merger, or *defacto* merger of the

20   Purchaser and the Debtor or the bankruptcy estate, or a continuation of the Debtor or the

21   bankruptcy estate's business.  The sale of the Assets to Purchaser is not being undertaken for the

22   purpose of escaping liability for the Debtor's debts.

23       P.    Neither the Purchaser nor the Seller engaged in any conduct that would prevent

24   the application of § 363 of the Bankruptcy Code or cause the application of § 363(n) of the

PAGE  6-    ORDER APPROVING SALE AND AUTHORIZING
INTERIM DISTRIBUTION OF SALE PROCEEDS

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

EXHIBIT C - PAGE 6

1  Bankruptcy Code with respect to the consummation of the transaction approved under this Sale

2  Order. The Purchaser is a good faith purchaser under § 363(m) of the Bankruptcy Code and, as

3  such, is entitled to all of the protections afforded thereby with respect to the transactions

4  contemplated by the Agreement, and the provisions of § 363(n) of the Bankruptcy Code are not

5  applicable.  In the absence of a stay pending appeal, if the closing of the sale occurs at any time

6  after entry of this Sale Order, then the Purchaser, as a purchaser in good faith of the Purchased

7  Assets, shall be entitled to all of the protections of § 363(m) of the Bankruptcy Code if this Order

8  or any authorization contained herein is reversed or modified on appeal.

9  

10  Q.    The Court has determined that the Debtor has the power and authority to execute

11  and deliver the Agreement, and all other documents contemplated thereby, and to consummate

12  the transactions contemplated by the Agreement.  The Agreement and all of the transactions

13  contemplated thereby have been duly and validly authorized by all necessary actions of the

14  Debtor.  No consents or approvals other than authorization and approval of this Court are

15  required for the Debtor to consummate the sale.

16  

17  R.    The Purchaser would not have entered into the Agreement and would not

18  consummate the transaction contemplated thereby, thus adversely affecting the Debtor, the

19  Estate, and its creditors, if the Court did not enter this Sale Order and provide the Purchaser with

20  the protections hereunder.

21  

22  S.    Time is of the essence in closing the sale of the Purchased Assets in accordance

23  with the Agreement.

24  NOW, THEREFORE, IT IS HEREBY ORDERED as follows:

25  1.    Debtor's Motion to finally approve sale to the Purchaser, contained in the Motion,

26  but on which ruling was previously reserved until the Sale Hearing, is GRANTED in all respects.

PAGE  7-    ORDER APPROVING SALE AND AUTHORIZING
            INTERIM DISTRIBUTION OF SALE PROCEEDS

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

EXHIBIT C - PAGE 7

2.     Any objections to entry of this Sale Order or to the relief granted herein and requested in the Motion that have not been withdrawn, waived, resolved, or settled, and all reservation of rights included therein are hereby denied and overruled on the merits with prejudice.

3.     Pursuant to §§ 105 and 363 of the Bankruptcy Code, the Debtor is hereby authorized and directed to sell the Purchased Assets to the Purchaser in accordance with the terms of the Agreement, and is empowered and directed to fully perform under, consummate, and implement the Agreement, and to execute and deliver to Purchaser all additional instruments and documents that may be reasonably necessary or desired by Purchaser to implement the Agreement.

4.     Pursuant to §§ 105, 363 and 365 of the Bankruptcy Code, the Purchased Assets shall be sold, assigned, transferred, and conveyed to the Purchaser in accordance with the Agreement, and such sale, assignment, transfer and conveyance shall, as of the Closing Date, constitute a legal, valid, binding and effective sale, assignment, transfer, and conveyance of all such Purchased Assets to Purchaser, and shall, pursuant to § 363(f) of the Bankruptcy Code, shall vest in the Purchaser full title in and to the Purchased Assets, as of the Closing Date, free and clear of any Liens, Liabilities, claims, debts, interests or encumbrances (except for the Permitted Liens and Assumed Liabilities) of any person or entity.  All holders of any such Liens, Liabilities, claims, debts, interests or encumbrances (except for the Permitted Liens and Assumed Liabilities) are forever barred, estopped, and permanently enjoined from asserting any Liens, Liabilities, claims, debts, interests or encumbrances (except for the Permitted Liens and Assumed Liabilities) in and to the Purchased Assets.

5.     The sale of the Purchased Assets to Purchaser pursuant to the Agreement

PAGE 8-   ORDER APPROVING SALE AND AUTHORIZING
            INTERIM DISTRIBUTION OF SALE PROCEEDS

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone: (503) 417-0500
Fax: (503) 417-0501

EXHIBIT C - PAGE 8

constitutes a legal, valid, and effective transfer of the Purchased Assets, shall vest the Purchaser with all of the Debtor's right, title, and interest in and to the Purchased Assets and Purchaser shall be the sole and exclusive owner thereof in accordance with the terms of this Sale Order and the Agreement.  As of the Closing, the Purchaser shall have any and all rights, claims, defenses, offsets, offsets, and recoupments held by the Debtor and the estate as to the Purchased Assets.

6.    Each federal, state, and local filing office and each Governmental Authority are directed to accept, file, and record, any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement.

7.    All Liens, Liabilities, claims, debts, interests or encumbrances (except for the Permitted Liens and Assumed Liabilities) shall attach to the proceeds from the sale of the Purchased Assets to the same extent, priority, and validity as they attached to the Purchased Assets on the Petition Date, subject to any rights, claims, and defenses the Debtor may possess with respect thereto.

8.    Except as expressly set forth in this Sale Order, and in Section 1.4 of the Agreement, Purchaser is not assuming or becoming obligated to pay, and the Purchased Assets shall not be or become liable for or subject to, any liabilities of or to the Debtor's employees, including any liabilities related to employment practices, COBRA, equal employment opportunity, nondiscrimination, harassment, wrongful termination, breach of contract, immigration, wage and hour laws, any other state, federal or local labor and employment laws, liability under the WARN Act, salaries, vacations, sick pay, incentives, severance pay, bonus, overtime, meal period, pension profit sharing retirement and/or deferred compensation and any other compensation or benefits, which claims, if any shall be and remain the liability of the Debtor.

