M. Vivienne Popperl, OSB #853055
Office of the United States Trustee
620 SW Main Street, Suite 213
Portland, OR 97205
Telephone: (503) 326-7656

Attorney for Gail Brehm Geiger, Acting United States Trustee for Region 18

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF OREGON

| | |
|---|---|
| In re | Case No. 15-30982-tmb11 |
| Earth Class Mail Corporation, | UNITED STATES TRUSTEE'S OBJECTION TO ASSUMPTION OF EMPLOYMENT AGREEMENTS AND MANAGEMENT CARVE-OUT PLAN |
| Debtor. | |

The Acting United States Trustee for Region 18, Gail Brehm Geiger ("UST"), by and through Trial Attorney M. Vivienne Popperl, objects to the assumption of employment agreements and Management Carve-Out Plan included in the debtor's motion for orders (1) scheduling an auction for the sale of substantially all assets of the debtor free and clear of liens and other interests and related relief including authorizing the interim distribution from sale proceeds (the "Sale Motion") (Doc. #37) because the debtor has not met its burden that the contracts which include payments pursuant to the Management Carve-Out Plan meet the requirements of 11 U.S.C. § 503(c).

### Factual Background

On February 27, 2015, Earth Class Mail Corporation, the debtor in possession (the

"Debtor") filed for protection under chapter 11 of the United States Bankruptcy Code. On March 20, 2015, the Debtor filed the Sale Motion to ratify the asset purchase agreement ("APA") which the Debtor and the proposed buyer, Delivered.IO, Inc. (the "Buyer") entered into on or about February 13, 2015, two weeks before the Debtor filed its case. The Debtor's filing of a chapter 11 case was one of the Buyer's pre-requisites for the purchase. The purchase price is $5,000,000 subject to certain adjustments.

On April 6, 2015, the Court held a hearing on the Sale Motion and determined to enter an order approving the sale procedures, authorizing an auction on June 2, 2015, and scheduling a hearing on the sale on June 4, 2015. The court directed that any objections to the proposed assumption of employment contracts be filed on or before April 15, 2015.

The APA attached to the Sale Motion includes the assignment by the Debtor and assumption by the Buyer of certain contracts listed in Schedule 1.5(a), including the employment agreements dated September 24, 2014 by and between the Debtor and James Wilson, President and COO of the Debtor, ("Wilson") and Stacey Lee, the Debtor's CFO ("Lee"). Paragraph 15 of the proposed order authorizing the sale permits interim distribution from the proceeds of the sale to pay amounts due under the Management Carve-Out Plans described in Section 6 of the Motion. Exhibit D to the Sale Motion is a copy of the Management Carve-Out Plan which provides in its preamble:

> Earth Class Mail Corporation (the "Company") hereby establishes this Management Carve-Out Plan (this "Plan") effective as of September 24, 2014 (the "Effective Date"). … This Plan supersedes and replaces the Management Carve-Out Plan which was approved by the Company's Board of Directors in 2009.

*Sale Motion*, Exhibit D-page 1.

At the meeting of creditors held on March 27, 2015, Lee testified that the Management Carve-Out Plan was established many years ago by the Debtor's founder. She and Wilson were not named participants until September 24, 2014, at which time the Debtor's Board of Directors (the "Board") wanted her and Wilson to focus on selling the company. Apparently, prior to September 24, 2014, Wilson and Lee did not have employment contracts with the Debtor. [1] At the meeting of creditors, Lee testified that no one had ever benefited from the Management Carve-Out because the Debtor had never experienced a sale transaction or other form of "liquidity event."

Wilson and Lee each signed almost identical employment agreements. *See Exhibits* 1 and 2. They also signed each other's employment agreements on behalf of the Debtor. The employment agreements describe severance payments payable to Wilson and Lee in the event either one is terminated by the Debtor without cause, other than in the event of a wind-down or acquisition of the company in connection with which the employee is hired by the acquiring company. The Sale Motion provides that Wilson and Lee will be hired by the Buyer.

The employment agreements reference a compensation package, attached as Schedule A which includes a description of basic salary, bonuses as awarded by the Board, medical insurance, retirement, leave, expense reimbursements and the Management Carve-Out Plan Allocation. The Management Carve-Out Plan Allocation

---

[1] Wilson has been President and COO of the Debtor since December 2007 or January, 2008. Lee has been CFO of the Debtor since 2009. She started with the Debtor as controller in November, 2007.

referenced in Schedule A to the employment agreements provides that Wilson and Lee

will each be entitled to "an allocation of a portion of the Management Carve-Out Plan to

be approved by the Board in an amount equal to 45% of the total bonus amount payable

under the Management Carve-Out Plan." *Exhibits* 1 and 2*, Schedule A*, *Management*

*Carve-Out Plan Allocation*.

The Management Carve-Out Plan Allocation included in Schedule A to the

Employment Contracts further provides:

> Notwithstanding any requirement in the Management Carveout(sic) Plan that an employee must be employed by the Company on the date the Company is sold acquisition (sic) in order to be entitled to participate in any related bonus payable under the Plan, *if Employee is terminated by the Company without "Cause" prior to a transaction in which a bonus amount is payable to participants under Management Carveout(sic) Plan (a) if such termination of Employee occurs within the 90-day period prior to the closing of such transaction, Employee will be entitled to participate in the Management Carveout(sic) Plan to the extent of 100% of her percentage allocation, and (b) if such termination of Employee occurs within the 91-180-day period prior to the closing of such transaction, Employee will be entitled to participate in the Management Carveout(sic) Plan to the extent of 50% of her percentage allocation.* If such transaction occurs more than 180 days after such termination, Employee will not be entitled to share any portion of amounts that may be payable under the Management Carveout(sic) Plan. (Emphasis added).

*Exhibits* 1 and 2, Schedule A.

The Management Carve-Out Plan attached as Exhibit D to the APA describes the

"Closing Bonus Fund Payments" as follows:

> The Closing Bonus Fund with respect to any applicable Triggering Event shall be equal to in the case of a Company Transaction, 10% of the initial $2,774,915 of Closing Transaction Consideration and 16% of any Closing Transaction Consideration in excess thereof payable in respect of such Company Transaction.

*Sale Motion*, Exhibit D-page 5, Sec. 4.1(a).

Also attached to the Sale Motion are identical "Notices of Award" to Wilson and Lee providing that effective as of September 24, 2014, the bonus percentage for each of them for purposes of determining their bonus amounts attributable to a Company Transaction shall be 45%, equivalent to 4.5% ($124,871) of the initial $2,774,915 of consideration and 7.2% of any consideration in excess thereof. [2]

At the meeting of creditors Lee testified that both she and Wilson regularly received performance bonuses approved by the Board in the year preceding their payment. They received bonuses twice yearly until the third quarter of 2014, after which they received bonuses quarterly for the remainder of 2014. Lee testified that as of February 2015, they receive the bonuses monthly.

Lee also testified at the meeting of creditors that she was not looking for another job and had received no job offers. She did not know whether Wilson was looking for another job or had received any job offers.

The Sale Motion provides that the Buyer will assume the employment agreements with Wilson and Lee, and that the proposed bonuses payable to Wilson and Lee pursuant to the Management Carve-Out Agreement were adopted by the Board

> to *provide an incentive* to certain officers, directors, employees and consultants *to contribute to the performance of the Debtor's business prior to any sale of the business*. The Debtor believes this bonus plan was necessary t*o retain key individuals*, and to maximize the going concern value of the Debtor (emphasis added).
> *Sale Motion*, p. 6.

---

[2] Two other individuals, Charles M. Clay and David Smith received Notices of Award of 5%, described as "equivalent to .5% of the initial $2,774,915 ($13,875) of Closing Transaction Consideration and .8% of any Closing Transaction Consideration in excess thereof," Sale Motion, Exhibit D, pp. 16, 17.