PAGE  9-    ORDER APPROVING SALE AND AUTHORIZING
INTERIM DISTRIBUTION OF SALE PROCEEDS

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

EXHIBIT C - PAGE 9

9.      The sale, assignment, transfer and conveyance of the Purchased Assets pursuant to this Sale Order shall not subject the Purchaser to any liability with respect to the obligations incurred in connection with, or in any way related to, Debtor or the Purchased Assets prior to the Closing Date, and except with respect to the Permitted Liens and Assumed Liabilities the Purchaser is released from any potential liability with respect to any of the Purchased Assets. All persons who have received the notices described in Section E, above, are bound by this Order and are enjoined from pursuing Purchaser to recover on any claims they may have against Debtor

10.      The transactions contemplated by the Agreement are undertaken by the Debtor and the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code. The Purchaser is not an "insider" or "affiliate" of the Seller as those terms are defined in the Bankruptcy Code.  Neither the Purchaser nor the Seller engaged in any conduct that would prevent the application of § 363 of the Bankruptcy Code or cause the application of § 363(n) of the Bankruptcy Code with respect to the consummation of the transaction approved under this Sale Order. The Purchaser is a good faith purchaser under § 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby with respect to the transactions contemplated by the Agreement, and the provisions of § 363(n) of the Bankruptcy Code are not applicable.  The consideration provided by the Purchaser for the Purchased Assets under the Agreement is the product of non-collusive, arm's-length negotiations, and is fair and reasonable and may not be avoided under the provisions of section 363(n) of the Bankruptcy Code.  In the absence of a stay pending appeal, if the closing of the sale occurs at any time after entry of this Sale Order, then the Purchaser, as a purchaser in good faith of the Purchased Assets, shall be entitled to all of the protections of § 363(m) of the Bankruptcy Code.  Reversal or modification

PAGE  10-  ORDER APPROVING SALE AND AUTHORIZING
INTERIM DISTRIBUTION OF SALE PROCEEDS

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

EXHIBIT C - PAGE 10

on appeal of the authorization provided herein to consummate the sale shall not affect the validity of the sale to the Purchaser.

11.    Neither the Purchaser nor any person or entity acting on its behalf has become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the transactions contemplated by the Agreement.

12.    Any holder of a Liens, Liabilities, claims, debts, interests or encumbrances (other than a Permitted Lien) in any of the Purchased Assets is provided adequate protection within the meaning of § 363(e) of the Bankruptcy Code, by the terms of this Sale Order, including but not limited to the provisions of this Sale Order that provide for the proceeds of the sale to attach to such Liens, Liabilities, claims, debts, interests or encumbrances.

13.    Effective (a) upon payment by the Debtor of the Cure Costs; and (b) on the Closing Date, each Material Contract shall be deemed assumed by the Debtor and assigned to the Purchaser.  The Debtor is ordered to pay the Cure Costs in the manner and within the time set forth in section 1.5 of the Agreement.  The requirements of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code are satisfied with respect to the Material Agreements, and except as expressly assumed at the closing of the purchase of the Purchased Assets, all executory contracts and unexpired leases are hereby rejected.  Any counterparty to a Material Agreement proposed to be assumed and assigned that did not timely file and serve an objection to the assumption and assignment as required by the Assumption and Assignment Notice is deemed to have consented to the assumption and assignment of its Material Agreement to Purchaser and the cure of existing defaults and is forever barred from objecting to the cure and from asserting any additional cure or other amounts against the Debtor or Purchaser.

14.    On or before the Closing Date, each of the Debtor's creditors is directed to

PAGE  11-   ORDER APPROVING SALE AND AUTHORIZING
           INTERIM DISTRIBUTION OF SALE PROCEEDS

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

EXHIBIT C - PAGE 11

1  execute such documents and take all other actions as may be necessary, or reasonably requested

2  by the Debtor or Purchaser to release its Liens, Liabilities, claims, debts, interests or

3  encumbrances in the Purchased Assets, if any, as such Liens, Liabilities, claims, debts, interests

4  or encumbrances may have been recorded or otherwise exist. The Debtor is directed to turn over

5  to the Purchaser physical possession of all of the Purchased Assets and to cooperate with the

6  Purchaser in transferring the Purchased Assets to Purchaser, including without limitation

7  executing and delivering such documents as may be necessary to transfer the Intellectual

8  Property to Purchaser. The Debtor is further directed to cooperate with Purchaser in calculating

9  the amount of the Purchase Price Adjustments as required in section 2.2 of the Agreement, to

10 obtain and deliver to Purchaser the Estoppel Certificates, and to otherwise fully comply with its

11 obligations under the Agreement.

12        15.    Upon Closing, the Debtor is authorized to make an interim distribution from the

13 proceeds of the Sale, to pay amounts due under the Management Carve Out Plans described in

14 Section 6 of the Motion, to Comerica Bank to pay its claim in full, and to the remaining Secured

15 Creditors in amounts agreed upon by the Debtor.  All remaining proceeds from the Sale will be

16 held by the Debtor for distribution to administrative and unsecured claims upon further order of

17 the Court.

18        16.    No bulk sales law or any similar law of any state or other jurisdiction shall apply

19 in any way to the transfer of the Assets to Purchaser.

20        17.    This Sale Order shall be effective and enforceable immediately upon entry and,

21 notwithstanding the provisions of Bankruptcy Rules 6004 or 6006, this Sale Order shall not be

22 stayed after the entry hereof, but shall be effective and enforceable immediately upon issuance

23 hereof.  Time is of the essence in closing the transactions referenced herein, and the Debtor and

PAGE  12-   ORDER APPROVING SALE AND AUTHORIZING
            INTERIM DISTRIBUTION OF SALE PROCEEDS

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

EXHIBIT C - PAGE 12

1  the Purchaser are authorized close the sale immediately upon entry of this order, or as soon as

2  practicable thereafter.