**Legal Analysis**

**Section 503(c) prohibits a debtor's payment of retention bonuses to insiders unless (a) the insider has a bona fide offer of employment at the same or higher pay, (b) the insider's services are essential to the business's survival, and (c) the bonus meets certain economic limits; and incentive plans are allowed only if they are tied to the insider's performance.**

Section 503(c) of the Bankruptcy Code provides, in relevant part, that:

Notwithstanding subsection (b), there shall neither be allowed, nor paid-

(1)  a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business, absent a finding by the court based on evidence in the record that-

   (A)    the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;

   (B)   the services provided by the person are essential to the survival of the business; and

   (C)    either-
       (i)    the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to  nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or

       (ii)   if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred;

(2)  a severance payment to an insider of the debtor, unless-

(A)    the payment is part of a program that is generally applicable to all full-time employees; and

(B)    the amount of the payment is not greater than 10 times the amount of the mean severance pay given to nonmanagement employees during the calendar year in which the payment is made; or

(3)  other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

11 U.S.C. § 503(c).

Section 503(c), which was added as part of the 2005 Bankruptcy Abuse Prevention and Consumer Protection Act, was intended to "eradicate the notion that executives were entitled to bonuses simply for staying with the [c]ompany through the bankruptcy process." *In re Velo Holdings, Inc*., 472 B.R. 201,209 (Bankr. S.D.N.Y. 2012) *cited with approval in In re AMR Corp*., 490 B.R. 158, 165 (Bankr. S.D.N.Y. 2013).   Section 503(c) was intended to curtail payments of retention incentives or severance to insiders, including bonuses, without factual or circumstantial justification. *See In re Journal Register Co*.,  407 B.R. 520, 536 (Bankr. S.D.N.Y. 2009).   The effect of section 503(c) was to put in place a series of challenging standards and high hurdles for debtors to overcome before retention bonuses could be paid.  *In re Global Home Prods., LLC*, 369 B.R. 778-85 (Bankr. D. Del. 2007).

Section 503(c) establishes specific evidentiary standards that must be met before a bankruptcy court may authorize payments made to an insider for the purpose of inducing such person to remain with a debtor's business or payments made on account of

severance.  *In re Dana Corp.*, 351 B.R. 96, 100 (Bankr. S.D.N.Y. 2006)("*Dana I*");  11

U.S.C. § 503(c)(1).  These amendments make it clear that if a proposed transfer falls

within Section 503(c)(1) or (c)(2) then the business judgment rule does not apply,

irrespective of whether a sound business purpose may actually exist.  *Id*.

**The Management Carve-Out Plan is described as both an incentive and retentive plan and it fails as both.**

The Sale Motion describes the Management Carve-Out Plan as both an incentive

plan and a retention plan.  *See Sale Motion*, p. 6.  If the Management Carve-Out Plan is

an incentive plan it does not incentivize employees by requiring them to meet

performance bench marks for their post-petition work.  If it is a retentive plan it does not

meet the specific requirements set forth in § 503(c)(1).

A true key employee incentive plan ("KEIP") should incentivize employees for

their post-petition efforts, not reward them for work they did prior to the debtor's

bankruptcy filing.  *In re Residential Capital, LLC*, 478 B.R. 154 (Bankr. S.D.N.Y. 2012).

If the only thing that the KEIP participant needs to do to receive compensation under the

agreement is to remain with the business until the closing of the asset sale, the KEIP is

not an incentive plan.  Rather, it is a key employee retention plan ("KERP")  and subject

to the specific stringent requirements set forth in 11 U.S.C. §503(c)(1).  *Id*. at 172;  *In re

Velo Holdings, Inc*., 472 B.R. 201, 209-210 (Bankr. S.D.N.Y. 2012).

To show that a KEIP is an incentive rather than a retentive plan so as to be subject

to the more lenient statutory requirements for KEIPs, Chapter 11 debtors must establish,

by a preponderance of the evidence, that the proposed plan is a "pay for value" plan that

offers incentives based on performance, rather than a "pay to stay" plan. *Residential Capital, supra,* 478 B.R. at 170; *citing with approval*, *Global Home Prods.,supra,* 369 B.R. at 784.

The evidence developed to date is that the Management Carve-Out Plan was established years ago.  No executive has ever benefited from it. Wilson and Lee and the other two individuals were not participants until September 24, 2014.

The APA for the sale of substantially all of the assets of the company was signed approximately two weeks before the Debtor filed its Chapter 11 case.  The minimum sale price is set.  The only requirement for Wilson, Lee and the other participants to receive payment under the Management Carve-Out Plan is to remain with the Debtor until the sale closes.  (If they are terminated without cause they may still benefit from Management Carve-Out Plan, depending on the time elapsed between their termination and the sale closing.)

The Debtor has not provided any evidence of benchmarks or performance triggers other than the requirement to remain with the Debtor which Wilson and Lee must fulfill in order to receive payment under the Management Carve-Out Plan.  The Management Carve-Out Plan is a prohibited "pay to stay" plan rather than a "pay for value" plan.

If the Management Carve-Out Plan is a retention plan it does not comply with § 503(c)(1).  To satisfy the requirements of § 503(c)(1) as a retention plan, the Debtor must show (1) that the individual receiving the payments has a bona fide job offer from another business at the same or greater rate of compensation, (2) that the services of the

individual are essential to the survival of the business, and (3) that the payment is (i) not greater than 10 times the amount of a similar transfer given to non-management employees during the same calendar year, or (ii) if no such transfers occurred in the calendar year, not greater than 25% of any similar transfer incurred for the benefit of the insider during the prior calendar year.

The Management Carve-Out Plan does not fulfil the elements of a retention plan set forth in § 503(c)(1).  First,  Lee testified that she was not looking for another job and had not received an offer of alternative employment.  She did not know whether Wilson was looking for another job or had received an offer for alternative employment.  Wilson, Lee and the two other potential recipients of payments under the Management Carve-Out Plan will be employed by the Buyer.  The § 503(c)(1)(A) element does not appear to be met.

Second, the Debtor has not made an evidentiary record that the services of the proposed recipients of payments under the Management Carve-Out Plan are essential to the Debtor's business as required by § 503(c)(1)(B).  Third, the Debtor has not made an evidentiary record that the amount of the proposed payments are within the parameters set forth in § 503(c)(1)(C).  The payments pursuant to the Management Carve-Out Plan do not appear to meet the elements set forth in § 503(c)(1)(B) and (C).

The evidence in the record to date supports a conclusion that the Management Carve-Out Plan does not comply with § 503(c)(1).  The Management Carve-Out Plan cannot be characterized as a retentive plan.

**The Debtor has not provided evidence showing that payments under the Management Carve-Out Plan are severance payments permissible under § 503(c)(2)**

Section 503(c)(2) prohibits payment of severance plans to an insider of the debtor unless the payment is part of a program generally applicable to all full-time employees and the amount of the payment is not greater than 10 times the mean severance pay given to nonmanagement employees during the same calendar year. The evidence in the record tends to support a finding that the proposed payments pursuant to the Management Carve-Out Plan are not severance payments. The Buyer is proposing to hire Wilson, Lee, and the other two individuals who are participants in the Management Carve-Out Plan. They are not being terminated. The employment contracts provide for severance payments if terminated without cause and not in connection with a wind-down or acquisition pursuant to which the employee is hired. *See Exhibits* 1 and 2, Employment Agreements, par. 3.2.

There is no evidence in the record that the Debtor has a severance program generally applicable to all full-time employees and that the amount of the proposed payments under the Management Carve-Out Plan is not greater than 10 times the amount of mean severance pay given to nonmanagement employees in 2015. 11 U.S.C. § 503(c)(2). If the Debtor attempts to characterize payments pursuant to the Management Carve-Out Plan as severance payments, the Debtor has failed to show that they comply with the requirements of § 503(c)(2).

**Payments under the Management Carve-Out Plan are transfers out of the ordinary course of business and not justified by the facts and circumstances of the case.**

Section 503(c)(3) prohibits payments to insiders outside the ordinary course of business and not justified by the facts and circumstances of the case. Lee testified that no-one had ever benefited from the Management Carve-Out Plan and that the four possible recipients of payments pursuant to the Plan were not included in it until September, 2014. Therefore, payments under the Plan are transfers out of the ordinary course of business.