3      18.    This Court retains jurisdiction to enforce and implement the terms and provisions

4  of the Agreement, all amendments thereto, any waivers and consents thereunder and each of the

5  agreements executed in connection therewith.  To the extent that this Sale Order is inconsistent

6  with any prior order or pleading with respect to the Sale Procedures Order, the terms of the Sale

7  Order shall govern.  The provisions of the Agreement and this Sale Order shall remain effective

8  and enforceable notwithstanding the appointment of a trustee or subsequent entry of any order

9  confirming any Chapter 11 plan or other order in this case (including any order entered after any

10  conversion of this case under Chapter 7 of the Bankruptcy Code).

11

12                                ###

13

14      I certify that I have complied with the requirements of LBR 9021-1(a)(2)(A).

15

16  **Presented by:**

17  MOTSCHENBACHER & BLATTNER, LLP

18  By: ___*EXHIBIT*_____
         Nicholas J. Henderson, OSB No. 074027
19          nhenderson@portlaw.com
     117 SW Taylor Street, Suite 200
20   Portland, OR  97204
     Telephone:  (503) 417-0500
21   Facsimile:  (503) 417-0501

22   Proposed Attorneys for Earth Class Mail
     Corporation

23   cc: List of Interested Parties

24

25

26

PAGE  13-   ORDER APPROVING SALE AND AUTHORIZING
             INTERIM DISTRIBUTION OF SALE PROCEEDS

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

EXHIBIT C - PAGE 13

1

2          EXHIBIT D
       MANAGEMENT CARVEOUT PLANS

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

PAGE 1-   EXHIBIT D

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

**EARTH CLASS MAIL CORPORATION**

**MANAGEMENT CARVE-OUT PLAN**

      **EARTH CLASS MAIL CORPORATION** (the "**Company**") hereby establishes this **MANAGEMENT CARVE-OUT PLAN** (this "**Plan**") effective as of September 24, 2014 (the "**Effective Date**").  Certain capitalized terms used in this Plan have the meanings assigned to them in Section 2 below.  This Plan supersedes and replaces the Management Carve-Out Plan which was approved by the Company's Board of Directors in 2009.

## SECTION 1 - NATURE AND PURPOSE

      **1.1**    **Purpose**.  The Board has adopted this Plan to provide an incentive to certain officers, directors, employees and consultants of the Company to contribute to the performance of the Company's business prior to any sale of the business to another entity or person (the "**Buyer**").  Of course, it is uncertain whether such a sale will take place.  However, in the event that such a sale does take place, this Plan will enable Participants to be rewarded for their contributions in effecting such a sale and to share in the proceeds from such sale.

      **1.2**    **Plan Benefits Unfunded**.  The liability of the Company to pay a Bonus Amount to any Participant or Beneficiary is based solely on the contractual obligations created by this Plan.  This Plan constitutes a mere promise by the Company to pay benefits in the future.  The interest of a Participant or Beneficiary in Plan benefits is an unsecured claim against the general assets of the Company.  No Participant or Beneficiary has any interest in any fund or in any specific asset of the Company by reason of any amounts credited or deemed to be credited hereunder.  Accordingly, Plan benefits are not secured by any trust, pledge, lien or encumbrance on any property of the Company or on the assets of any benefit trust.  The Company intends that this Plan be unfunded for tax purposes and for purposes of Title I of Employee Retirement Income Security Act of 1974, as amended, if applicable.

      **1.3**    **Participation Not a Contract of Employment**.  This Plan is not a promise of continued employment and nothing in this Plan gives any person a right to remain in the employ of or provide services to the Company or any Buyer nor does it affect the right of the Company or Buyer to terminate the employment or services of any person at any time with or without cause and with or without advanced notice, subject to the terms of any employment agreement or independent contractor agreement that may exist between such person and the Company or the Buyer.

## SECTION 2  - DEFINED TERMS

      Whenever used herein, the masculine pronoun shall be deemed to include the feminine, and the singular to include the plural, unless the context clearly indicates otherwise, and the following definitions shall govern this Plan:

      **2.1**    "**Triggering Event**" means a Company Transaction.

**2.2** "**Aggregate Transaction Consideration**" means the sum of the Closing Transaction Consideration and the Contingent Transaction Consideration.

**2.3** "**Beneficiary**" means a person designated by a Participant under Section 5.4 to receive his or her Plan benefits in the event of the Participant's death.

**2.4** "**Board**" means the Board of Directors of the Company.

**2.5** "**Bonus Amount**" means the portion of the Bonus Fund payable to a Participant as provided under this Plan.

**2.6** "**Bonus Fund**" means the sum of the Closing Bonus Fund and the Contingent Bonus Fund.

**2.7** "**Bonus Percentage**" means, for each Participant, the percentage of the Bonus Fund allocated to such Participant and set forth on the Notice of Award Form delivered to each such Participant.

**2.8** "**Cause**" means any of the following: (a) acts or omissions constituting gross negligence, recklessness or willful misconduct on the part of the Participate with respect to the Participant's obligations or otherwise relating to the business of Company; (b) the Participant's material breach of any employment agreement, independent contractor agreement or any other agreement between the Participant and the Company; (c) the Participant's conviction or entry of a plea of nolo contendere for fraud, misappropriation or embezzlement, or any felony or crime of moral turpitude, or any crime against Company or any of its shareholders or employees; (d) the Participant's willful neglect of duties as determined in the sole and exclusive discretion of the Board; or (e) the Participant's breach or violation of any of the Company's written policies (if such breach or violation continues following any applicable cure period in such policies) applicable to employees or consultants, as the case may be, of the Company generally.