The proposed payments are not justified by the facts and circumstances of the case. Wilson and Lee have been employed by the Debtor for over seven years. The auction, if any, is slated to occur on June 2, 2015, with a final hearing on the Sale Motion on June 4, 2015. The sale is likely to close shortly thereafter, a mere three and a half months since the filing of the chapter 11 case.

The Debtor signed the APA two weeks before it filed the Chapter 11 case on February 27, 2015. Wilson and Lee are to be employed by the Buyer. They are receiving regular performance bonuses as approved by the Board in accordance with their employment contracts. There is no justification for paying them additional amounts as called for under the Management Carve-Out Plan.

## Conclusion

Based on the foregoing, the United States Trustee requests that the court determine that the Management Carve-Out Plan violates 11 U.S.C. § 503(c) and that the Debtor's assumption of the employment contracts to the extent that they call for payments under the Management Carve-Out Plan is denied.

DATED this 15th day of April, 2015.

Respectfully submitted,
GAIL BREHM GEIGER
Acting United States Trustee for Region 18

/s/ M. Vivienne Popperl
M. Vivienne Popperl, OSB #853055
Trial Attorney

# EMPLOYMENT AGREEMENT

EMPLOYMENT AGREEMENT is dated effective as of _Sept 24_ , 2014 (the "Effective Date"), between EARTH CLASS MAIL CORPORATION, an Oregon corporation (the "Company"), and JAMES WILSON ("Employee")

## RECITALS

A.    Employee is currently employed as the President and COO of the Company.

B.    The Company has determined that this Agreement will help to reinforce and encourage the Employee's continued attention and dedication to the Company.

C.    The Employee is willing to continue to make his services available to the Company on the terms and conditions hereinafter set forth.

## AGREEMENT

NOW, THEREFORE, for and in consideration of the foregoing premises and mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## SECTION 1. NATURE OF EMPLOYMENT

### 1.1    Title; Duties

The Company hereby employs Employee on a full-time basis as President and COO in accordance with the terms of this Agreement. During the term of Employee's employment under this Agreement, Employee will report to the Board and will perform such duties and exercise such powers, authorities and discretions in relation to the Company as are applicable to the title of President and COO, and/or as may otherwise be established by, and subject always to the discretion and control of, the Board of Directors. The Board may at any time require Employee to cease performing or exercising any particular power, authority or discretion delegated to Employee.

### 1.2    Attention to Business; Loyalty

Employee accepts such employment, agrees to abide by the decisions of the Board, and acknowledges and agrees that Employee will (a) will devote Employee's full time and attention to the performance of Employee's duties under this Agreement, (b) comply with the reasonable instructions, policies, and rules that the Company may establish from time to time, and (c) discharge Employee's duties to the best of Employee's ability, in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner Employee reasonably believes to be in the best interests of the Company. Employee agrees and understands that Employee owes the Company fidelity

circumstances, and in a manner Employee reasonably believes to be in the best interests of the Company. Employee agrees and understands that Employee owes the Company fidelity and loyalty during the term of this Agreement and will not perform similar duties in any other capacity for any other person or entity, or otherwise engage in any outside professional, business, or charitable activities that would materially interfere with the performance of Employee's duties under this Agreement, in any case, without the prior written consent of the Board.

## SECTION 2.  COMPENSATION AND BENEFITS

During the term of this Agreement, Employee shall be compensated solely in accordance with the terms of Schedule A hereof (the "Compensation Package"). If Employee, during the term of this Agreement, receives any compensation in excess of the Compensation Package, the payment of such increased compensation shall not be deemed to be an amendment to this Agreement and may be discontinued at any time without cause.

## SECTION 3.  TERM OF AGREEMENT AND TERMINATION

### 3.1  Term

The initial term of this Agreement shall be for a period of one (1) year commencing on the date first set forth above, which term shall, unless sooner terminated in the manner provided herein, automatically renew for additional one (1)-year terms on an annual basis thereafter unless terminated in writing by either party not later than 90 days prior to the end of the then current term (the "Term"). Unless otherwise agreed in writing by the parties, any further employment with the Company following the expiration of the Term of this Agreement will be on an at-will basis and may be terminated by either party at any time with or without cause, in any case, subject to the terms of Section 3.2 below with regard to any termination of Employee without cause.

### 3.2  Termination by the Company Without Cause; Acquisition of the Company

(a)  **Termination by the Company**. The Company may terminate Employee's employment, and this Agreement, without cause at any time upon ten (10) days prior written notice to Employee. In such event, unless (i) the Board determines that such termination is occurring in connection with a wind down of the Company, or (ii) the termination occurs in connection with an Acquisition of the Company in connection with which Employee is hired by the acquiring entity (or an affiliate thereof), Employee will be entitled to receive (A) severance payments in an amount equal to Employee's then current Base Salary amount, and payable on the applicable dates that such Base Salary would be payable to Employee following the date of such termination ("Severance Payments"), and (B) to the extent properly (and timely) elect COBRA continuation coverage under the Company's group health plans, reimbursement for the cost of the premiums for such coverage paid by Employee (not to exceed the amount being paid by the Company for Employee's health insurance as of the date of termination) ("COBRA Payments"), in each case, for a period of six (6) months after

the date of termination, provided that such COBRA Payments shall end effective on the date Employee becomes eligible for health insurance through a subsequent employer.

      (b)    **Termination by Acquiring Entity**.  If following an Acquisition of the Company Employee is hired by the acquiring entity (or an affiliate thereof) and is thereafter terminated without Cause prior to the later of (i) the first anniversary of the date of this Agreement, or (ii) the datethat is six (6) months after the date of the Acquisition of the Company, Employee will be entitled to receive (A) Severance Payments in an amount equal to Employee's Base Salary amount immediately prior to the date of closing of such Acquisition, and payable on the applicable dates that such Base Salary would be payable to Employee following the date of such termination ("Severance Payments"), and (B) to the extent properly (and timely) elect COBRA continuation coverage under the Company's group health plans, reimbursement for the cost of the premiums for such coverage paid by Employee (not to exceed the amount being paid by the Company for Employee's health insurance as of the date of termination) ("COBRA Payments"), in each case, up to the later of (1) the first anniversary of the date of this Agreement, or (2) the date this is six (6) months after the date of the Acquisition of the Company, provided that such COBRA Payments shall end effective on the date Employee becomes eligible for health insurance through a subsequent employer.  For purposes of this Agreement, the term "Acquisition of the Company" means (i) an acquisition of the Company by another entity by means of merger, consolidation, statutory share exchange or other transaction or series of related transactions resulting in the exchange of the outstanding shares of the Company for securities of or consideration issued, or caused to be issued, by the acquiring entity or any of its affiliates, or (ii) the Company's sale, lease or other disposition of all or substantially all of its assets; provided that, in either case, after such transaction the shareholders of the Company immediately prior to such transaction own less than a majority of the outstanding voting equity securities of the surviving or transferee entity immediately following such transaction, and in any case unless such transaction occurs in connection with a wind down of the Company.  Furthermore, a voluntarily termination of employment by Employee after an Acquisition of the Company shall be deemed to constitute a termination of Employee without cause under this Section 3.2(b) if within 60 days prior to Employee's voluntary termination one of the following events has occurred:  (i) a reduction in Employee's Base Salary, unless such reduction applies generally to the class of employees of which Employee is a part; (ii) a material reduction in the kind or level of non-monetary benefits Employee is entitled to receive, unless such reduction applies generally to the benefits class of which Employee is a part; (iii) a material reduction in Employee's duties and responsibilities; or (iv) a forced relocation of Employee's principal workplace to a location more than 25 miles outside of the Portland metropolitan area and which causes an unreasonable burden upon Employee; provided that none of the foregoing will be deemed a "termination of the Employee by the Company without cause" unless (A) Employee notifies the acquiring entity in writing of Employee's assertion that such action constitutes grounds for Employee to terminate her employment under this Section 3.2(b), which notice shall be delivered within 30 days after Employee becomes aware of such action, and (B) such entity fails to reverse such action or to otherwise remedy the matter in a manner reasonably acceptable to Employee within 30 days after receipt of such written notice.