**2.9** "**Closing Transaction Consideration**" means the sum of (a) the net purchase price to be paid by a third party in cash (or liquid securities) in connection with the Triggering Event on the Closing Date to either the Company or to its shareholders and/or holders of Company Notes, in any case, but for the operation of this Plan; provided that such amount shall not include any debt forgiveness or cancellation of any debt of the Company in connection with the Triggering Event, any amounts payable to officers, directors or employees of the Company by the Buyer in connection with any agreement(s) not to compete or similar arrangement(s) or as salary, bonus, severance compensation or consulting fees, or any amounts payable to shareholders or the Company as Contingent Transaction Consideration; minus (b) any fees, expenses or other costs incurred by the Company or its stockholders and/or holders of Company Notes in connection with the Triggering Event ( including, without limitation, legal, accounting, banking and broker fees and commissions), any indebtedness or other obligations of the Company to be discharged or otherwise satisfied upon the closing of the Triggering Event, including, without limitation, all bank debt and amounts payable to vendors, creditors or other third parties (other than, in the case of a Trigger Event constituting a sale of Company Notes, amounts payable in respect of such Company Notes), and any other costs that may be related to the wind-down the Company, if applicable.  In the case of a Triggering Event constituting a sale

-2-

of assets, Closing Transaction Consideration shall only be taken into account to the extent that such Closing Transaction Consideration is or will be distributed to the Company's shareholders and holders of the Company Notes in connection with such Triggering Event.  In the case of a Triggering Event constituting a sale of Company Notes, Closing Transaction Consideration shall only be taken into account to the extent that such Closing Transaction Consideration is or will be distributed to holders of Company Notes in connection with such Triggering Event.

       **2.10**    "**Closing Bonus Amount**" means the portion of the Closing Bonus Fund payable to a Participant as provided under this Plan.

       **2.11**    "**Closing Bonus Fund**" means the aggregate amount that has been designated by the Company for payment under this Plan pursuant to Section 4.1(a).

       **2.12**    "**Closing Date**" means the date on which the closing of the Triggering Event is determined pursuant to the agreements providing for such event.

       **2.13**    "**Company Notes**" mean the Convertible Notes and the Secured Notes.

       **2.14**    "**Common Stock**" means the common stock of the Company.

       **2.15**    "**Company Transaction**" means (a) a sale of all or substantially all of the assets or stock of the Company, (b) the acquisition of the Company by means of merger, share exchange or other form of corporate combination or reorganization (other than a reincorporation for the purpose of changing the corporation's domicile in which the corporation's ownership does not change) as a result of which the shareholders of the Company immediately prior to the transaction hold less than fifty percent (50%) of the aggregate outstanding capital stock or voting power of the surviving or resulting entity (on an as-converted basis), or (c) a sale of at least fifty percent (50%) of the aggregate outstanding original principal amount of the Company's Secured Notes and/or Convertible Notes.  The Plan Administrator shall have the right to determine whether multiple sales or exchanges of the securities or promissory notes of the Company or multiple Triggering Events are related, and its determination shall be final, binding and conclusive.  For the avoidance of doubt, regular payments of principal and/or interest on Company Notes will not be taken into consideration for purposes of determining whether a Company Transaction has occurred, nor will regular principal or interest payments on any indebtedness which are discharged or forgiven be included for purposes of calculating Closing Transaction Consideration or Contingent Transaction Consideration.

       **2.16**    "**Contingent Transaction Consideration**" means the fair market value of all cash and other consideration paid after the Closing Date to the shareholders and/or holders of Company Notes in respect of an Triggering Event, such as following the expiration of an indemnification or holdback period or in connection with an earn-out, , in each case but for the operation of this Plan; provided, however, that in calculating Contingent Transaction Consideration, (i) any amounts payable (A) to officers, directors or employees of the Company by the Buyer in connection with any agreement(s) not to compete or similar arrangement(s) or as salary, bonus, severance compensation or consulting fees, or (B) to creditors (other than in respect of any Company Notes) or other third parties, shall be specifically excluded, and (ii) the value of any non-cash consideration subject to such contingencies or earn-out will be valued as

-3-

of the date such consideration is actually distributed to the Company or its shareholders and/or holders of Company Notes, as the case may be.  In the case of a Triggering Event constituting a sale of assets, Contingent Transaction Consideration shall only be taken into account to the extent that such Contingent Transaction Consideration is or will be distributed to the Company's shareholders and holders of the Company Notes in connection with such Triggering Event.  In the case of a Triggering Event constituting a sale of Company Notes, Closing Transaction Consideration shall only be taken into account to the extent that such Closing Transaction Consideration is or will be distributed to the holders of Company Notes in connection with such Triggering Event.

2.17    "**Contingent Bonus Amount**" means the portion of the Contingent Bonus Fund payable to a Participant as provided under this Plan.

2.18    "**Contingent Bonus Fund**" means the aggregate amount that has been designated by the Company for payment under this Plan pursuant to Section 4.2(a).

2.19    "**Convertible Notes**" mean the Convertible Subordinated Promissory Notes issued by the Company pursuant to the terms of the Note and Warrant Purchase Agreement dated as of May 9, 2008, as amended, in the aggregate original principal amount of $5,052,485.

2.20    "**Executives**" means all executive officers of the Company, as well as any other employees deemed key employees by the board of directors of the Company.

2.21    "**Notice of Award Form**" means the form attached hereto as <u>Exhibit A</u>, on which an eligible individual is notified of his/her participation in this Plan.

2.22    "**Participants**" means all Executives, and such other individuals as may be designated by the Board, in its sole discretion, as eligible to participate in this Plan, who meet the eligibility requirements set forth in Section 3.1.

2.23    "**Participant Transaction Consideration**" means the amount equal to the fair market value of the portion of the Aggregate Transaction Consideration distributable to a Participant in respect of (a) the shares of Common Stock then held by such Participant that were issued upon exercise of an Option or granted to such Participant in connection with such Participant's employment or consulting arrangement with the Company, (b) the vested Options then held by such Participant less the aggregate exercise price that such Participant would have to pay to purchase such shares of Common Stock and (c) any other consideration payable to such Participant pursuant to an employment agreement, independent contractor agreement or otherwise in connection with the Triggering Event (other than pursuant to this Plan).

2.24    "**Plan**" means this Management Carve-Out Plan, as amended from time to time.

2.25    "**Plan Administrator**" means the Board, or any committee designated by the Board to act as the Plan Administrator; provided that any committee designated by the Board shall include Jonathan Roberts, in his capacity as the Executive Chairman of the Company.