(c)     The Company's obligations to make the foregoing Severance Payments and COBRA Payments, if any, together with any Management Carveout Plan bonus that may be payable to Employee, are expressly conditioned upon Employee's compliance with the terms of this Agreement (including, without limitation, Section 4 below), and any other agreements Employee may have with the Company, and upon Employee's execution of a severance agreement and a valid waiver and release of claims against the Company (and acquiring entity, if applicable), and their affiliates in form and substance satisfactory to the Company. Furthermore, the foregoing Severance Payments and COBRA Payments, if any, together with any Management Carveout Plan bonus that may be payable to Employee, shall constitute the full liquidated damages to which Employee shall be entitled as an employee of the Company. Employee agrees that, as an employee, Employee will not be entitled to any other remedy at law or in equity, including, without limitation, general, special, punitive or exemplary damages and/or injunctive relief.  Notwithstanding the foregoing, after such notification is given and through the end of the ten (10)-day notice period, Employee shall, if requested by the Company, continue to render the services required under this Agreement.

### 3.3     Termination by Employee Without Cause

Employee may terminate Employee's employment, and thus this Agreement, upon thirty (30) days prior written notice to the Company.  In such event, after such notification is given and through the end of the thirty (30)-day notice period, Employee, if requested by the Company, will continue to render the services required under this Agreement and will be compensated in accordance with the Compensation Package then in effect, up to the date of termination.  Employee shall not be entitled to any Severance Payments, Management Carve-Out Plan or other bonus payment or any other payments upon or following such termination.

### 3.4     Termination With Cause

(a)     The Company may terminate Employee's employment, and thus this Agreement, for "Cause" at any time upon written notice of such termination to Employee. For purposes of this Agreement, "Cause" shall mean Employee's (i) failure or refusal to observe or perform any duty or obligation of Employee under this Agreement or any other agreements entered into by Employee with the Company, (ii) failure to comply with any policy or procedure of the Company currently in effect or as may be adopted or modified by the Company from time to time, which failure adversely affects the Company in any material respect, (iii) commission of any act of fraud, misappropriation, embezzlement or theft, breach of fiduciary duty involving personal profit, or other acts of dishonesty, alcoholism, drug addiction or dependency, (iv) conviction of, or guilty plea or plea of nolo contendere to, any crime of moral turpitude or crime punishable as a felony, (v) gross negligence or willful misconduct in connection with or related to the business of the Company; (vi) gross neglect of duties and responsibilities to the Company, including, without limitation, material deviation from the business plan adopted in good faith by the Board; or (vii) commission of any other action that could reasonably be expected to have a material adverse effect upon such individual's ability to perform Employee's duties, or other actions or occurrences that otherwise adversely affect the interests of the Company; provided, that prior to terminating Employee in accordance with (i), (ii), (v), (vi) or (vii) above, Company shall first have

notified such individual in writing of such breach and, if such breach is capable of being cured, given such individual thirty (30) days to cure the breach.

(b)     If Employee's employment is terminated for Cause in accordance with this Section 3.4, Employee's right to compensation and benefits set forth on Schedule A shall immediately terminate and/or cease to accrue and Employee shall have no right to Severance Payments, Management Carve-Out Plan or other bonus payment(s) or any other payments or benefits; provided, that the Company will pay Employee for all accrued and unpaid salary and benefits payable under this Agreement to such date of termination. In addition, termination of Employee's employment for Cause will not terminate or extinguish Employee's obligation or liability to pay to the Company any amounts owed by Employee, including, without limitation, any amounts misappropriated or obtained by Employee by reason of any of the occurrences referred to in this Section 3.4, without prejudice to any other rights or remedies of the Company at law or in equity.

### 3.5     Termination upon Death of Employee

This Agreement will automatically terminate in the event of Employee's death. Upon such termination, the Company will pay Employee's estate or beneficiaries, all accrued and unpaid salary and benefits in accordance with the terms of the Compensation Package as then in effect through the date on which Employee's death occurs.

### 3.6     Termination upon Total Disability of Employee

In the event of Employee's "Total Disability," which shall be defined as any illness or mental or physical incapacity or disability which prevents Employee from performing Employee's normal duties for a continuous period exceeding six (6) months or for shorter periods aggregating six (6) months within any consecutive twelve (12) month period (in any case, even after reasonable accommodation), the Company may terminate Employee's employment under this Agreement (subject to the terms of the Americans with Disabilities Act and other applicable laws). Upon such termination, Employee, or Employee's estate, will be paid all accrued and unpaid salary and benefits in accordance with the terms of the Compensation Package as then in effect through the date on which such termination occurs.

### 3.7     Effect of Termination

If this Agreement is terminated for any of the reasons set forth in this Section 3, Employee will be subject to all restrictions provided for in Section 4 of this Agreement. The provisions of Sections 3, 4, and 5 will survive the termination or expiration of this Agreement.

### 3.8     Section 409A

The Company makes no representations or warranties to Employee with respect to any tax, economic or legal consequences of this Agreement or any payments or other benefits provided hereunder, including without limitation under Section 409A of the Internal Revenue Code of 1986, as amended, and any regulations or guidance issued thereunder

("Section 409A"), and no provision of the Agreement shall be interpreted or construed to transfer any liability for failure to comply with Section 409A from Employee or any other individual to the Company or any of its affiliates. However, the parties intend that this Agreement and the payments and other benefits provided hereunder be exempt from the requirements of Section 409A to the maximum extent possible, whether pursuant to the short-term deferral exception described in Treasury Regulation Section 1.409A-1(b)(4), the involuntary separation pay plan exception described in Treasury Regulation Section 1.409A-1(b)(9)(iii), or otherwise. To the extent Section 409A is applicable to this Agreement (and such payments and benefits), the parties intend that this Agreement (and such payments and benefits) comply with the deferral, payout and other limitations and restrictions imposed under Section 409A. Without limiting the generality of the foregoing, and notwithstanding any other provision of this Agreement to the contrary, with respect to any payments and benefits under this Agreement to which Section 409A applies, all references in this Agreement to the termination of Employee's employment are intended to mean Employee's "separation from service," within the meaning of Section 409A(a)(2)(A)(i). Each installment of any severance payments and severance benefit, as applicable, shall be treated as a separate "payment" for purposes of Section 409A.

## SECTION 4. PROPRIETARY INFORMATION, INVENTION ASSIGNMENT, NON-COMPETITION AND NON-SOLICITATION AGREEMENT

Employee acknowledges and agrees that Employee entered into a Proprietary Information, Invention Assignment, Non-Competition and Non-Solicitation Agreement (the "Confidentiality Agreement") with the Company prior to or concurrently with the commencement of Employee's employment with the Company and that Employee is, and will continue to be, bound by the terms of such Confidentiality Agreement during the term of Employee's employment with the Company and thereafter.

## SECTION 5. General Matters

### 5.1  Compliance With Other Agreements

Employee represents and warrants that the execution, delivery and performance of this Agreement will not conflict with or result in the violation or breach of any term or provision of any order, judgment, injunction, contract, agreement, commitment or other arrangement to which Employee is a party or by which he is bound. Employee acknowledges that the Company is relying on his representation and warranty in entering into this Agreement, and Employee agrees to indemnify the Company from and against all claims, demands, causes of action, damages, costs or expenses (including, without limitation, reasonable attorneys' fees) arising from any breach thereof.

### 5.2  Governing Law

This Agreement shall be governed by, and construed in accordance with, the laws of the State of Oregon applicable to contracts made and to be wholly performed in Oregon by persons domiciled in Oregon, without regard to principles of conflict of laws.

### 5.3  Binding Effect

This Agreement will be binding upon and inure to the benefit of Employee and the Company and their respective permitted successors, heirs and assigns.