-4-

2.26  "**Secured Notes**" mean the Subordinated Secured Promissory Notes issued by the Company pursuant to the terms of the Secured Credit Facility Agreement dated as of March 3, 2010, in the aggregate original principal amount of $2,774,915.

## SECTION 3 - ELIGIBILITY

3.1  **Eligibility Requirements**.  Subject to Section 4.3 below, an individual shall be eligible to participate in this Plan if he or she is (a) an employee, director or consultant of the Company in good standing on the Closing Date, or (b) an employee, director or consultant whose service was terminated during the ninety (90) calendar days prior to such Closing Date as a result of his or her death or permanent disability or by the Company for a reason other than Cause.

3.2  **Benefits Subject to Forfeiture**.  Except as otherwise (a) set forth herein, or (b) determined by the Board and provided in writing to such Participant, termination of a Participant's employment or services with the Company either by the Company or by the Participant for any reason at any time more than 90 days prior to the Closing Date shall automatically result in the termination of such Participant's rights to any and all payments of Bonus Amounts.  Additionally, any Participant may voluntarily forfeit all or any portion of such Participant's right to receive payments of the Bonus Amount to which such Participate otherwise would have been entitled under this Plan by delivery of written notice of such forfeiture to the Company.

## SECTION 4 - AWARDS UNDER THE PLAN

### 4.1  Closing Bonus Fund Payments

(a)  **Closing Bonus Fund**.  The Closing Bonus Fund with respect to any applicable Triggering Event shall be equal to in the case of a Company Transaction, 10% of the initial $2,774,915 of Closing Transaction Consideration and 16% of any Closing Transaction Consideration in excess thereof payable in respect of such Company Transaction.

(b)  **Closing Bonus Amount**.  Effective as of the Closing Date with respect to any Triggering Event, each Participant shall be entitled to receive his or her Closing Bonus Amount, which shall be the amount equal to such Participant's Bonus Percentage with respect to such Triggering Event multiplied by the Closing Bonus Fund less the Participant Transaction Consideration payable to such Participant at such time.  For purposes of clarification, if a Participant's Participant Transaction Consideration is greater than his or her Closing Bonus Amount, such Participant will not be eligible to receive any Closing Bonus Amount and no Closing Bonus Amount shall be distributed to such Participant.

### 4.2  Contingent Bonus Fund Payments

(a)  **Contingent Bonus Fund**.  The Contingent Bonus Fund with respect to any applicable Triggering Event shall be equal to in the case of a Company Transaction, 10% of the initial (i) $2,774,915 of Closing Transaction Consideration minus (ii) the amount paid into the Closing Bonus Fund (provided that such amount shall not be less than zero) and 16% of any Closing Transaction Consideration in excess thereof payable in respect of such Company Transaction.

      (b)    **Contingent Bonus Amount**.  Effective as of the date the Contingent Transaction Consideration is actually distributed to the Company or the Company's shareholders, as the case may be, each Participant shall be entitled to receive his or her Contingent Bonus Amount, which shall be the amount equal to such Participant's Bonus Percentage with respect to the Triggering Event giving rise to such Contingent Transaction Consideration multiplied by the Contingent Bonus Fund less the Participant Transaction Consideration payable to such Participant, if any, to the extent such Participant Transaction Consideration has not been fully offset against any Closing Bonus Amount or prior Contingent Bonus Amounts otherwise payable to such Participant.  For purposes of clarification, if a Participant's Participant Transaction Consideration payable at the time of payment of the Contingent Bonus Amount is greater than his or her Contingent Bonus Amount, such Participant will not be eligible to receive any Contingent Bonus Amount and no Contingent Bonus Amount shall be distributed to such Participant.  Notwithstanding the foregoing, in the event an Triggering Event does not constitute a change in ownership of the Company or a substantial portion of the Company's assets within the meaning of Treasury Regulations Section 1.409A-3(i)(5) or the Board determines that the special rules under Treasury Regulations Section 1.409A-3(i)(5)(iv) for certain delayed payments pursuant to a change in control event otherwise do not apply, the Board shall, using good faith and reasonable methods, determine the value of any Contingent Transaction Consideration that could otherwise be included in the Aggregate Transaction Consideration.  An amount equal to such value shall be included in the Aggregate Transaction Consideration as of the date of the Transaction Event (and any Bonus Amount which has been calculated to include such value in the Aggregate Transaction Consideration shall be paid pursuant to the terms hereof within five (5) days of such Transaction Event), and no Contingent Transaction Consideration that is actually received by the Company or the Company's shareholders, as the case may be, shall be included in the Aggregate Transaction Consideration.  All determinations necessary under this Section 4.2(b) by the Board may be based on such tax and financial advice as the Board considers appropriate, in its reasonable discretion.

    **4.3**    **Plan Administrator's Discretion**.  The determination of the Aggregate Transaction Consideration, Participant Transaction Consideration, Bonus Fund, Bonus Amount, and all determinations necessary therefore, and the resolution of any issues that arise under this Plan shall be made by the Plan Administrator in its sole and absolute discretion and all such determinations shall be binding on all Participants.

## SECTION 5  - PAYMENTS UNDER THE PLAN

    **5.1**    **Payment Schedule**.  Subject to Section 5.3 below, payments of Bonus Amounts under this Plan shall be made in one or more installments at the same time and in the same proportion that the Aggregate Transaction Consideration is paid to the Company and/or the shareholders of the Company in connection with the Triggering Event.