### 5.4  Entire Agreement; Amendments in Writing

This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and thereof and supersedes all prior agreements and undertakings, both written and oral, among the parties, or any of them, with respect to the subject matter hereof and thereof.  No amendment, modification, waiver, termination or discharge of any provision of this Agreement, or any consent to any departure by the parties from any provision hereof, shall in any event be effective unless the same shall be in writing and signed by the parties, and each such amendment, modification, waiver, termination or discharge shall be effective only in the specific instance and for the specific purpose for which given.  Notwithstanding the foregoing, the parties further agree that if a judicial or quasi-judicial entity declares the agreement invalid in whole or in part, it may modify the terms of the Agreement to give effect to the Agreement as modified.

### 5.5  Text to Control

The captions and headings of this Agreement are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

### 5.6  Reformation

The provisions and covenants contained herein are intended to be separate and divisible and if, for any reason, any one or more of such provisions or covenants should be held to be invalid and unenforceable in whole or in part, it is agreed that the same will not be held to affect the validity or enforceability of any other provisions and covenants of this Agreement.  In the event that any restriction set forth in this Agreement is determined by a court to be unenforceable with respect to scope, time or geographical coverage, Employee agrees that such a restriction should be modified and narrowed so as to provide the maximum protection of the Company's and the Company's legally protectable interests as described in this Agreement, and without negating or impairing any other restrictions or agreements set forth herein.

### 5.7  Reasonableness

Employee acknowledges that Employee has carefully read this Agreement and has given careful consideration to the restraints imposed upon Employee by this Agreement, and

is in full accord as to their necessity for the reasonable and proper protection of the Company's confidential and proprietary information. Employee expressly acknowledges and agrees that each and every restraint imposed by this Agreement is reasonable with respect to subject matter, time period and geographical area, except for mutually agreed upon modifications to this Agreement.

### 5.8    Notices

All notices, requests, demands, consents, approvals, declarations and other communications required by this Agreement shall be in writing, shall be in English and shall be deemed delivered (a) if given by facsimile, when transmitted and the appropriate telephonic confirmation received, (b) if given by first-class air mail (certified and return-receipt requested), when delivered, (c) if given personally, when delivered, and (d) if given by an internationally recognized overnight courier, when received or personally delivered, in each case, with all charges prepaid and addressed as follows, or to such other address as any party shall specify in a notice delivered to all other parties in accordance with this Section 5.8:

#### If to Employee:

at the address of Employee set
forth on the signature page hereto.

#### If to the Company to:

Earth Class Mail Corporation
9450 SW Gemini Drive #101
Beaverton, OR  97008-7105
Facsimile:  [(503) 914-1487]
Attention:  CFO

#### with a copy to:

Perkins Coie LLP
1120 NW Couch Street, 10th Floor
Portland, OR  97209
Facsimile:  503-727-2222
Attention:  Brentley M. Bullock

### 5.9    Assignment; Third Party Beneficiary

This Agreement shall be binding upon, and shall inure to the benefit of, the parties and each of their respective successors, heirs and assigns. Notwithstanding the foregoing, Employee may not assign or delegate any right or duty hereunder without the prior written consent of the Company. The Company may assign this Agreement and all rights hereunder, and delegate all duties hereunder, to any party with which or into which the Company merges

or consolidates, or to whom the Company may sell all or substantially all of the Company's assets.

### 5.10    Survival of Obligations and Provisions

The parties acknowledge and agree that the provisions under Sections 3, 4, and 5 survive the termination or expiration of this Agreement as well as the termination of Employee's employment relationship with the Company.

### 5.11    WAIVER OF JURY TRIAL

THE PARTIES HEREBY WAIVE, TO THE MAXIMUM EXTENT PERMITTED BY LAW, ANY RIGHTS TO TRIAL BY JURY AND AGREE NOT TO REQUEST A TRIAL BY JURY ON ANY CLAIMS, COUNTERCLAIMS OR CROSS-CLAIMS.

### 5.13    Execution in Counterparts; Facsimile

This Agreement may be executed in any number of counterparts, each of which, when so executed and delivered, shall be deemed to be an original, and all of which, taken together, shall constitute one and the same instrument.  Delivery of an executed signature page to this Agreement or any amendment, waiver, consent or supplement hereto or thereto, by facsimile transmission shall be as effective as delivery of a manually signed counterpart hereof.

[This space intentionally left blank]

IN WITNESS WHEREOF, the parties have duly executed and delivered this EMPLOYMENT AGREEMENT effective as of the Effective Date.

**EARTH CLASS MAIL CORPORATION**

By: _Stacy L Lee_

Name: _Stacey L. Lee_

Title: _CFO_

**EMPLOYEE:**

_James J Wilson_

JAMES WILSON

_President & COO_

Address:      4483 NW Chanticleer Dr
              APT I-4
              Portland, OR 97229

**SCHEDULE A**

**COMPENSATION PACKAGE**

1.      Salary.  During the Term, the Company will pay Employee a base salary
("Base Salary") of US $154,500 per annum (US $12,875 per month), payable in bi-weekly
installments, or more frequently at the Company's discretion.  All payments will be subject to
and will be paid net of all required foreign, federal, state and local withholdings.

2.      Bonus.  In addition to the Salary, during the Term, the Board will review
management's performance on a semi-annual basis and may award a bonus to Employee
(and/or other employees of the Company), in such amounts, if any, as the Board may
determine in its sole discretion.  Unless otherwise provided by the Board, no Bonus shall be
payable to Employee with respect to any period unless Employee is in the employ of
Company on the date of the payment of such Bonus.

3.      Management Carveout Plan Allocation.  Employee will be entitled to an
allocation of a portion of the Management Carveout Plan to be approved by the Board in an
amount equal to 45% of the total bonus amount payable under the Management Carveout
Plan.  Employee's rights with respect to the foregoing bonus amount allocation will at all
times be subject to the terms of the Management Carveout Plan as approved by the Board.

Notwithstanding any requirement in the Management Carveout Plan that an employee
must be employed by the Company on the date the Company is sold acquisition in order to
be entitled to participate in any related bonus payable under the Plan, if Employee is
terminated by the Company without "Cause" prior to a transaction in which a bonus amount
is payable to participants under the Management Carveout Plan (a) if such termination of
Employee occurs within the 90-day period prior to the closing of such transaction, Employee
will be entitled to participate in the Management Carveout Plan to the extent of 100% of her
percentage allocation, and (b) if such termination of Employee occurs within the 91- to 180-
day period prior to the closing of such transaction, Employee will be entitled to participate in
the Management Carveout Plan to the extent of 50% of her percentage allocation.  If such
transaction occurs more than 180 days after such termination, Employee will not be entitled
to share any portion of amounts that may be payable under the Management Carveout Plan.

4.      Medical Insurance, Retirement and Other Benefits.  During the Term,
Employee will be entitled to participate, to the extent Employee qualifies under the terms
thereof, in any employee benefit plans, including medical and life insurance and retirement
plans generally made available to employees, in any case, as specified in the Company's
Employee Handbook and other compensation and benefit communications, as the same may
be amended from time to time in the Company's sole discretion.

A-1

5.      Leave.  During the Term, Employee will be entitled to paid leave in accordance with Company's policies and practices.  A maximum of [25] days of unused leave time at the end of a calendar year may be carried over to future calendar years.

6.      Expense Reimbursement.  Employee will be entitled to reimbursement for reasonable business expenses incurred by Employee in connection with the performance of Employee's services under this Agreement, upon Employee's compliance with the reasonable expense reimbursement instructions, policies, and rules that the Company may establish from time to time.

All payments and other benefits will be subject to and will be paid net of all required foreign, federal, state and local withholdings.

Notwithstanding any other provision of the Employment Agreement, the Company shall have the right, after consulting with and securing the approval of Employee, to provide for the application and effects of Section 409A of the Code (relating to deferred compensation arrangements) and any related administrative guidance issued by the Internal Revenue Service such that the amounts paid under this Agreement shall not trigger the additional tax, interest, and any related penalties imposed by Section 409A(1)(B) of the Code.  The Company shall have the authority to delay the payment of any amounts under this Agreement to the extent it deems necessary or appropriate to comply with Section 409A(a)(2)(B)(i) of the Code (relating to payments made to certain "key employees" of publicly-traded companies); in such event, the payment(s) at issue may not be made before the date which is six (6) months after the date of Employee's separation from service, or if earlier, the date of death.