    **5.2**    **Form of Payment; Release of Claims**.  Any payment obligations made hereunder shall be comprised of the same type of consideration provided to the Company's shareholders in the Triggering Event.  With respect to any payment obligations satisfied by the transfer to a Participant of non-cash consideration, the value of such consideration shall be determined by the Board in its sole discretion; provided, however, that the value of any non-cash consideration paid as part of the Contingent Transaction Consideration will be calculated as set

-6-

forth in the definition above.  Any restrictions on delivery of or subsequent transfer of such consideration imposed by the Buyer on the Company or its shareholders shall likewise apply to Participants, and the Company may retain custody of the consideration as Participants' agent until such restrictions on delivery or transfer, as applicable, no longer apply.  Participants shall execute and deliver upon request such acknowledgments as the issuer of such consideration may reasonably request to evidence Participants' obligations to comply with such restrictions.  If a Participant fails to do so within a reasonable time after the Company's or issuer's written request, such Participant shall forfeit his or her rights to such portion of the Bonus Funds represented by such consideration.  Prior to making any payment or distribution to a Participant pursuant to the terms of this Plan, the Company may require such Participant to execute a waiver and release of claims against the Company and its officers, directors, employees, shareholders, agents, affiliates, successors and assigns in such form as the Company may determine.

**5.3    Restricted Securities**.  Notwithstanding anything contained in this Agreement to the contrary, if a Participant's Bonus Amount consists of common stock or other securities that are not issued to the Participants pursuant to a registration statement declared or ordered "effective" under the Securities Act of 1933, as amended, then, provided the Company reasonably anticipates that payment of the Bonus Amount would violate applicable securities laws, the Company may defer the distribution to such Participant of the amounts otherwise payable hereunder until such time as, in the reasonable good faith determination of the Board, such stock can be delivered to such Participant without violation of applicable securities laws.

**5.4    Payment to a Beneficiary**.  If a Participant dies before receiving all benefits to which the Participant is entitled under this Plan, the deceased Participant's benefits under this Plan shall be paid or issued to the Participant's Beneficiary at the time and in the amount provided under this Plan as if the Participant had not died.  A Participant shall, on a form furnished by the Company, designate one or more death Beneficiaries.  A Beneficiary designation will be effective only when a signed and dated beneficiary designation form has been filed with the Company.  If a Participant is not survived by any Beneficiary, the Company shall distribute the Participant's benefits under this Plan to the legal representative of the estate of the deceased Participant.

**5.5    Effect of Forfeiture On Benefits for Remaining Participants**.  Notwithstanding any reduction or forfeiture of Bonus Amounts payable to any Participant or termination of any Participant's rights hereunder, such reduction, forfeiture or termination will not affect the amount of Bonus Amounts that other (*i.e.*, non-forfeiting or terminating) Participants will receive hereunder.

**5.6    Claw Back**.  To the extent consideration from the Triggering Event is not withheld but remains subject to indemnification or offset claims, each recipient of a portion of the Bonus Fund shall be obligated to refund his or her pro-rata portion of any amounts that are paid on account of such indemnification or offset.  For example, if the aggregate consideration received by the Company shareholders in a transaction would be $2,000,000 and the aggregate amount of the indemnity payment is $200,000 (*i.e.*, 10%), each recipient of a portion of the Bonus Amounts would also be obligated to refund 10% of his or her respective Bonus Amount.  Notwithstanding anything to the contrary in this Section 5.6, for all tax purposes, the Company

intends to treat each recipient of a Bonus Amount as having received the full amount of the Bonus Amount at the time of receipt.

      **5.7**    **Tax Withholding**.  Payments under this Plan are subject to applicable federal and state withholding taxes, FICA and similar charges, and the Company may deduct the amount thereof from any payments required hereunder.  Nevertheless, Participants remain ultimately responsible for the payment of any and all taxes applicable to income a Participant may receive or be deemed to have received hereunder.  At the Company's discretion, the amount required to be withheld may be withheld in cash from such wages, or otherwise as the Plan Administrator or Board may reasonably determine.  By execution of a Notice of Award Form, each Participant agrees, as a condition to participation in this Plan, that, if a Participant's Bonus is payable in non-cash assets, the Company may, in its discretion, withhold an amount from the Participant's share of the Bonus sufficient to satisfy the Company's withholding obligation or require the payment in cash of the amount of the Participant's withholding obligation (as determined in the good faith judgment of the Board).

      **5.8**    **No Tax Representations**.  Notwithstanding any provision of this Plan to the contrary, none of the Company, the Plan Administrator or the Board makes any representations or warranties to any Participant with respect to any tax, economic or legal consequences of this Plan or any payments to any Participant hereunder, including, without limitation, under Sections 280G or 409A of the Code, or other Code provisions.  Each Participant, by agreeing to be bound by the terms of this Plan and executing and delivering a Notice of Award Form, shall be deemed to have waived any claim against the Company and the Board with respect to any such tax, economic or legal consequences.

      **5.9**    **Section 409A**.  The Company intends that the Plan and the benefits provided hereunder be exempt from or comply with the requirements of Section 409A of the Code to the maximum extent possible, whether pursuant to the short-term deferral exception described in Treasury Regulation Section 1.409A-1(b)(4) or otherwise.  To the extent Section 409A of the Code is or may be applicable to the Plan and the benefits provided hereunder, the Company intends that the Plan comply with the deferral, payout and other limitations and restrictions imposed under Section 409A of the Code, including, without limitation, the change in control event provisions of Treasury Regulation Section 1.409A-3(i)(5)(iv).  Notwithstanding any provision in the Plan to the contrary, the Plan shall be interpreted, operated and administered in a manner consistent with such intentions.

      **5.10**    **Payment Obligation**.  Bonus Amounts shall be paid by the Company except where the Buyer agrees to make all payments required hereby and assume all obligations of the Company under this Plan.

## SECTION 6 - ADMINISTRATION

      **6.1**    **Plan Administration**.  Except as otherwise specifically set forth in this Plan, the Board has full discretionary power and authority to (a) construe and interpret this Plan and awards granted hereunder, to establish, amend and rescind such rules and regulations as it may deem appropriate for the proper administration of this Plan; (b) determine in each case the terms and provisions which shall apply to a particular award grant, including, without limitation,

eligibility for benefits and amount of benefits; (c) correct any defect, supply any omission or reconcile any inconsistency in this Plan or award grant in the manner and to the extent they shall, in their discretion, consider expedient; and (d) make all other determinations which are necessary or desirable for the proper administration of this Plan.  The Board may, from time to time, delegate any right, power or duty with respect to the operation and administration of the Plan to one or more committees or individuals.