A-2

Exhibit 1 page 12

# EMPLOYMENT AGREEMENT

EMPLOYMENT AGREEMENT is dated effective as of ___9-24___, 2014 (the "Effective Date"), between EARTH CLASS MAIL CORPORATION, an Oregon corporation (the "Company"), and STACEY LEE ("Employee")

## RECITALS

A.     Employee is currently employed as the Chief Financial Officer of the Company.

B.     The Company has determined that this Agreement will help to reinforce and encourage the Employee's continued attention and dedication to the Company.

C.     The Employee is willing to continue to make his services available to the Company on the terms and conditions hereinafter set forth.

## AGREEMENT

NOW, THEREFORE, for and in consideration of the foregoing premises and mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## SECTION 1.  NATURE OF EMPLOYMENT

### 1.1     Title; Duties

The Company hereby employs Employee on a full-time basis as Chief Financial Officer in accordance with the terms of this Agreement.  During the term of Employee's employment under this Agreement, Employee will report to the Board and will perform such duties and exercise such powers, authorities and discretions in relation to the Company as are applicable to the title of Chief Financial Officer, and/or as may otherwise be established by, and subject always to the discretion and control of, the Board of Directors.  The Board may at any time require Employee to cease performing or exercising any particular power, authority or discretion delegated to Employee.

### 1.2     Attention to Business; Loyalty

Employee accepts such employment, agrees to abide by the decisions of the Board, and acknowledges and agrees that Employee will (a) will devote Employee's full time and attention to the performance of Employee's duties under this Agreement, (b) comply with the reasonable instructions, policies, and rules that the Company may establish from time to time, and (c) discharge Employee's duties to the best of Employee's ability, in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner Employee reasonably believes to be in the best interests of

the Company. Employee agrees and understands that Employee owes the Company fidelity and loyalty during the term of this Agreement and will not perform similar duties in any other capacity for any other person or entity, or otherwise engage in any outside professional, business, or charitable activities that would materially interfere with the performance of Employee's duties under this Agreement, in any case, without the prior written consent of the Board.

## SECTION 2. COMPENSATION AND BENEFITS

During the term of this Agreement, Employee shall be compensated solely in accordance with the terms of Schedule A hereof (the "Compensation Package"). If Employee, during the term of this Agreement, receives any compensation in excess of the Compensation Package, the payment of such increased compensation shall not be deemed to be an amendment to this Agreement and may be discontinued at any time without cause.

## SECTION 3. TERM OF AGREEMENT AND TERMINATION

### 3.1 Term

The initial term of this Agreement shall be for a period of one (1) year commencing on the date first set forth above, which term shall, unless sooner terminated in the manner provided herein, automatically renew for additional one (1)-year terms on an annual basis thereafter unless terminated in writing by either party not later than 90 days prior to the end of the then current term (the "Term"). Unless otherwise agreed in writing by the parties, any further employment with the Company following the expiration of the Term of this Agreement will be on an at-will basis and may be terminated by either party at any time with or without cause, in any case, subject to the terms of Section 3.2 below with regard to any termination of Employee without cause.

### 3.2 Termination by the Company Without Cause; Acquisition of the Company

(a) **Termination by the Company**. The Company may terminate Employee's employment, and this Agreement, without cause at any time upon ten (10) days prior written notice to Employee. In such event, unless (i) the Board determines that such termination is occurring in connection with a wind down of the Company, or (ii) the termination occurs in connection with an Acquisition of the Company in connection with which Employee is hired by the acquiring entity (or an affiliate thereof), Employee will be entitled to receive (A) severance payments in an amount equal to Employee's then current Base Salary amount, and payable on the applicable dates that such Base Salary would be payable to Employee following the date of such termination ("Severance Payments"), and (B) to the extent properly (and timely) elect COBRA continuation coverage under the Company's group health plans, reimbursement for the cost of the premiums for such coverage paid by Employee (not to exceed the amount being paid by the Company for Employee's health insurance as of the date of termination) ("COBRA Payments"), in each case, for a period of six (6) months after

Case 15-30982-tmb11    Doc 64    Filed 04/15/15

the date of termination, provided that such COBRA Payments shall end effective on the date Employee becomes eligible for health insurance through a subsequent employer.

(b) **Termination by Acquiring Entity**. If following an Acquisition of the Company Employee is hired by the acquiring entity (or an affiliate thereof) and is thereafter terminated without Cause prior to the later of (i) the first anniversary of the date of this Agreement, or (ii) the datethat is six (6) months after the date of the Acquisition of the Company, Employee will be entitled to receive (A) Severance Payments in an amount equal to Employee's Base Salary amount immediately prior to the date of closing of such Acquisition, and payable on the applicable dates that such Base Salary would be payable to Employee following the date of such termination ("Severance Payments"), and (B) to the extent properly (and timely) elect COBRA continuation coverage under the Company's group health plans, reimbursement for the cost of the premiums for such coverage paid by Employee (not to exceed the amount being paid by the Company for Employee's health insurance as of the date of termination) ("COBRA Payments"), in each case, up to the later of (1) the first anniversary of the date of this Agreement, or (2) the date this is six (6) months after the date of the Acquisition of the Company, provided that such COBRA Payments shall end effective on the date Employee becomes eligible for health insurance through a subsequent employer. For purposes of this Agreement, the term "Acquisition of the Company" means (i) an acquisition of the Company by another entity by means of merger, consolidation, statutory share exchange or other transaction or series of related transactions resulting in the exchange of the outstanding shares of the Company for securities of or consideration issued, or caused to be issued, by the acquiring entity or any of its affiliates, or (ii) the Company's sale, lease or other disposition of all or substantially all of its assets; provided that, in either case, after such transaction the shareholders of the Company immediately prior to such transaction own less than a majority of the outstanding voting equity securities of the surviving or transferee entity immediately following such transaction, and in any case unless such transaction occurs in connection with a wind down of the Company. Furthermore, a voluntarily termination of employment by Employee after an Acquisition of the Company shall be deemed to constitute a termination of Employee without cause under this Section 3.2(b) if within 60 days prior to Employee's voluntary termination one of the following events has occurred: (i) a reduction in Employee's Base Salary, unless such reduction applies generally to the class of employees of which Employee is a part; (ii) a material reduction in the kind or level of non-monetary benefits Employee is entitled to receive, unless such reduction applies generally to the benefits class of which Employee is a part; (iii) a material reduction in Employee's duties and responsibilities; or (iv) a forced relocation of Employee's principal workplace to a location more than 25 miles outside of the Portland metropolitan area and which causes an unreasonable burden upon Employee; provided that none of the foregoing will be deemed a "termination of the Employee by the Company without cause" unless (A) Employee notifies the acquiring entity in writing of Employee's assertion that such action constitutes grounds for Employee to terminate her employment under this Section 3.2(b), which notice shall be delivered within 30 days after Employee becomes aware of such action, and (B) such entity fails to reverse such action or to otherwise remedy the matter in a manner reasonably acceptable to Employee within 30 days after receipt of such written notice.

(c)     The Company's obligations to make the foregoing Severance Payments and COBRA Payments, if any, together with any Management Carveout Plan bonus that may be payable to Employee, are expressly conditioned upon Employee's compliance with the terms of this Agreement (including, without limitation, Section 4 below), and any other agreements Employee may have with the Company, and upon Employee's execution of a severance agreement and a valid waiver and release of claims against the Company (and acquiring entity, if applicable), and their affiliates in form and substance satisfactory to the Company. Furthermore, the foregoing Severance Payments and COBRA Payments, if any, together with any Management Carveout Plan bonus that may be payable to Employee, shall constitute the full liquidated damages to which Employee shall be entitled as an employee of the Company. Employee agrees that, as an employee, Employee will not be entitled to any other remedy at law or in equity, including, without limitation, general, special, punitive or exemplary damages and/or injunctive relief.  Notwithstanding the foregoing, after such notification is given and through the end of the ten (10)-day notice period, Employee shall, if requested by the Company, continue to render the services required under this Agreement.