      **6.2    Decisions of the Board**.  Decisions of the Board made in good faith upon any matter within the scope of its authority shall be final, conclusive and binding upon all persons, including Participants and their legal representatives or Beneficiaries.

## SECTION 7  - AMENDMENT AND TERMINATION

      **7.1    Plan Amendment**.  The Board may amend this Plan at any time in its sole discretion.  Any amendment must be made in writing; no oral amendment will be effective.

      **7.2    Plan Termination**.  The Board may terminate or amend this Plan at any time.  No termination or amendment of the Plan shall adversely affect any Participant in any material respect without the consent of the Participant, unless such termination or amendment affects all Participants in the same or substantially similar manner, in which case such termination or amendment shall require the consent of Participants holding at least a majority   of the then granted Bonus Percentages, or is required or necessary to comply with applicable law, regulation or rule, in which case no consent shall be required.  This Plan will terminate automatically upon the earliest of (a) the closing of the Company's initial public offering of shares of Common Stock pursuant to a registration statement filed under the Securities Act of 1933, as amended, (b) upon the closing of any Company Transaction, provided that this Plan will continue with respect to any Bonus Amounts payable in respect of such Company Transaction for a period of 30 days following the date that all Bonus Amounts in respect of such Company Transaction have been distributed under this Plan, or (c) dissolution of the Company or cessation of its operations.

## SECTION 8  - MISCELLANEOUS

      **8.1    No Liability**.  No member of the Board and no officer or employee of the Company shall be liable to any person for any action taken or omitted in connection with the administration of this Plan unless attributable to such person's own fraud or willful misconduct; nor shall the Company be liable to any person for any such action unless attributable to fraud or willful misconduct on the part of a director, officer or employee of the Company.

      **8.2    No Trust**.  Nothing contained in this Plan and no action taken pursuant to the provisions of any related agreements shall create or be construed to create a trust of any kind. No property which may be acquired or invested by the Company in connection with this Plan shall be deemed to be security for the obligations to participants hereunder, but shall be, and continue for all purposes to be, a part of the general funds of the Company.  The right of Participants to receive payment from the Company under this Plan shall be no greater than the right of any unsecured general creditor of the Company.

**8.3     Discharge**.  The payment of any Bonus Amount under this Plan to a Participant or Beneficiary shall fully and completely discharge the Company from all further obligations under this Plan and the Notice of Award Form with respect to the Participant and Beneficiary.

**8.4     Plan Benefits are not Assignable**.  Except as provided in Section 5.4, the rights of a Participant to Plan benefits are not subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, attachment or garnishment by creditors of the Participant or Beneficiary, and any attempt to assign, pledge or encumber that interest shall be void.

**8.5     Attorneys' Fees**.  If the Company, any Participant, any Beneficiary, and/or a successor in interest to any of the foregoing, brings legal action to enforce any of the provisions of this Plan, the prevailing party in such legal action shall be reimbursed by the other party, the prevailing party's costs of such legal action including, without limitation, reasonable fees of attorneys, accountants and similar advisors and expert witnesses.

**8.6     Successors and Assigns**.  The terms and conditions of this Plan shall inure to the benefit of and bind the Company and the Participants, and their successors, assigns and personal representatives.

**8.7     No Third Party Beneficiaries**.  Except as specifically provided herein, this Plan is not intended to confer upon any person, other than the Company, the Participants, the Beneficiaries and their respective successors and permitted assigns, any rights or remedies hereunder.

**8.8     Confidentiality**.  This Plan is a special compensation program adopted by the Board solely for the benefit of certain employees, directors and agents of the Company who are designated as being eligible to participate in the Plan.  Each Participant and Beneficiary has an affirmative obligation to maintain the confidentiality of the terms and conditions this Plan and of his or her participation in this Plan, including the fact of his or her participation in this Plan and his or her bonus allocation amount, except where disclosure is necessary on a "need-to-know" basis to the participant's spouse, attorney and tax or financial advisor, or others with a need to know, who, in turn, shall be advised by such participant that they may not disclose or communicate the terms and conditions of the participant's participation in this Plan.

**8.9     No Vested Rights**.  Except as otherwise provided herein or in a Participant's Notice of Award Form, no individual shall have a vested right to any benefit or payment under this Plan until the occurrence of a Triggering Event.

**8.10     Entire Agreement**.  This Plan constitutes the entire understanding and agreement with respect to the subject matter contained herein, and there are no agreements, understandings, restrictions, representations or warranties among any Participant and the Company other than those as set forth or provided for herein.

**8.11     Governing Law**.  This Plan constitutes an agreement, and any disputes arising under this Agreement will be governed by and construed in accordance with the laws of the state of Washington, without giving effect to any conflict of laws principle to the contrary.  Venue for any dispute arising under this Agreement will lie exclusively in the state or federal courts located

-10-

in Portland, Oregon, and any Participant or Beneficiary irrevocably waives any right to raise forum non conveniens or any other argument that Oregon is not the proper venue and hereby irrevocably consents to personal jurisdiction in the state and federal courts of the State of Oregon.

    **8.12    Section Headings**.  The headings contained in this document are for reference purposes only, and shall not affect the meaning or interpretation thereof.

[The remainder of this page is intentionally left blank.]

IN WITNESS WHEREOF, this MANAGEMENT CARVE-OUT PLAN has been executed effective as of the date first written above.

EARTH CLASS MAIL CORPORATION

By: _____
    STACEY L. LEE
    SECRETARY

## EXHIBIT A

### EARTH CLASS MAIL CORPORATION

### MANAGEMENT CARVE-OUT PLAN

### NOTICE OF AWARD FORM

Effective as of _____, 201__, _____ (the "**Participant**") has been granted the following Bonus Percentage pursuant to the Earth Class Mail Corporation (the "**Company**") Management Carve-Out Plan (the "**Plan**"):

The Participant's Bonus Percentage for purposes of determining the Participant's Bonus Amount attributable to a Company Transaction shall be:

**Company Transaction Bonus Percentage: _____%**

By their signatures below, the Company and the Participant agree that the Bonus Percentage and any Bonus Amounts are governed by this Notice and by the provisions of the Plan, a copy of which is attached to and made a part of this document. The Participant acknowledges receipt of a copy of the Plan, represents that the Participant has read and is familiar with its provisions.