### 3.3     Termination by Employee Without Cause

Employee may terminate Employee's employment, and thus this Agreement, upon thirty (30) days prior written notice to the Company.  In such event, after such notification is given and through the end of the thirty (30)-day notice period, Employee, if requested by the Company, will continue to render the services required under this Agreement and will be compensated in accordance with the Compensation Package then in effect, up to the date of termination.  Employee shall not be entitled to any Severance Payments, Management Carve-Out Plan or other bonus payment or any other payments upon or following such termination.

### 3.4     Termination With Cause

(a)     The Company may terminate Employee's employment, and thus this Agreement, for "Cause" at any time upon written notice of such termination to Employee. For purposes of this Agreement, "Cause" shall mean Employee's (i) failure or refusal to observe or perform any duty or obligation of Employee under this Agreement or any other agreements entered into by Employee with the Company, (ii) failure to comply with any policy or procedure of the Company currently in effect or as may be adopted or modified by the Company from time to time, which failure adversely affects the Company in any material respect, (iii) commission of any act of fraud, misappropriation, embezzlement or theft, breach of fiduciary duty involving personal profit, or other acts of dishonesty, alcoholism, drug addiction or dependency, (iv) conviction of, or guilty plea or plea of nolo contendere to, any crime of moral turpitude or crime punishable as a felony, (v) gross negligence or willful misconduct in connection with or related to the business of the Company; (vi) gross neglect of duties and responsibilities to the Company, including, without limitation, material deviation from the business plan adopted in good faith by the Board; or (vii) commission of any other action that could reasonably be expected to have a material adverse effect upon such individual's ability to perform Employee's duties, or other actions or occurrences that otherwise adversely affect the interests of the Company; provided, that prior to terminating Employee in accordance with (i), (ii), (v), (vi) or (vii) above, Company shall first have

notified such individual in writing of such breach and, if such breach is capable of being cured, given such individual thirty (30) days to cure the breach.

(b)    If Employee's employment is terminated for Cause in accordance with this Section 3.4, Employee's right to compensation and benefits set forth on Schedule A shall immediately terminate and/or cease to accrue and Employee shall have no right to Severance Payments, Management Carve-Out Plan or other bonus payment(s) or any other payments or benefits; provided, that the Company will pay Employee for all accrued and unpaid salary and benefits payable under this Agreement to such date of termination. In addition, termination of Employee's employment for Cause will not terminate or extinguish Employee's obligation or liability to pay to the Company any amounts owed by Employee, including, without limitation, any amounts misappropriated or obtained by Employee by reason of any of the occurrences referred to in this Section 3.4, without prejudice to any other rights or remedies of the Company at law or in equity.

### 3.5    Termination upon Death of Employee

This Agreement will automatically terminate in the event of Employee's death. Upon such termination, the Company will pay Employee's estate or beneficiaries, all accrued and unpaid salary and benefits in accordance with the terms of the Compensation Package as then in effect through the date on which Employee's death occurs.

### 3.6    Termination upon Total Disability of Employee

In the event of Employee's "Total Disability," which shall be defined as any illness or mental or physical incapacity or disability which prevents Employee from performing Employee's normal duties for a continuous period exceeding six (6) months or for shorter periods aggregating six (6) months within any consecutive twelve (12) month period (in any case, even after reasonable accommodation), the Company may terminate Employee's employment under this Agreement (subject to the terms of the Americans with Disabilities Act and other applicable laws). Upon such termination, Employee, or Employee's estate, will be paid all accrued and unpaid salary and benefits in accordance with the terms of the Compensation Package as then in effect through the date on which such termination occurs.

### 3.7    Effect of Termination

If this Agreement is terminated for any of the reasons set forth in this Section 3, Employee will be subject to all restrictions provided for in Section 4 of this Agreement. The provisions of Sections 3, 4, and 5 will survive the termination or expiration of this Agreement.

### 3.8    Section 409A

The Company makes no representations or warranties to Employee with respect to any tax, economic or legal consequences of this Agreement or any payments or other benefits provided hereunder, including without limitation under Section 409A of the Internal Revenue Code of 1986, as amended, and any regulations or guidance issued thereunder

("Section 409A"), and no provision of the Agreement shall be interpreted or construed to transfer any liability for failure to comply with Section 409A from Employee or any other individual to the Company or any of its affiliates. However, the parties intend that this Agreement and the payments and other benefits provided hereunder be exempt from the requirements of Section 409A to the maximum extent possible, whether pursuant to the short-term deferral exception described in Treasury Regulation Section 1.409A-1(b)(4), the involuntary separation pay plan exception described in Treasury Regulation Section 1.409A-1(b)(9)(iii), or otherwise. To the extent Section 409A is applicable to this Agreement (and such payments and benefits), the parties intend that this Agreement (and such payments and benefits) comply with the deferral, payout and other limitations and restrictions imposed under Section 409A. Without limiting the generality of the foregoing, and notwithstanding any other provision of this Agreement to the contrary, with respect to any payments and benefits under this Agreement to which Section 409A applies, all references in this Agreement to the termination of Employee's employment are intended to mean Employee's "separation from service," within the meaning of Section 409A(a)(2)(A)(i). Each installment of any severance payments and severance benefit, as applicable, shall be treated as a separate "payment" for purposes of Section 409A.

## SECTION 4. PROPRIETARY INFORMATION, INVENTION ASSIGNMENT, NON-COMPETITION AND NON-SOLICITATION AGREEMENT

Employee acknowledges and agrees that Employee entered into a Proprietary Information, Invention Assignment, Non-Competition and Non-Solicitation Agreement (the "Confidentiality Agreement") with the Company prior to or concurrently with the commencement of Employee's employment with the Company and that Employee is, and will continue to be, bound by the terms of such Confidentiality Agreement during the term of Employee's employment with the Company and thereafter.

## SECTION 5. General Matters

### 5.1 Compliance With Other Agreements

Employee represents and warrants that the execution, delivery and performance of this Agreement will not conflict with or result in the violation or breach of any term or provision of any order, judgment, injunction, contract, agreement, commitment or other arrangement to which Employee is a party or by which he is bound. Employee acknowledges that the Company is relying on his representation and warranty in entering into this Agreement, and Employee agrees to indemnify the Company from and against all claims, demands, causes of action, damages, costs or expenses (including, without limitation, reasonable attorneys' fees) arising from any breach thereof.

### 5.2 Governing Law

This Agreement shall be governed by, and construed in accordance with, the laws of the State of Oregon applicable to contracts made and to be wholly performed in Oregon by persons domiciled in Oregon, without regard to principles of conflict of laws.

### 5.3 Binding Effect

This Agreement will be binding upon and inure to the benefit of Employee and the Company and their respective permitted successors, heirs and assigns.

### 5.4 Entire Agreement; Amendments in Writing

This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and thereof and supersedes all prior agreements and undertakings, both written and oral, among the parties, or any of them, with respect to the subject matter hereof and thereof. No amendment, modification, waiver, termination or discharge of any provision of this Agreement, or any consent to any departure by the parties from any provision hereof, shall in any event be effective unless the same shall be in writing and signed by the parties, and each such amendment, modification, waiver, termination or discharge shall be effective only in the specific instance and for the specific purpose for which given. Notwithstanding the foregoing, the parties further agree that if a judicial or quasi-judicial entity declares the agreement invalid in whole or in part, it may modify the terms of the Agreement to give effect to the Agreement as modified.

### 5.5 Text to Control

The captions and headings of this Agreement are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

### 5.6 Reformation

The provisions and covenants contained herein are intended to be separate and divisible and if, for any reason, any one or more of such provisions or covenants should be held to be invalid and unenforceable in whole or in part, it is agreed that the same will not be held to affect the validity or enforceability of any other provisions and covenants of this Agreement. In the event that any restriction set forth in this Agreement is determined by a court to be unenforceable with respect to scope, time or geographical coverage, Employee agrees that such a restriction should be modified and narrowed so as to provide the maximum protection of the Company's and the Company's legally protectable interests as described in this Agreement, and without negating or impairing any other restrictions or agreements set forth herein.