EARTH CLASS MAIL CORPORATION      PARTICIPANT

By: _____     _____
         Name:                             *Signature*
         Title:

                                                         _____
                                                         *Print Name*

                                                         Address:

                                                         _____
                                                         _____

                                                         Date:

ATTACHMENT:      Management Carve-Out Plan.

**EARTH CLASS MAIL CORPORATION**

**MANAGEMENT CARVE-OUT PLAN**

**NOTICE OF AWARD**

Effective as of September 24, 2014, JAMES WILSON (the "**Participant**") has been granted the following Bonus Percentage pursuant to the Earth Class Mail Corporation (the "**Company**") Management Carve-Out Plan (the "**Plan**"):

The Participant's Bonus Percentage for purposes of determining the Participant's Bonus Amount attributable to a Company Transaction shall be:

> **Company Transaction Bonus Percentage:  45%.**  This is equivalent to 4.5% of the initial $2,774,915 ($124,871) of Closing Transaction Consideration and 7.2% of any Closing Transaction Consideration in excess thereof payable in respect of such Company Transaction.

By their signatures below, the Company and the Participant agree that the Bonus Percentage and any Bonus Amounts are governed by this Notice and by the provisions of the Plan, a copy of which is attached to and made a part of this document.  The Participant acknowledges receipt of a copy of the Plan, represents that the Participant has read and is familiar with its provisions.

EARTH CLASS MAIL CORPORATION         PARTICIPANT

By: _____      _____
        STACEY LEE                   *Signature*
        CFO
                                     James L. Wilson_____

                                     Address:
                                     _____
                                     _____

                                     Date:

ATTACHMENT:      Management Carve-Out Plan.

## EARTH CLASS MAIL CORPORATION

## MANAGEMENT CARVE-OUT PLAN

### NOTICE OF AWARD

Effective as of September 24, 2014, STACEY LEE (the "**Participant**") has been granted the following Bonus Percentage pursuant to the Earth Class Mail Corporation (the "**Company**") Management Carve-Out Plan (the "**Plan**"):

The Participant's Bonus Percentage for purposes of determining the Participant's Bonus Amount attributable to a Company Transaction shall be:

> **Company Transaction Bonus Percentage:  45%.**  This is equivalent to 4.5% ($124,871) of the initial $2,774,915 of Closing Transaction Consideration and 7.2% of any Closing Transaction Consideration in excess thereof payable in respect of such Company Transaction.

By their signatures below, the Company and the Participant agree that the Bonus Percentage and any Bonus Amounts are governed by this Notice and by the provisions of the Plan, a copy of which is attached to and made a part of this document.  The Participant acknowledges receipt of a copy of the Plan, represents that the Participant has read and is familiar with its provisions.

EARTH CLASS MAIL CORPORATION          PARTICIPANT

By: _____          _____
 JAMES L. WILSON                              *Signature*
 PRESIDENT, CEO
                                             Stacey L. Lee_____


                                             Address:
                                             _____
                                             _____

                                             Date:

ATTACHMENT:     Management Carve-Out Plan.

**EXHIBIT D - PAGE 15**

**EARTH CLASS MAIL CORPORATION**

**MANAGEMENT CARVE-OUT PLAN**

**NOTICE OF AWARD**

Effective as of September 24, 2014, CHARLES M. CLAY (the "**Participant**") has been granted the following Bonus Percentage pursuant to the Earth Class Mail Corporation (the "**Company**") Management Carve-Out Plan (the "**Plan**"):

The Participant's Bonus Percentage for purposes of determining the Participant's Bonus Amount attributable to a Company Transaction shall be:

>    **Company Transaction Bonus Percentage:  5%.**  This is equivalent to .5% of the initial $2,774,915 *($13,875)* of Closing Transaction Consideration and .8% of any Closing Transaction Consideration in excess thereof payable in respect of such Company Transaction.

By their signatures below, the Company and the Participant agree that the Bonus Percentage and any Bonus Amounts are governed by this Notice and by the provisions of the Plan, a copy of which is attached to and made a part of this document.  The Participant acknowledges receipt of a copy of the Plan, represents that the Participant has read and is familiar with its provisions.

EARTH CLASS MAIL CORPORATION        PARTICIPANT


By: _____        _____
    JAMES L. WILSON                 *Signature*
    PRESIDENT, CEO
                                    Charles M. Clay_____


                                    Address:
                                    _____
                                    _____

                                    Date:

ATTACHMENT:     Management Carve-Out Plan.

**EARTH CLASS MAIL CORPORATION**

**MANAGEMENT CARVE-OUT PLAN**

**NOTICE OF AWARD**

Effective as of September 24, 2014, DAVID SMITH (the "**Participant**") has been granted the following Bonus Percentage pursuant to the Earth Class Mail Corporation (the "**Company**") Management Carve-Out Plan (the "**Plan**"):

The Participant's Bonus Percentage for purposes of determining the Participant's Bonus Amount attributable to a Company Transaction shall be:

> **Company Transaction Bonus Percentage:  5%.**  This is equivalent to .5% of the initial $2,774,915 *($13,875)* of Closing Transaction Consideration and .8% of any Closing Transaction Consideration in excess thereof payable in respect of such Company Transaction.

By their signatures below, the Company and the Participant agree that the Bonus Percentage and any Bonus Amounts are governed by this Notice and by the provisions of the Plan, a copy of which is attached to and made a part of this document.  The Participant acknowledges receipt of a copy of the Plan, represents that the Participant has read and is familiar with its provisions.

EARTH CLASS MAIL CORPORATION          PARTICIPANT

By: _____          _____

      JAMES L. WILSON                        *Signature*
      PRESIDENT, CEO
                                              David D. Smith_____


                                        Address:
                                        _____
                                        _____

                                        Date:

ATTACHMENT:       Management Carve-Out Plan.