### 5.7 Reasonableness

Employee acknowledges that Employee has carefully read this Agreement and has given careful consideration to the restraints imposed upon Employee by this Agreement, and

Case 15-30982-tmb11    Doc 64    Filed 04/15/15

is in full accord as to their necessity for the reasonable and proper protection of the Company's confidential and proprietary information. Employee expressly acknowledges and agrees that each and every restraint imposed by this Agreement is reasonable with respect to subject matter, time period and geographical area, except for mutually agreed upon modifications to this Agreement.

### 5.8    Notices

All notices, requests, demands, consents, approvals, declarations and other communications required by this Agreement shall be in writing, shall be in English and shall be deemed delivered (a) if given by facsimile, when transmitted and the appropriate telephonic confirmation received, (b) if given by first-class air mail (certified and return-receipt requested), when delivered, (c) if given personally, when delivered, and (d) if given by an internationally recognized overnight courier, when received or personally delivered, in each case, with all charges prepaid and addressed as follows, or to such other address as any party shall specify in a notice delivered to all other parties in accordance with this Section 5.8:

**If to Employee**:

at the address of Employee set
forth on the signature page hereto.

**If to the Company to**:

Earth Class Mail Corporation
9450 SW Gemini Drive #101
Beaverton, OR 97008-7105
Facsimile: (503) 914-1487
Attention: CFO

**with a copy to**:

Perkins Coie LLP
1120 NW Couch Street, 10th Floor
Portland, OR 97209
Facsimile: 503-727-2222
Attention: Brentley M. Bullock

### 5.9    Assignment; Third Party Beneficiary

This Agreement shall be binding upon, and shall inure to the benefit of, the parties and each of their respective successors, heirs and assigns. Notwithstanding the foregoing, Employee may not assign or delegate any right or duty hereunder without the prior written consent of the Company. The Company may assign this Agreement and all rights hereunder, and delegate all duties hereunder, to any party with which or into which the Company merges

Case 15-30982-tmb11    Doc 64    Filed 04/15/15

or consolidates, or to whom the Company may sell all or substantially all of the Company's assets.

### 5.10  Survival of Obligations and Provisions

The parties acknowledge and agree that the provisions under Sections 3, 4, and 5 survive the termination or expiration of this Agreement as well as the termination of Employee's employment relationship with the Company.

### 5.11  WAIVER OF JURY TRIAL

THE PARTIES HEREBY WAIVE, TO THE MAXIMUM EXTENT PERMITTED BY LAW, ANY RIGHTS TO TRIAL BY JURY AND AGREE NOT TO REQUEST A TRIAL BY JURY ON ANY CLAIMS, COUNTERCLAIMS OR CROSS-CLAIMS.

### 5.13  Execution in Counterparts; Facsimile

This Agreement may be executed in any number of counterparts, each of which, when so executed and delivered, shall be deemed to be an original, and all of which, taken together, shall constitute one and the same instrument.  Delivery of an executed signature page to this Agreement or any amendment, waiver, consent or supplement hereto or thereto, by facsimile transmission shall be as effective as delivery of a manually signed counterpart hereof.

[This space intentionally left blank]

IN WITNESS WHEREOF, the parties have duly executed and delivered this EMPLOYMENT AGREEMENT effective as of the Effective Date.

**EARTH CLASS MAIL CORPORATION**

By: _James L. Wilson_

Name: James L. Wilson

Title: President & COO

**EMPLOYEE:**

_Stacey L. Lee_

STACEY LEE

Address:     2010 SW Vacuna St.
             Portland, OR 97219

## SCHEDULE A

## COMPENSATION PACKAGE

     1.     <u>Salary</u>. During the Term, the Company will pay Employee a base salary ("Base <u>Salary</u>") of US $142,800 per annum (US $11,900 per month), payable in bi-weekly installments, or more frequently at the Company's discretion. All payments will be subject to and will be paid net of all required foreign, federal, state and local withholdings.

     2.     <u>Bonus</u>. In addition to the Salary, during the Term, the Board will review management's performance on a semi-annual basis and may award a bonus to Employee (and/or other employees of the Company), in such amounts, if any, as the Board may determine in its sole discretion. Unless otherwise provided by the Board, no Bonus shall be payable to Employee with respect to any period unless Employee is in the employ of Company on the date of the payment of such Bonus.

     3.     <u>Management Carveout Plan Allocation</u>. Employee will be entitled to an allocation of a portion of the Management Carveout Plan to be approved by the Board in an amount equal to 45% of the total bonus amount payable under the Management Carveout Plan. Employee's rights with respect to the foregoing bonus amount allocation will at all times be subject to the terms of the Management Carveout Plan as approved by the Board.

     Notwithstanding any requirement in the Management Carveout Plan that an employee must be employed by the Company on the date the Company is sold acquisition in order to be entitled to participate in any related bonus payable under the Plan, if Employee is terminated by the Company without "Cause" prior to a transaction in which a bonus amount is payable to participants under the Management Carveout Plan (a) if such termination of Employee occurs within the 90-day period prior to the closing of such transaction, Employee will be entitled to participate in the Management Carveout Plan to the extent of 100% of her percentage allocation, and (b) if such termination of Employee occurs within the 91- to 180-day period prior to the closing of such transaction, Employee will be entitled to participate in the Management Carveout Plan to the extent of 50% of her percentage allocation. If such transaction occurs more than 180 days after such termination, Employee will not be entitled to share any portion of amounts that may be payable under the Management Carveout Plan.

     4.     <u>Medical Insurance, Retirement and Other Benefits</u>. During the Term, Employee will be entitled to participate, to the extent Employee qualifies under the terms thereof, in any employee benefit plans, including medical and life insurance and retirement plans generally made available to employees, in any case, as specified in the Company's Employee Handbook and other compensation and benefit communications, as the same may be amended from time to time in the Company's sole discretion.

LEGAL123575536.1

5.     Leave.  During the Term, Employee will be entitled to paid leave in accordance with Company's policies and practices.  A maximum of [25] days of unused leave time at the end of a calendar year may be carried over to future calendar years.

6.     Expense Reimbursement.  Employee will be entitled to reimbursement for reasonable business expenses incurred by Employee in connection with the performance of Employee's services under this Agreement, upon Employee's compliance with the reasonable expense reimbursement instructions, policies, and rules that the Company may establish from time to time.

All payments and other benefits will be subject to and will be paid net of all required foreign, federal, state and local withholdings.

Notwithstanding any other provision of the Employment Agreement, the Company shall have the right, after consulting with and securing the approval of Employee, to provide for the application and effects of Section 409A of the Code (relating to deferred compensation arrangements) and any related administrative guidance issued by the Internal Revenue Service such that the amounts paid under this Agreement shall not trigger the additional tax, interest, and any related penalties imposed by Section 409A(1)(B) of the Code.  The Company shall have the authority to delay the payment of any amounts under this Agreement to the extent it deems necessary or appropriate to comply with Section 409A(a)(2)(B)(i) of the Code (relating to payments made to certain "key employees" of publicly-traded companies); in such event, the payment(s) at issue may not be made before the date which is six (6) months after the date of Employee's separation from service, or if earlier, the date of death.

A-2

# CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2015, I served a copy of the foregoing UNITED STATES TRUSTEE'S OBJECTION TO ASSUMPTION OF EMPLOYMENT AGREEMENTS AND MANAGEMENT CARVE OUT PLAN by mailing a copy of this document, by United States first-class mail, postage prepaid, addressed to the following:

Earth Class Mail Corporation
9450 SW Gemini Drive, No. 101
Beaverton, OR 97008

Frank T. Pepler
DLA PIPER LLP
555 Mission St #2400
San Francisco, CA 97105

GAIL BREHM GEIGER
Acting United States Trustee for Region 18


/s/ M. Vivienne Popperl
M. Vivienne Popperl, OSB #853055
Trial Attorney